---

## Ex Parte Bird.

### Application for a Writ of Habeas Corpus.

No. 29.—Decided March 15, 1904.

Liberty of the Press.—The first amendment to the Constitution of the United States guarantees the freedom of the press, but not an unbounded license to publish whatever may be thought fit with respect to persons, public officials or judges of the courts in their public or private capacity.

Insult to Authorities—American Institutions.—The provisions contained in article 265 of the Spanish Penal Code, which defines and punishes the crime of

el delito de injurias á la autoridad, no son incompatibles con el espíritu de las instituciones de carácter americano.

Id.—Delito de Caracter Infamante.—El delito de injurias á la autoridad, no es de carácter infamante, pues no se castiga con pena corporal, sino con pena correccional, y como ésta se cumple en la Cárcel, tal delito es un misdemeanor, y solamente los delitos calificados de felony pueden tener tal carácter.

Gran Jurado.—Tribunales Insulares.—Las disposiciones del Artículo 5 de las enmiendas á la Constitución de los Estados Unidos no tienen aplicación á los Tribunales Insulares, en los que no es necesaria la acusación de un Gran Jurado para que en ellos pueda declararse culpable á un acusado.

Juicio por Jurado.—Si un acusado no solicitare á su debido tiempo el juicio por jurado, se entenderá que renuncia á él, y tal juicio solo puede concederse en casos de felony.

Habeas Corpus.—Nombramiento de Jueces.—Juez de Facto.—Se presume que el nombramiento de un Juez que esté actuando regularmente en un Tribunal ha sido hecho con las formalidades legales, pero en todo caso, la legalidad ó ilegalidad de tal nombramiento no puede ser investigada en un procedimiento de Habeas Corpus, y aún en el caso de que no hubiera sido legalmente nombrado, tendría el carácter de *Juez de facto*, y como tal sus resoluciones serían válidas y no podrían ser atacadas colateralmente por Habeas Corpus.

Codigo de Enjuiciamiento Criminal.—Codigo Penal.—Delitos Cometidos con Anterioridad a Julio 1, 1902. Los nuevos Códigos Penal y de Enjuiciamiento Criminal, que empezaron á regir en Julio 1, 1902, no tienen aplicación á actos ó delitos cometidos con anterioridad á esa fecha.

Leyes in Pari Materia.—Las leyes *in pari materia* deben ser interpretadas conjuntamente, armonizándolas, si es posible, y en forma tal que no resulte incompatible con los principios generales de derecho.

Constitucion de los Estados Unidos.—Territorios.—Para que la Constitución de los Estados Unidos se entienda vigente en un Territorio es necesaria una Ley del Congreso que así lo disponga, ó que sus beneficios se hagan extensivos á tal Territorio por otros Departamentos del Gobierno y que el Congreso tácitamente consienta en ello, lo que no ha tenido lugar con respecto á Puerto Rico.

Habeas Corpus.—Jurisdiccion sobre la Persona del Acusado y sobre el Delito.—En los casos en que apareciere que el Tribunal tuvo jurisdicción sobre la persona del acusado y sobre el delito de que fué acusado, la solicitud de excarcelación por Habeas Corpus deberá desestimarse.

Id.—Objeto del Auto de Habeas Corpus.—El objeto del auto de Habeas Corpus es librar al peticionario de prisión ilegal, pero tal procedimiento no puede utilizarse á los efectos de una apelación ó de un recurso por causa de error.

Los hechos están expresados en la opinión.

Abogados del peticionario: *Sres. Dexter y Hernández Usera.*

Abogado del Pueblo: *Sr. del Toro* (Fiscal).

insult to authorities, are not incompatible with the spirit of American institutions.

Id.—Crime of an Infamous Character.—The crime of insult to authorities is not of an infamous character, since it is not punishable by a corporal penalty but by a correctional penalty, and as the same is served in jail, such offense is a misdemeanor, and only crimes defined as felonies may have such character.

Grand Jury—Insular Courts.—The provisions of article V of the amendments to the Constitution of the United States are not applicable to the insular courts, in which the indictment of a grand jury is not necessary in order to find the accused guilty.

Trial by Jury.—If the accused person does not demand a trial by jury in due time, it shall be understood that he waives the same and such a trial can only be granted in cases of felony.

Habeas Corpus—Appointment of Judges—Judge de Facto.—It is presumed that the appointment of a judge who is regularly acting in a court has been made with legal formalities, but in any event the legality or illegality of such appointment cannot be inquired into on *habeas corpus* proceedings, and even in the case in which he has not been legally appointed he shall be considered as a judge *de facto,* and as such his decisions would be considered valid and could not be collaterally attacked on *habeas corpus.*

Code of Criminal Procedure—Penal Code—Crimes Committed Prior to July 1, 1902.—The new Penal Code and the Code of Criminal Procedure, which went into effect on July 1, 1902, are not applicable to acts or crimes committed prior to that date.

Laws in Pari Materia.—Laws *in pari materia* should be construed together, harmonizing them, if possible, and in such manner that they are not incompatible with the general principles of law.

Constitution of the United States—Territories.—In order that the Constitution of the United States may be considered as in force in a territory, an act of Congress so providing is necessary, or that the benefits thereof are made extensive to such territory by other departments of the Government, and that Congress tacitly consents thereto, which has not taken place with respect to Porto Rico.

Habeas Corpus—Jurisdiction Over the Person of the Accused and Over the Crime.—In cases in which it appears that the court has jurisdiction over the person of the defendant and over the crime of which he is accused, the petition for his discharge upon *habeas corpus* should be dismissed.

Id.—Object of the Writ.—The object of the writ of *habeas corpus* is to deliver the petitioner from illegal restraint, but such proceeding cannot be availed of for the purpose of an appeal or a writ of error.

The facts are stated in the opinion.

*Messrs. Dexter* and *Hernández Usera,* for the petitioner.

*Mr. del Toro, Fiscal,* for the People.

Mr. Justice MacLeary delivered the following opinion of the court:

El Juez Asociado Sr. MacLeary emitió la siguiente opinión del Tribunal:

El día cuatro del corriente mes, Hobart S. Bird presentó una solicitud al Honorable José S. Quiñones, Juez Presidente de la Suprema Corte, para un auto de *habeas corpus,* alegando que había sido arrestado en dicha fecha, por un oficial de la Corte de Distrito de San Juan, y detenido en custodia, de acuerdo con cierto mandamiento expedido por dicho Tribunal de Distrito, bajo una sentencia dictada por la Corte Suprema de Puerto Rico, en 27 del mes de Febrero próximo pasado, en la causa de El Pueblo de Puerto Rico contra Hobart S. Bird, y acompañando á la citada solicitud, copia de dicha sentencia. El Juez Presidente expidió el auto solicitado, y mandó que se viera la causa ante el Tribunal en pleno, en 6 del presente mes, y de acuerdo con la súplica del demandado, se señaló el día 12 del mismo mes, para la vista, siendo el acusado puesto en libertad bajo fianza durante este intervalo. En la vista habida se discutió el caso para resolverlo hoy.

El peticionario alegó que estaba ilegalmente detenido y privado de su libertad por José Berrios, Alcaide de la prisión "La Cárcel", que corresponde á la cárcel del condado, en Puerta de Tierra, un barrio de San Juan, con violación de la Constitución de los Estados Unidos, y las leyes de los mismos, consignando los siguientes fundamentos:

"1. El Sr. Bird ha sido enjuiciado por infringir el Artículo 265 del Código Penal, vigente en Puerto Rico al tiempo de la ocupación americana y que el Congreso de los Estados Unidos, en su Ley Orgánica de 12 de Abril de 1900, Sección 8, declaró vigente y con fuerza legal en Puerto Rico.

Dicho Artículo 265 al tiempo de la comisión de este delito por el Sr. Bird, era absolutamente nulo y sin fuerza legal, por ser incompatible con las instituciones americanas y, porque el mismo no era aplicable al caso que servía de base á este proceso.

2. El Artículo 265, ameritado, hacía la ofensa prescrita en él "un crímen infame" (infamous crime) y lo castigaba con arresto mayor.

On the 4th of this month Hobart S. Bird made application to Hon. José S. Quiñones, Chief Justice of the Supreme Court of Porto Rico, for a writ of *habeas corpus,* alleging that he had been arrested on said date by an officer of the District Court of San Juan and detained in custody, in accordance with a certain commitment issued by the said district court, under a judgment of the Supreme Court of Porto Rico rendered on the 27th of February previous, in the case of the *People of Porto Rico* v. *Hobart S. Bird,* attaching a copy of the said judgment to his application. The Chief Justice granted the writ making it returnable before the full bench on the 6th instant, and at the request of the applicant the hearing was set for the 12th, he being in the meantime released on bail. On the hearing the case was taken under advisement until to-day.

Petitioner alleged that he was unlawfully detained and deprived of his liberty by José Berríos, warden of the prison la "Cárcel," corresponding to the court jail, in Puerta de Tierra, a suburb of San Juan, in violation of the Constitution of the United States, and the laws thereof, setting forth the following grounds:

"1. Defendant was prosecuted under section 265 of the Penal Code of Porto Rico in force in Porto Rico at the time of the American occupation, and which by the express enactment of the Congress of the United States, *i. e.,* the Organic Act of April 12, 1900, and particularly section 8 thereof, was applied to Porto Rico and continued in full force and effect therein.

"That said article 265 at the time of the commission of the alleged offense by the defendant was absolutely null and void, being incompatible with the institutions of the American Government, and because it did not apply to the case of circumstances which were made the basis of this proceeding against defendant.

"2. That said article 265 made the offense described therein an 'infamous crime,' punishable by *arresto mayor.*

Por esta razón, el denunciado no debía haber sido procesado sino prévia la presentación de acusación por el Gran Jurado.

3. Al denunciado Sr. Bird se le negó el derecho de ser juzgado por un Pequeño Jurado, como está garantizado por la Constitución de los Estados Unidos.

4. Los procedimientos de la Corte de Distrito no fueron procedimientos legales, tales como los define y prescribe la Constitución de los Estados Unidos.

5. En el acto del juicio oral, la Corte de Distrito estaba ilegalmente constituida, pues según los preceptos de la Sección 33 de la Ley del Congreso, de Abril 12 de 1900, llamada la Ley Orgánica, los Jueces de las Cortes de Distrito deben ser nombrados por el Gobernador, con la anuencia y consentimiento del Consejo Ejecutivo. Según consta en los autos, cuando el Sr. Bird fué juzgado y sentenciado en la Corte de Distrito, uno de sus Jueces, el Sr. Morera, se inhibió del conocimiento de la causa, y fué sustituido por el Sr. Don Angel García Veve, nombrado por el Gobernador Juez Especial de Corte de Distrito, pero no consta que su nombramiento haya sido aprobado por el Consejo Ejecutivo, ni que el puesto del Sr. Morera esté vacante por su muerte, renuncia, ó por haber expirado el tiempo de su nombramiento. Por esta razón, todos los procedimientos de la Corte de Distrito, y con posterioridad, los del Tribunal Supremo, fueron ejecutados sin tener competencia para ello.

6. Los procedimientos por los cuales el denunciado fué sentenciado en la Corte de Distrito, no fueron legales, porque en los autos consta que el Sr. Bird fué acusado de la comisión de este delito el 13 de Febrero de 1902, y el segundo juicio, en el cual fué sentenciado, fué celebrado en Octubre de 1903.

El 1o. de Julio de 1902, la nueva Ley de Enjuiciamiento Criminal empezó á regir, y según consta de los autos, los procedimientos no estaban regulados por esta ley, excepto lo que se refiere á la contestación del denunciado en el acto del "arraigment" de no ser culpable y señalamiento del día para la celebración del juicio oral. No consta en los autos, que la acusación fuera presentada por el Fiscal en audiencia pública, y á nombre de El Pueblo de Puerto Rico, ni que estuviera formulada bajo juramento de que estaba basada en la declaración de testigos juramentados ante él. Tampoco expresa claramente los hechos constitutivos del delito como lo exige la ley, y por lo tanto, la sentencia de la Corte de Distrito es completamente nula.

7. El Sr. Bird tenía derecho á ser juzgado por Jurado, según lo

"For this reason defendant should not have been held to answer for the alleged offense except upon the presentment or indictment of a grand jury.

"3.   Defendant was denied the right of trial by a petit jury as guaranteed him by the United States Constitution.

"4.   The proceedings in the district court were not due process of law as provided for and understood in the Constitution of the United States.

"5.   In the trial of defendant in the district court the court was illegally constituted in this, that by the provisions of section 33 of the said act of Congress of April 12, 1900, i. e., the Organic Act, it is provided that the judges of the district courts shall be appointed by the Governor by and with the advice and consent of the Executive Council. It appears from the record herein that at the time defendant was tried and convicted in the said district court one of the regular members thereof, to wit, Judge Morera, declined to sit in the case, and thereupon he was substituted by Sr. Don Angel García Veve, who was appointed by the Governor as a special district court judge, but it does not appear that this nomination was approvd by the Executive Council, nor that the office of Judge Morera had become vacant by death, resignation, or legal termination of his appointment. For this reason all the proceedings had and held in the said district court and thereafter in the Supreme Court were without jurisdiction.

"6.   The proceedings under which defendant was convicted in the district court were not due process of law.   It appears from the records in this case that defendant was charged to have committed the alleged offense on the thirteenth day of February, 1902.   The second trial of defendant in which he was convicted occurred in October, 1903.

"On July 1, 1902, the new Law of Criminal Procedure took effect, and it appears from the records herein that no proceedings seem to have been taken under that law except the arraignment, pleading not guilty and setting the date for trial. It appears from the record that no information was filed herein against the defendant by the prosecuting attorney in open court in the name of the People of Porto Rico, and verified by his affidavit that the information was based upon the testimony of witnesses sworn before him.   The information or accusation herein does not clearly set forth an offense as required by law.   The judgment rendered by the district court was irregular and void.

"7.   Defendant was entitled to a jury trial in accordance with the

preceptúa el Capítulo 10 del Código Penal, que empezó á regir en 1º. de Julio de 1902.

8.   Al ser determinada esta causa por la Corte Suprema de Puerto Rico, ésta rehusó considerar los .preceptos legales infringidos, que no hubieran sido presentados por el Sr. Bird, á pesar de que con anterioridad á esta sentencia del Tribunal Supremo, ya éste había sido transformado por Ley de la Asamblea Legislativa de Puerto Rico, de 12 de Marzo de 1902, en Tribunal de Apelación con el deber de que en sus resoluciones, tanto en causas civiles como criminales, no se limitaría á considerar las infracciones de leyes, ó quebrantamientos de forma protestados por las partes, ó expuestos en sus alegatos y que constaran en los autos, sino que además podría, para impartir mejor justicia, conocer de todos los hechos y procedimientos en la causa, como constaran de los autos, y al mismo tiempo entrar en el fondo de la cuestión, para así administrar mejor justicia.

9.   La sentencia del Tribunal Supremo es nula por las razones ya expuestas.

Por lo cuál, el Tribunal Supremo, al dictar sentencia contra mi defendido, erró, causando así un perjuicio muy grande al denunciado, y perjudicándolo en sus derechos''.

El peticionario alega, además, que dicho arresto y detención fueron ilegales, á causa del mencionado procedimiento ilegal y nulo, y por no tener competencia la Corte de Distrito, ni el Tribunal Supremo, para conocer de la causa, por cuyas razones suplicó que se expidiera el auto de *habeas corpus* á su favor, y que se excarcelara.   Estos fundamentos se considerarán seriatim.

1.   El primero, que alega que el Artículo 265 del antíguo Código Penal, bajo el cuál el demandado fué convicto, fué absolutamente nulo, por ser incompatible con las instituciones americanas, y porque no era aplicable á los hechos, se considerarará primeramente.   Esta sección había sido la Ley de Puerto Rico por muchos años antes de la ocupación americana, y durante el Gobierno militar, y cuando se estableció el Gobierno Civil por la Ley del Congreso, aprobada en 12 de

provisions of chapter 10 of the Penal Code, which took effect July 1, 1902.

"8. In the determination of this case by the Supreme Court of Porto Rico the latter refused to consider any points of law or error except those presented by defendant or his attorney, although prior to such sentence and judgment of the Supreme Court the latter had been created by an act of the Legislative Assembly of Porto Rico, approved March 12, 1902, a court of appeals, which said act provided that in its deliberations and decisions in all cases, civil and criminal, said court shall not be confined to error in proceeding or of law only as are pointed out and saved by the respective parties to the suit or set forth in their briefs and exceptions, but in furtherance of justice the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof so as to promote justice and right and to prevent injustice and delay.

"9. The judgment and sentence of the Supreme Court is irregular and void for the various reasons above enumerated.

"By reason of all of which the Supreme Court erred in rendering judgment and sentence against defendant in said cause, greatly to the prejudice and contrary to the rights of the defendant."

Petitioner further alleged that said arrest and detention is unlawful because of the illegal and void proceedings mentioned, and because of the absence of jurisdiction of the cause upon the part of the District Court of San Juan and the Supreme Court of Porto Rico, for which reasons he prayed that a writ of *habeas corpus* might be issued in his favor, and that he might be discharged from imprisonment. These grounds will be considered seriatim.

1. The first claim alleging that article 265 of the old Penal Code under which defendant was convicted was absolutely null and void, being incompatible with the institutions of the American Government, and because it did not apply to the facts of the case, will be the first considered. This section had been the law of Porto Rico for many years previous to the American occupation, and all during the military government, and when civil government was established by the

Abril de 1900, continuó en vigor, por la Sección 8 de la Ley citada, la que, pasando en silencio los *"Disponiéndose"*, que no son aplicables al presente caso, dice lo que sigue:

"Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas ó modificadas por la presente; ó hayan sido alteradas ó modificadas por ordenes militares y decretos vigentes cuando esta ley entre á regir, y en todo aquello en que las mismas no resulten incompatibles ó en conflicto con las leyes estatutarias de los Estados Unidos no inaplicables localmente, ó con las presentes disposiciones, hasta que sean alteradas, enmendadas ó revocadas por la autoridad legislativa creada por la presente para Puerto Rico, ó por una ley del Congreso de los Estados Unidos".

No se pretende que esta ley hubiere sido alterada, enmendada ó modificada por ordenes ó decretos vigentes en 1 de Mayo de 1900, cuando empezó á regir la Ley Orgánica, ni se alega que este estatuto esté en conflicto ó sea inconsistente con los estatutos de los Estados Unidos, no inaplicables localmente, ó que esté en conflicto con las disposiciones de la Ley Orgánica, ni que ésta hubiese sido alterada, enmendada ó revocada por la autoridad legislativa de Puerto Rico. Se alega simplemente que semejante ley es incompatible con las instituciones del Gobierno americano. Atendido el argumento oral del abogado defensor del solicitante, es de presumirse que él considera esta ley en conflicto con la primera enmienda de la Constitución de los Estados Unidos, que garantiza la libertad de la prensa. Pero tal no es el parecer de este Tribunal. Dicho artículo de la Constitución dice lo que sigue:

"El Congreso no promulgará ninguna ley con respecto al establecimiento de una religión, ó prohibiendo el libre ejercicio de la misma; ó coartando la libertad de la palabra, ó de la prensa; ó el derecho del pueblo de reunirse pacíficamente y de dirigir peticiones al Gobierno, pidiendo la reforma de abusos".

Nosotros creemos, sin duda alguna, que nadie, bajo estas

act of Congress passed on the twelfth day of April, 1900, it was continued in force by section 8 of said act, which, omitting the provisions which do not apply to this case, reads as follows:

"That the laws and ordinances of Porto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereafter or as altered or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States."

It is not contended that this law had been altered, amended or modified by military orders or decrees in force on the 1st of May, 1900, when the Organic Act took effect, nor is it contended that this statute is inconsistent or in conflict with the statutory laws of the United States, not locally inapplicable, or in conflict with the provisions of the Organic Act, nor that the same has ever been altered, amended or repealed by the legislative authority of Porto Rico. It is simply alleged that such an act is incompatible with the institutions of the American Government.

The presumption arises from the oral argument of applicant's counsel that he considers this law to conflict with the first amendment to the Constitution of the United States, guaranteeing freedom of the press. But such is not the view taken by this court. That article of the Constitution reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

It is confidently believed that no one, under these provi-

disposiciones de la Constitución, aún si se sostuviera que está vigente en esta Isla, podría reclamar que por las mismas tendría derecho de publicar, á su capricho, cuanto le plugiera en cuanto á personas ó funcionarios, ó Jueces de los Tribunales en sus relaciones públicas ó particulares. En otras palabras, es la libertad de la prensa, y no la licencia desenfrenada, lo que se intenta protejer por esta disposición de la Constitución.

Este Tribunal consideró esta materia muy cuidadosamente en la causa de Julio Medina, que fué fallada en 26 de Marzo de 1902. En dicha causa se falló que en vista de que la Ley Penal, bajo la cual fué procesado el demandado, había sido revocada en virtud de una ley subsiguiente de la legislatura, que se consideró como un indulto legislativo, tendría que ponerse en libertad al acusado y anularse la sentencia dictada. Pero Medina no fué acusado de haber publicado un artículo injurisoso, ó de haber abusado de la libertad de imprenta. Los hechos de esa causa demuestran que el delito atribuido fué la publicación de un periódico sin haber obtenido préviamente una licencia de las autoridades municipales. Tal licencia era necesaria según la antígua ley española, la cuál, si bien no estaba en pugna con la Ley Orgánica de la Isla, fué revocada por una ley de la Asamblea Legislativa, decretada el 27 de Febrero de 1902, titulada "Ley definiendo derechos del Pueblo", y en su tercera sección preceptúa que no se coartará á nadie la libertad de la palabra y de la imprenta, y que toda persona en Puerto Rico tendrá la libertad de hablar, escribir ó publicar lo que le plazca sobre cualquier asunto, siendo responsable, sin embargo, de todo abuso en que incurra de esa libertad, y cuya ley entró en vigor inmediatamente después de su aprobación.

Ni del exámen de la ley, ni de la consideración de los argumentos aducidos por el letrado en el juicio, se advierte que éste Artículo 265 del Código Penal español sea, bajo ningún concepto, incompatible con las instituciones americanas, y

sions of the Constitution, even if it should be held to be in force on this island, could claim that he was thereby licensed to print any and everything which he might choose to publish in regard to persons or officers, or judges of courts in their public or private relations.

In other words, it is the liberty of the press, and not unbounded license, that is intended to be protected by this provision of the Constitution.

This court carefully considered this matter in the case of Julio Medina, which was decided on the 26th of March, 1902. It was decided in that case that, inasmuch as the penal law under which the defendant had been prosecuted had been abrogated by force of a subsequent act of the legislature, which was considered as a legislative pardon, that the defendant would have to be liberated, and the judgment rendered against him annulled. But Medina was not accused of publishing a libelous article, or of abusing the liberty of the press. The facts of his case show that the offense charged against him was publishing a newspaper without having previously secured a license from the municipal authorities. This was the old Spanish law, which was, if not in conflict with the Organic Law of the Island, repealed by an act of the Legislative Assembly, passed on the 27th of February, 1902, entitled "An act to define the rights of the People" and in its third article providing that liberty of speech and freedom of the press should not be abridged and that every person in Porto Rico should have the liberty of speaking and writing and publishing everything which he pleased, upon any subject whatever, being responsible, however, for all abuse of the said liberty, and which law went into force immediately upon its approval.

It is not perceived from an examination of the law itself, nor from a consideration of the arguments adduced by counsel on the trial, that this article 265 of the Spanish Penal Code is in any respect incompatible with American institutions,

dicho artículo ciertamente es aplicable á las circunstancias del caso, que· sirvieron de base á los procedimientos contra el procesado. Para hacer manifiesto ó patente esto, basta solamente leer la ley en relación con el artículo publicado y por el cuál fué convicto, y el que se expresa en el fallo de esta Corte, confirmando la sentencia del tribunal inferior.

2. La segunda pretensión del peticionario de que la ofensa descrita en el Artículo 265 del Código Penal, es un delito infame, y que por lo tanto, no debería estimarse al procesado por responsable del mismo, á no ser en virtud de una acusación hecha por un gran jurado, no puede considerarse como bien fundada. En primer término, el delito descrito y perseguido en el Artículo 265 del Código Español, penado con arresto mayor, no es un delito infame, pues no es de aquellos por los que en caso de convición podría aplicársele al acusado castigo corporal, sino simplemente una pena correccional.

Y este delito tampoco podría estimarse como infame bajo las disposiciones del nuevo Código Penal, si éste fuera aplicable al mismo, porque la distinción entre *felonies* y *misdemeanors* se demuestra claramente en la Sección 14 de dicha ley, la que á la letra dice:

"Felony" es un crímen castigado con la pena de muerte ó de presidio. "Misdemeanor" comprende todos los demás delitos".

Juzgado por esta ley, el delito del cuál fué convicto el peticionario, es claramente un *misdemeanor*, puesto que el castigo del mismo no puede exceder de seis meses de cárcel. Ningún delito que sea menos grave que un felony puede estimarse como delito infame, de acuerdo con las disposiciones de la quinta enmienda de la Constitución de los Estados Unidos.

No hay dificultad ninguna, hoy en día, para determinar cuales delitos son declarados infames bajo la quinta enmienda de la Constitución de los Estados Unidos. Esa cuestión, que ha sido discutida por mucho tiempo, fué resuelta definitiva-

and it certainly applies to the circumstances of the case, which were made the basis of the proceeding against the defendant. To make this evident it is only necessary to read the law in connection with the article which he is convicted of publishing and which is set out in the opinion of this court, affirming the sentence of the court below.

2. The second claim of the applicant, that the offense described in article 265 of the old Penal Code, is an infamous crime, and that therefore the defendant should not have been held to answer for it, except upon the presentment of an indictment by a grand jury, cannot be considered as well taken. In the first place the crime described and sought to be punished in article 265 of the Spanish Code by *arresto mayor* (greater imprisonment) is not an infamous crime, not being one on the conviction of which a defendant would be punished by a corporal penalty, but only punished by a correctional penalty.

Nor could this crime be considered infamous under the provisions of the new Penal Code, if such were applicable to it, because the distinction between felonies and misdemeanors is clearly drawn in section 14 of that act, which reads thus:

"A felony is a crime punishable with death or by imprisonment in the penitentiary. Every other crime is a misdemeanor."

Tried by this law, the crime of which the applicant was convicted is clearly a misdemeanor, since the only punishment which could be inflicted is not more than six months in the public jail. Nothing less than a felony can be considered an infamous crime under the provisions of the fifth amendment to the Constitution of the United States.

There is no difficulty at the present day in deciding what crimes are declared infamous under the fifth amendment to the Constitution of the United States. That question, which had been mooted for a long time, was forever set at rest by

mente por el Sr. Juez Gray, en la causa de Wilson, *ex-parte,* referida en 114 U. S. p. p. 425, 426. En aquella opinión clara el Tribunal Supremo dice:

"Pero por las razones arriba citadas, que se refieren al objeto y los términos de la primera disposición de la quinta enmienda, así como á la historia de su adopción, y á su' primitiva inteligencia y práctica bajo la misma, este Tribunal es de opinión que la capacidad del demandado, en el caso de que sea convicto, para servir como testigo en otra causa, no es una prueba verdadera; y que no puede hacerse responsable á ninguna persona, sin información ó acusación por un Gran Jurado, por ningún delito que se pueda castigar por la Corte con una pena infamatoria.

. La cuestión es, si el delito es uno de aquellos por el cual la Corte queda autorizada por los estatutos á castigar con una pena infamatoria, y no, si la pena que últimamente se imponga, lo es. Cuando el acusado se encuentra en el peligro de ser sometido á una pena infamatoria, si se le declarase culpable, él tiene el derecho de insistir que no se celebre el juicio, excepto bajo la acusación de un gran jurado.

Ni podemos acceder á la proposición, que algunas veces se ha mantenido, que ningún delito es infame en el sentido de la Quinta Enmienda, que no haya sido declarado por el Congreso. Véase *United States* contra *Wynn,* 3 McCrary, 266, and 11 Fed. Rep., 57; *United States* contra *Petit,* 11 Fed. Rep., 58; *United States* contra *Cross,* 1 McArthur, 149. El propósito de la enmienda fué limitar el poder de la Legislatura, así como el de los Fiscales de los Estados Unidos."

Se ha seguido uniformemente esta causa desde 1884, y entre otros, en los casos de los *United States* contra *Petit,* 114 U. S., 429, y *Mackin* contra *United States,* 117 U. S., 348. Véase también *Miller* on Constitution, p. 504 y 1 Rawles Bouvier's Dict., p. 1026.

El delito del cuál se declaró culpable al solicitante bajo el Artículo 265 del Código penal español, era punible con la pena de arresto mayor. Esta pena fué calificada como pena correccional bajo el Artículo 24 del Código Penal Español. Solamente las penas corporales corresponden, bajo dicho Código,

Mr. Justice Gray in the case of *Wilson, Ex parte,* reported in 114 U. S., pp. 425, 426. In this lucid opinion the Supreme Court says:

"But, for the reasons above stated, having regard to the object and the terms of .the first provision of the fifth amendment, as well as to the history of its proposal and adoption, and to the early understanding and practice under it, this court is of opinion that the competency of the defendant, if convicted, to be a witness in another case is not the true test; and that no person can be held to answer, without presentment or indictment by a grand jury, for any crime for which an infamous punishment may be imposed by the court.

"The question is whether the crime is one for which the statutes authorize the court to award an infamous punishment, not whether the punishment ultimately awarded is an infamous one. When the accused is in danger of being subjected to an infamous punishment if convicted, he has the right to insist that he shall not be put upon his trial, except on the accusation of a grand jury.

"Nor can we accede to the proposition, which has been sometimes maintained, that no crime is infamous within the meaning of the fifth amendment that has not been so declared by Congress. See *United States* v. *Wynn,* 3 McCrary, 266, and 11 Fed. Rep. 57; *United States* v. *Petit,* 11 Fed. Rep. 58; *United States* v. *Cross,* 1 McArthur, 149. The purpose of the amendment was to limit the powers of the legislature, as well as of the prosecuting officers of the United States."

This case has been uniformly followed since 1884, and among others in the cases of *United States* v. *Petit,* 114 U. S. 429, and *Mackin* v. *United States,* 117 U. S. 348. (See also Miller on Constitution, p. 504; and 1 Rawle's Bouvier's Dictionary, p. 1026.)

The crime of which the applicant was convicted under article 265 of the Spanish Penal Code was punishable by the penalty of *arresto mayor.* This was classified as a "correctional penalty" under article 24 of the Spanish Penal Code. Only corporal penalties under said Code correspond to the

al castigo de *felonies* bajo la Ley Penal americana. Esto aparece claramente al leer el Artículo citado, que es como sigue:

"Artículo 24.—Las penas que pueden imponerse con arreglo á este Código, y sus diferentes clases, son las que comprende la siguiente escala general.

*Penas Aflictivas.*—Muerte, cadena perpétua, reclusión perpétua, relegación perpétua, entrañamiento perpétuo, cadena temporal, reclusión temporal, relegación temporal, entrañamiento temporal, presidio mayor, prisión mayor, confinamiento, inhabilitación perpétua, inhabilitación absoluta temporal, inhabilitación especial perpétua, inhabilitación especial temporal.

*Penas Correccionales.*—Presidio correccional, prisión correccional, destierro represión pública, suspensión de cargo, suspensión de cargo público, derecho de sufragio activo y pasivo, profesión ú oficio y arresto mayor.

*Penas Leves.*—Arresto menor, represión privada.

*Penas Comunes á las Tres Clases Anteriores.*—Multa, caución.

*Penas Accesorias.*—Degradación, interdicción civil, sujeción á la vigilancia de la autoridad, pérdida ó comiso de los instrumentos y efectos del delito, pago de costas".

Las penas corporales, según se han designado anteriormente, corresponden con las penas capitales é ignominiosas á que se refiere la quinta enmienda de la Constitución; y las penas correccionales, leves y accesorias, son de grado inferior. La pena de que se queja el peticionario, es correccional solamente, y no se castiga el delito por prisión en el presidió ó la penitenciaría, sino solamente en la cárcel. De aquí que pudiera ser perseguido por información, y no necesitaría una acusación por un gran jurado, ni aún en los Tribunales federales. Pero aparte de este aspecto de la causa, el Artículo 5º. de las enmiendas de la Constitución de los Estados Unidos, no tiene aplicación á los Tribunales insulares, y acusaciones por un gran jurado para la declaración de culpabilidad del acu-

punishment of felonies in the American penal law. This will readily appear by a reading of the article, which is as follows:

"Article 24.—The penalties which may be imposed according to this code, and their different classes, are those included in the following general scale:

"Corporal Penalties.—Death; *cadena perpétua, reclusión perpétua, relegación perpétua,* perpetual expulsion, *cadena temporal, reclusión temporal, relegación temporal,* temporary expulsion; *presidio mayor, prisión mayor, confinamiento,* perpetual absolute disqualification; temporary absolute disqualification; perpetual special disqualification from public office, the right of suffrage, active, passive, and from the exercise of a profession or trade; temporary special disqualification from a public office, the right of suffrage, both active and passive, and from the exercise of a profession or trade.

"Correctional Penalties.—*Presidio correctional, prisión correccional;* banishment, public censure, suspension from public office, active and passive right of suffrage and from the exercise of a profession or trade, *arresto mayor.*

"Light penalties.—*Arresto mayor,* private censure.

"Penalties Common to the Three Preceding Classes.—Fine and caution.

"Accessory Penalties.—Degradation, civil interdiction, subjection to the surveillance of the authorities, forfeiture or confiscation of the instruments and proceeds of the crime, payment of costs."

Corporal penalties as above designated correspond to the capital and infamous punishments referred to in the fifth amendment to the Constitution; and correctional, light and accessory penalties are of lesser grade. The punishment of which the applicant complains is correctional only, and the offense is not punished by confinement in the *presidio* or penitentiary but only in the *cárcel* or county jail. Hence it could be prosecuted by information and would not require an indictment of a grand jury, even in the federal courts.

But aside from this view of the case, article 5 of the amendments to the Constitution of the United States has no application to the insular courts, and indictments by grand

sado, en dichos Tribunales, no son más necesarias de lo que lo serían en los tribunales de estado, ó de los territorios en los Estados Unidos. Esto es un punto bien establecido por numerosos casos, según queda demostrado en los discursos del Juez Miller sobre la Constitución de los Estados Unidos, discurso 10, p. 493, donde dicho distinguido jurista, al hablar de la enmienda séptima, dice:

"Este artículo de las enmiendas de la Constitución, así como todos los demás, desde uno á ocho inclusive, se refiere al ejercicio del gobierno de los Estados Unidos y no al de los Estados. Esto ha sido decidido repetidas veces". Citando *Livingston* contra *Moore*, 7 Pet., 469; *The Justices* v. *Murray*, 9 Wall, 24.

Ni podrá aplicarse esta disposición en manera alguna á los Tribunales insulares, en Puerto Rico, hasta que sean convertidos en Cortes Federales por una ley del Congreso. *Reynolds* v. *United States*, 98 U. S. 145; *Eilenbecker* v. *District Court*, 134 U. S., 31; *United States* v. *Cruikshank*, 92, U. S., 542; *Walker* v. *Sanvinet*, 92 U. S., 90; *Fox* v. *Ohio*, 46 U. S., 510; *Holmes* v. *Jennings;* 39 U. S., 549; *Presser* v. *Illinois*, 116 U. S., 252; *Ross* v. *McIntyre*, 140 U. S., 453; *Cook* v. *United States*, 138 U. S., 157; *Hurtado* v. *California*, 110 U. S., 516; *MacAllister* v. *United States*, 141 U. S., 174; *Permoli* v. *N. O.*, 44 U. S., 589.

No hemos podido encontrar ninguna resolución de la Corte Suprema que de un modo directo prescriba la condición de las Cortes Territoriales con arreglo á la Enmienda 7ª. de la Constitución de los Estados Unidos; pero en el caso de *Walker* v. *S. P. R. R. Co.* resuelto en 1896, el abogado presentó esta cuestión y el Juez Señor Brewer, al redactar la opinión del Tribunal, dijo:

"Juzgamos innecesario considerar la alegación que hace el demandado de que las Cortes Territoriales no son Cortes de los Estados Unidos, y que la Enmienda 7ª. no es de aplicarse á los Territorios, porque el Congreso, por una Ley de Abril 7 de 1874, c. 80, 18 Stat. 27,

juries are not necessary to the conviction of a defendant in these courts any more than it would be in the state courts, or in the territorial courts in the United States. This is well-settled in numerous cases, as is shown in the lectures of Mr. Justice Miller on the Constitution of the United States, lecture 10, page 493, where that distinguished jurist, speaking of the seventh amendment, says:

"This article of the amendments to the Constitution, as well as all of the others from one to eight inclusive, applies to the powers exercised by the Government of the United States and not to those of the States. This has been repeatedly decided." Citing *Livingston* v. *Moore*, 7 Pet. 469; The *Justices* v. *Murray*, 9 Wall. 274; *Edwards* v. *Elliott*, 21 Wall. 532.

Nor can this provision have any application to the insular courts in the Island of Porto Rico until they are made federal courts by an act of Congress. (*Reynolds* v. *United States*, 98 U. S. 145; *Eilenbecker* v. *District Court*, 134 U. S. 31; *United States* v. *Cruikshank*, 92 U. S. 542; *Walker* v. *Sanvient*, 92 U. S. 90; *Fox* v. *Ohio*, 46 U. S. 510; *Holmes* v. *Jennings*, 39 U. S. 549; *Presser* v. *Illinois*, 116 U. S. 252; *Ross* v. *McIntyre*, 140 U. S. 453; *Cook* v. *United States*, 138 U. S. 157; *Hurtado* v. *California*, 110 U. S. 516; *MacAllister* v. *United States*, 141 U. S. 174; *Permoli* v. *N. O.*, 44 U. S. 589.)

We have been unable to find any decision of the Supreme Court which directly prescribes the status of territorial courts under the seventh amendment to the Constitution of the United States; but in the case of *Walker* v. *S. P. R. R. Co.*, decided in 1896, the question was presented by counsel and Mr. Justice Brewer, delivering the opinion of the court, said:

"We deem it unnecessary to consider the contention of defendant in error that the territorial courts are not courts of the United States and that the seventh amendment is not operative in the territories for by the act of April 7, 1874, c. 80, 18 Stat. 27, Congress, legislating

al legislar para todos los Territorios, declaró que á ninguna parte "se le privará del derecho de tener un juicio por jurado en los casos que hayan de resolverse con arreglo á la ley común"; y aunque esto no haga extensivas á los Territorios, de modo terminante, todas las prescripciones de la Enmienda 7ª. asegura todos los derechos de un juicio por jurado, tal y como ellos existían en la ley común. (*Walker* v. *S. P. R. R. Co.,* 175 U. S., p. p., 395 y 396). Se hizo referencia á esta causa ,aprobándola, en la causa posterior de *American Publishing Co. v. Fisher,* 166 U. S., 467.

Si la enmienda 7ª. tuviera aplicación á dichas Cortes, es bastante probable que la resolución se hubiera basado en la Constitución más bien que en el estatuto; y podemos deducir lógicamente que la Corte Suprema no considera que las Cortes Territoriales sean Cortes Federales dentro de los límites de la enmienda 7ª.

Pero las Cortes Insulares de Puerto Rico, de jurisdicción original, tienen más analogía con las Cortes de los Estados que con las de los Territorios. No fueron creadas por una ley del Congreso, sino que existian antes de la aprobación de la Ley Foraker que las reconoció y las dejó en vigor. (Véase la Sección 33 de la Ley Orgánica.) Puerto Rico no es un Territorio, ni es Estado de la Unión Americana, pero sus Cortes de Primera Instancia tienen muchas, si no todas, de las atribuciones de dichas Cortes, y al firmarse el Tratado de Paris, y durante todo el período del Gobierno Militar, había en la Isla un completo sistema judicial que hasta la fecha presente se ha modificado solamente, sin que se haya cambiado del todo durante el Gobierno Civil.

Por estas razones, si la Constitución de los Estados Unidos estuviera vigente en Puerto Rico, no podría considerarse que la enmienda 7ª. tuviera aplicación á sus Cortes, pues ellas estarían comprendidas en las decisiones mencionadas anteriormente, las que sostienen que esta enmienda no tiene aplicación á las Cortes de los Estados.

Una institución como el gran jurado no ha sido nunca vista

for all the territories, declared that no party 'shall be deprived of the right of trial by jury in cases cognizable at common law'; and while this may not in terms extend all the provisions of the seventh amendment to the territories, it does secure all the rights of trial by jury as they existed at common law. *Walker* v. *S P. R. R. Co.*, 165 U. S., pp. 595 and 596. This case was referred to with approval in the later case of *American Publishing Company* v. *Fisher*, 166 U. S. 467."

If the seventh amendment had applied to such courts it is quite probable that the decisions would have been based on the Constitution rather than on the statute; and we may reasonably infer that the Supreme Court does not consider territorial courts to be federal courts within the purview of the seventh amendment.

But the insular courts of Porto Rico of original jurisdiction are more nearly analogous to the trial courts of the states than to territorial courts. They were not created by an act of Congress, but were in existence before the passage of the Foraker Law, which recognized them and continued them in force. (See section 33 of the Organic Act.) Porto Rico is not a territory, nor is it a state of the American Union, but its trial courts have many, if not all the attributes of said courts; and at the signing of the Treaty of Paris, and all during the military government, there was a complete judicial system in the Island, which has only been modified, and not entirely changed during civil government, up to the present time.

For these reasons, even if the Constitution of the United States were in force in Porto Rico, the seventh amendment could not be considered as applying to its courts, but they would fall under the decisions quoted, holding that this amendment has no application to state courts.

Such a body as a grand jury has never been known in the

en las Cortes Insulares de Puerto Rico. Existen á la sazón
unos mil prisioneros en la penitenciaría de Puerto Rico, á los
cuales habría que soltar si se diese esta interpretación al
Código Penal; sin embargo, si fuera necesario para hacer jus-
ticia en el presente caso, este Tribunal no vacilaría en abrir
las puertas de todas las cárceles de la isla. Pero esa inter-
pretación no está autorizada por autoridad alguna, de las que
se han presentado ante esta Corte, ó pudieran encontrarse
después de una diligente busca.

3. Se alega que al acusado le fué denegado el derecho á
un juicio por Jurado, cuyo derecho se lo garantiza la Consti-
tución de los Estados Unidos. En relación á esta garantía
constitucional, son aplicables las mismas observaciones con-
tenidas en el párrafo anterior referentes á acusaciones por los
grandes jurados. La enmienda sexta, en vez de la quinta, es
la que está envuelta en este caso, y hé ahí la úinca diferencia.
Pero el acusado, como está demostrado en los autos, renunció
á todo derecho á un juicio por jurado, de acuerdo con las
leyes de Puerto Rico y la Constitución de los Estados Unidos,
si las mismas fueren aplicables, por no haber hecho una solici-
tud, con aquél objeto, á su debido tiempo. La Ley de Jurados
de Puerto Rico preceptúa que un acusado tiene derecho á un
juicio por jurado en todos los casos de delito grave, siempre
que así lo solicite cuando se haga la primera lectura de la lista
ó relación de las causas, y se ponga la de él en la correspon-
diente á jurados. (Véase el Artículo 178 del Código de Enjui-
ciamiento Criminal.) Ninguna solicitud referente á un jurado
fué jamás presentada á favor del procesado, antes ó durante
la acusación (*arraigment*), ni durante más de una semana des-
pués, cuando su abogado defensor se presentó ante el Tri-
bunal, tratando de excusar su negligencia, y pidió un jurado,
que le fué negado, porque el delito de que se le había acusado
era solamente un delito menos grave, y no *felony*, y además,
porque no había pedido ó solicitado el jurado dentro del tér-

insular courts of Porto Rico. There are now nearly a thous-
and prisoners in the penitentiary of Porto Rico, who would
have to be turned out if this construction were put upon the
penal laws; but if it were necessary to do justice in this case,
this court would not hesitate to open the doors of every prison
in the Island. However, such a construction is not war-
ranted by any authority which has been presented to the
court, or which can be found on diligent search.

3. It is claimed that defendant was denied the right of a
trial by petit jury, as guaranteed to him by the United States
Constitution. The same remarks in regard to this constitu-
tional guarantee as those made in the foregoing paragraph in
regard to indictment by grand juries are applicable to this
claim for a trial by a petit jury. It is the sixth amendment,
instead of the fifth, which is involved in this claim, and that is
the only difference. But the defendant, as the record shows,
waived all claim to a petit jury, under the laws of Porto Rico,
and under the Constitution of the United States, if the same
were applicable, by failing to make his application therefor
in due time. It is provided by the jury law of Porto Rico that
a defendant is entitled to a jury in all cases of felony, provid-
ed he demands the same at the first general call of the calen-
dar and his case is put upon the jury docket. (See Code of
Criminal Procedure, sec. 178.) No demand was ever made
on behalf of the defendant for a jury prior to or at the time
of his arraignment, or for more than a week thereafter, when
his counsel came into court, attempting to excuse his neglect,
and demanded a jury, which was refused, because the offense
of which he was accused was only a misdemeanor, and not a
felony, and moreover, because he had not demanded the jury
within the time prescribed by law, and therefore waived the
right, if any he had. The record of the case amply bears out
this proposition, and a mere reference to the same is sufficient

mino prescrito por la ley, y por lo tanto había renunciado á su derecho, si es que tenía alguno. Los autos en este proceso sostienen ampliamente esta proposición, y una ligera ojeada dada á los mismos es suficiente para demostrar que una petición ó solicitud de esa naturaleza carece de base en que fundarse.

4. El cuarto motivo alegado por el peticionario, de que los procedimientos en la Corte de Distrito no constituían un procedimiento legal en debida forma, como lo preceptúa la Constitución de los Estados Unidos, parece simplemente una repetición de las aserciones del segundo y tercero, con probable alusión al quinto y sexto motivo de esta solicitud; al menos no se ha invocado en la solicitud, ni citado en el informe oral del Letrado defensor, al presentar la causa á este Tribunal, ninguna otra disposición constitucional, ni legal. Sin embargo, puede ser que por el uso del término ''procedimiento legal en debida forma'' se haya hecho referencia á la enmienda catorce de la Constitución de los Estados Unidos, que dice:

''Ni tampoco privará ningún estado á persona alguna, de su vida, libertad, ni bienes, sin un procedimiento legal en debida forma; ni denegará á ninguna persona, dentro de su jurisdicción, la uniforme protección de las leyes''.

Esto es claramente una limitación de los poderes de las Legislaturas de los Estados, y no puede tener referencia á Puerto Rico. En el discurso trece de Miller sobre la Constitución, se discute esta enmienda, y el distinguido autor se expresa en la forma siguiente:

''Aquella enmienda fué ordenada para asegurar iguales derechos á todas las personas Para llevar á cabo el objeto de la misma, el Congreso está investido del poder de hacer cumplir sus disposiciones mediante una legislación adecuada. Por otra parte, no fué ideada para poner obstáculos al poder del Estado para proteger la vida, libertad, y los bienes de sus ciudadanos, ni al ejercicio de ese poder en las adju-

to show that such a claim has no foundation whereon to rest.

4. The fourth ground alleged by the applicant, that the proceedings of the district court were not due process of law, as provided for under the Constitution of the United States, seems to be merely a restatement of the second and third, with a probable allusion to the fifth and sixth grounds of this application. At least no other constitutional or statutory provision is invoked in the application, nor cited in the argument made by counsel in presenting the case to this court. However, by the use of the term "due process of law," it is possible that reference may be made to the fourteenth amendment to the Constitution of the United States, which says:

"Nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

This is clearly a limitation upon the powers of the state legislatures, and can have no reference to Porto Rico. In lecture the XIII of Miller on the Constitution this amendment is discussed and the distinguished author uses the following language:

"That amendment was ordained to secure equal rights to all persons. To render its purpose effective Congress is vested with power to enforce its provisions by appropriate legislation. On the other hand, it was not designed to interfere with the power of the state to protect the lives, liberty and property of its citizens, nor with the exercise of that power in the adjudications of the courts of the state

dicaciones de los Tribunales del Estado, al instruir los procedimientos dispuestos por sus leyes. Por lo tanto, cuando una persona acusada de un delito dentro de un Estado, es sometida, al igual de todas las demás personas, en dicho estado, á la ley, en el curso ordinario de su administración en los tribunales de justicia, el fallo que resulte en esta forma, no puede considerarse como un ejercicio de poder arbitrario y sin restricción, y por eso nulo y sin ningún valor''. Virginia Ex-Parte, 100 U. S., 339. In *re.* Converse, 137 U. S., 624; Miller on the Constitution, 658, 659.

La eminente autoridad continúa diciendo:

''La Ley, en su curso ordinario de administración por los Tribunales de Justicia, constituye un procedimiento legal en debida forma, y cuando está asegurada por las leyes del Estado, se han llenado los requisitos de la enmienda catorce. El procedimiento legal en debida forma, según el sentido de dicha enmienda, está asegurado si las leyes se aplican á todos de igual modo, y si, por ellas, no se somete al individuo á un ejercicio arbitrario de los poderes del gobierno''. (*Leeper* contra *Texas,* 139 U. S., 462; *Miller* on the Constitution, p. 664. Véase también *Miller* sobre la Constitution, p. 673, como un caso análogo.)

Según las autoridades citadas, y después de resumir todo lo que se refiere al punto que trata de sostener el Letrado defensor, en su solicitud, nos vemos abligados á declarar que el solicitante en el presente caso, no puede quejarse de que los trámites del Tribunal de Distrito no fueran practicados de acuerdo con un procedimiento legal en debida forma, y que todo derecho que tuviera, y que persona alguna pudiera reclamar bajo la enmienda catorce de la Constitución, ó bajo cualquiera otra sección de aquél documento, le ha sido concedido y cuidadosamente guardado en el juicio de esta causa.

5. El quinto motivo alegado por el peticionario, para que se le ponga en libertad bajo el auto de *habeas corpus,* se refiere á la competencia del Juez especial de la Corte de Distrito, que fué nombrado para reemplazar al Juez en propiedad de dicho Tribunal, que estaba inhabilitado, porque era uno de los Jueces á quien el acusado había atacado en el artí-

in administering the process provided by its laws. Therefore when a person accused of crime within a state is subjected, like all other persons in the state, to the law in its regular course of administration in the courts of justice, the judgment so arrived at cannot be held to be unrestrained and an arbitrary exercise of power and therefore void. *Virginia, Ex parte,* 100 U. S. 339; *In re Converse,* 137 U. S. 624.'' (Miller on the Constitution, 658 and 659.)

The eminent authority continues:

''Law in its regular course of administration through the courts of law, is due process of law, and when it is secured by the law of the state, the requirements of the fourteenth amendment are satisfied. Due process of law, within the meaning of that amendment, is secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of the government. *Leeper* v. *Texas,* 139 U. S. 462.'' (Miller on the Constitution, p. 664.) (See, also, Miller on the Constitution, p. 675, for a case in point.)

According to the authorities cited, and after summarizing the point intended to be made by counsel in his application, we feel constrained to hold that the applicant in this case cannot complain that the proceedings of the district court were not conducted in accordance with due process of law, and that every right which he had, or any person could possibly claim under the fourteenth amendment to the Constitution, or any other section of that instrument, has been carefully safeguarded and extended to him in the trial of his case.

5. The fifth ground presented by the applicant for his discharge under the writ of *habeas corpus* has regard to the competency of the special district judge who was appointed to take the place of the regular district judge, who was disqualified because he was one of the judges whom the defendant had attacked in the article for the publication of which he was

culo, por cuya publicación fué procesado. Se alega que el Juez especial de dicho Tribunal, aunque fué nombrado por el Gobernador, no fué nunca confirmado por el Consejo Ejecutivo, lo cuál, según se pretende, era necesario con arreglo á la Ley Orgánica. Si es que la Ley Foraker exige que un Juez especial de un Tribunal de Distrito, sea no solamente nombrado por el Gobernador, sino también confirmado por el Consejo Ejecutivo, no hay nada en los autos que demuestre que este Juez no fué confirmado por el Consejo Ejecutivo. Él fué nombrado en debida forma por el Gobernador, y si fué confirmado, ó no, por el Consejo Ejecutivo, no consta afirmativamente, ni tampoco los autos contienen nada en sentido contrario, y por lo tanto hay que presumir concluyentemente que fué confirmado, si es que la ley lo exigió. En otras palabras, el hecho de que un Juez estaba funcionando en debida forma en el Tribunal de Distrito, en unión con otros dos, cuyo nombramiento no se pone en duda, y quienes tomaron parte en el juicio bajo la dirección del Fiscal General, con arreglo á lo dispuesto por la ley, á lo menos autoriza la presunción de que fué nombrado y confirmado legalmente y en debida forma. De todos modos, este fallo era el de un Tribunal *de facto,* y no hay ley que justificaría á este Tribunal, en un procedimiento de *habeas corpus,* de investigar la legalidad de su nombramiento.

La Suprema Corte de los Estados Unidos establece esta doctrina en los términos siguientes:

"No se puede decir que se haya denegado á una persona la uniforme protección de las leyes, ni que haya sido privado de su libertad, sin un procedimiento legal en debida forma, en violación de la enmienda decimacuarta, por haber sido juzgada y sentenciada á prisión, por un Juez, que, aunque haya sido nombrado por el Gobernador, sin autoridad para ello, es un Juez *de facto* de un tribunal *de jure,* por la ley del Estado, según se ha declarado por el Tribunal más alto del mismo''. (*In re Manning,* 139 U. S., 504; Miller's Lectures, p. 673.)

being prosecuted. It is alleged that the special district judge, though appointed by the Governor, was never confirmed by the Executive Council, as it is claimed should have been done under the Organic Law. If the Foraker Law requires a special district judge not only to be appointed by the Governor, but to be confirmed by the Executive Council, there is nothing in the record to show that this judge was not so confirmed by the Executive Council. He was regularly appointed by the Governor, and whether or not he was confirmed by the Council does not affirmatively appear, the records showing nothing to the contrary; it will therefore be conclusively presumed that he was so confirmed, if the law required it. In other words, the fact that a judge was regularly acting on the district bench, with two others whose appointments are not questioned, and who took part in the trial under the direction of the Attorney General, as provided for by law, at least warrants the presumption that he was regularly and legally appointed and confirmed. At any rate, this judgment was that of a *de facto* court, and there is no law which would justify this court, in a *habeas corpus* proceeding, to inquire into the legality of his appointment.

The Supreme Court of the United States settles this question in the following language:

"A person is not denied the equal protection of the laws, nor deprived of liberty without due process of law in violation of the fourteenth amendment to the Constitution, by being tried and sentenced to imprisonment by a judge who, although appointed by the Governor without authority, is a judge *de facto* of a court *de jure*, by the law of the state as declared by its highest court." (*In re Manning*, 139 U. S. 504; Miller's Lectures, p. 673.)

Tan recientemente como en el año 1898, esta doctrina ha sido reafirmada por el Tribunal Supremo de los Estados Unidos, en la causa de Henry Ward, *ex-parte,* en la cual el Juez Presidente Fuller, al pronunciar el fallo del Tribunal, dice:

"No necesitamos, sin embargo, considerar el amplio alegato del abogado defensor con respecto á este punto, puesto que nosotros consideramos aplicable al presente caso la regla bien establecida de que en los casos en que el Tribunal tenga jurisdicción sobre un delito y sobre el acusado, si los procedimientos por otra parte se ajustan á la ley, una declaración de culpabilidad es legal, aunque el Juez que presida el Tribunal sea solamente un Juez *de facto;* y que la validez del derecho de tal Juez al cargo como tal, ó su derecho de ejercer las funciones judiciales, no pueden ser determinados al presentarse un auto de *habeas corpus".  Henry Ward, ex-parte,* 173 U. S., 454.

Es verdad que con arreglo á la antigua Ley española, en un recurso de apelación interpuesto contra una sentencia dictada, tal como el anterior recurso interpuesto contra la primera declaración de culpabilidad en esta causa, se investigaba la competencia de un Juez especial de un Tribunal de Distrito; pero ese no era un caso de *habeas corpus,* y tal investigación se hizo únicamente con arreglo á las expresas disposiciones del Código español, que no son aplicables á procedimientos de *habeas corpus,* sino solamente á recursos de apelación.   Resulta pues que todas las presunciones deben ser á favor de la legalidad del nombramiento del Juez especial García, y de la validez de la sentencia que él dictó en unión con los otros Jueces, y esa sentencia no puede atacarse colateralmente en un procedimiento de *habeas corpus.*

6.   El sexto motivo alegado por el peticionario, para que se le ponga en libertad, es que no fué declarado culpable á consecuencia de un procedimiento legal en debida forma; porque él alega que el segundo juicio, en que fué declarado culpable por segunda vez, tuvo lugar en Octubre de 1903, y que en primero de Julio de 1902 había empezado á regir una nueva Ley de Enjuiciamiento Criminal, y que debia habérsele juz-

As late as the year 1898 this doctrine was reaffirmed by the Supreme Court of the United States, in the case of *Henry Ward, Ex parte,* in which Mr. Chief Justice Fuller, in delivering the opinion of the court, says:

"We need not, however, consider the elaborate argument of counsel in this behalf, since we regard the well settled rule applicable here that where a court has jurisdiction of an offence, and of the accused and the proceedings are otherwise regular, a conviction is lawful although the judge holding the court may be only an officer *de facto;* and that the validity of the title of such judge to the office, or his right to exercise the judicial functions, cannot be determined on a writ of *habeas corpus."* (*Henry Ward, Ex parte,* 173 U. S. 454.)

It is true that under the old Spanish law, on an appeal taken from the judgment rendered, such as the former appeal taken from the first conviction in this case, the qualifications of a special district judge were inquired into; but that was not a case of *habeas corpus,* and such inquiry was only made on the express provisions of the Spanish Code, which do not apply to *habeas corpus* proceedings, but only to appeals. Then all the presumptions must be in favor of the regularity of the appointment of Special Judge García, and of the validity of the judgment which he participated in making, and such judgment cannot be attacked collaterally, in a proceeding by *habeas corpus.*

6. The sixth reason assigned by the applicant for his enlargement is that he was not convicted by due process of law, because he alleges that his second trial in which he was convicted for the second time, occurred in October, 1903, and that on July 1, 1902, a new Law of Criminal Procedure took effect, and that he should have been tried under that Law, This court has repeatedly held that the new Law of Criminal

gado con arreglo á dicha ley.   Este Tribunal ha declarado re-
petidas veces que la nueva Ley de Enjuiciamiento Criminal,
que fué adoptada en primero de Marzo de 1902, y empezó á
regir el primero de Julio del mismo año, no podía aplicarse
á hechos ó delitos perpetrados y cometidos con anterioridad
al primer día de Julio de 1902.   El delito de que se declaró
culpable al peticionario, fué cometido en trece de Febrero de
1902, antes de que se adoptara la ley á que él se refiere, y
mucho antes de que empezara á regir, y según numerosas de-
cisiones de este Tribunal, y especialmente la pronunciada en
la causa de *Mauleón, ex-parte,* que en la actualidad está pen-
diente ante el Tribunal de los Estados Unidos, el nuevo Códi-
go de Enjuiciamiento Criminal no podia aplicarse á delitos
cometidos con anterioridad á la fecha en que empezó á regir.

Se ha decidido repetidas veces por este Tribunal, que el
Código de Enjuiciamiento Criminal y el Código Penal, que
fueron adoptados el primer día de Marzo de 1902, para empe-
zar á regir al medio día del primero de Julio siguiente, no
regía en cuanto á la persecución y castigo de delitos cometidos
con anterioridad á esta fecha.   Las razones para esta decisión
se hallan consignadas en el ámplio dictamen concurrente emi-
tido por el Juez MacLeary, en la causa de *Mauleón, ex-parte,*
que fué decidida por este Tribunal en 9 de Octubre de 1903, y
contra cuya decisión se interpuso por el peticionario, recurso
de apelación para ante el Tribunal Supremo de los Estados
Unidos; será conveniente, sin embargo, resumirlas aquí su-
cintamente.   La interpretación que se ha dado á estos Códi-
gos, está de acuerdo con la manifiesta intención de la Legis-
latura, según se deriva de los mismos Códigos; de la historia
contemporánea; y de las circunstancias que prevalecían en
esa época.   (*Church of H. T.* v. *United States,* 143 U. S., 457;
*Siemans* v. *Sellers,* 123 U. S., 276; *United States* v. *U. P. R.
R. C.,* 91 U. S., 72; *Aldridge* v. *Williams,* 3 How., 8); de la
anterior condición de los estatutos ó leyes que existían en la
Isla. (*Ross, ex-parte,* 140 U. S.; *Platt* v. *U. P. R. R. Co.,*

Procedure, which was passed on the 1st of March, 1902, and took effect on the 1st of July of the same year, had no application to acts or offenses done and committed prior to the first day of July, 1902. The offense of which the applicant was convicted was committed on the 13th of February, 1902, before the act to which he refers was passed and long before it took effect, and according to numerous decisions of this court, and especially that in *Mauleón, Ex parte,* 4 Porto Rico Reports, 227, which is now pending in the Supreme Court of the United States, the new Code of Criminal Procedure could have no application to offenses committed prior to the date on which it took effect.

It has been repeatedly decided by this court that the Code of Criminal Procedure and the Penal Code which were passed on the first day of March, 1902, to take effect at noon on the first day of July thereafter, did not govern the prosecution and punishment of offenses committed prior to the latter date. The reasons for this decision are given in the elaborate concurring opinion delivered by Mr. Justice MacLeary in the case of *Mauleón, Ex parte, supra,* decided by this court on the 29th of October, 1903, and appealed by the petitioner to the Supreme Court of the United States. It may be well, however, to summarize them here. The construction given to these codes is in accordance with the manifest intention of the legislature as derived from the codes themselves, the contemporaneous history and surrounding circumstances (*Church of H. T.* v. *United States,* 143 U. S. 457; *Siemans* v. *Sellers,* 123 U. S. 276; *United States* v. *U. P. R. R. Co.,* 91 U. S. 72; *Aldrige* v. *Williams,* 3 How. 8), the previous condition of the statutory laws existing in the island (*Ross, Ex Parte,* 140 U. S. 453; *Platt* v. *U. P. R. R. Co.,* 99 U. S. 48), the contemporaneous construction by executive officers charged with their exe-

99 U. S., 48), de la interpretación contemporánea por funcionarios ejecutivos, encargados de su ejecución. (*United States* v. *Healy,* 160 U. S., 136; *People* v. *Dayton,* 55 N. Y., 377; *Wetmore* v. *State,* 55 Ala., 198; *United States* v. *A. G. S. R. R. Co.,* 142 U. S., 615; *United States* v. *Johnston,* 124 U. S., 236), y de una repugnancia de cambiar una larga serie de decisiones, envolviendo graves consecuencias para la Administración de Justica. (Sutherland on Statutory Construction, Sección 314, 323; *In re Warfield,* 22 Cal., 51; *Broker* v. *Lorriland,* 4 N. Y., 261; *Rogers* v. *Goodwin,* 2 Mass., 477). En el dictamen citado, se hace también referencia á *Soon King* v. *Crowley,* 113 U. S., 703; *King* v. *Gallum,* 109 U. S., 99; *Wisconsin Central R. R. Co.* v. *Forsythe,* 159 U. S., 46; *United States v. Clarke,* 8 Pet., 436; *Territory* v. *Commissioners,* 8 Mon., 409, 411; *Foster* v. *Blount,* 18 Ala., 687; *Phillips* v. *Detroit,* 111 U. S., 604; *United States* v. *Perot,* 98 U. S., 428; *Conger* v. *Weaver,* 6 Cal., 548; *Sparrow* v. *Strong,* 3 Wall., 97; *Tavner* v. *Patton,* 49 Ala., 406; *Stockton School District* v. *Wright,* 134 Cal., 68; *People* v. *Craycroft,* 111 Cal., 544; *Carpy* v. *Dowdell,* 129 Cal., 245; *Merced Bank* v. *Cassacia,* 103 Cal., 645; *People* v. *Curry,* 130 Cal., 94; Black on Interpretation of Laws, 112; Bishop's Written Law, 19; *United States* v. *Webster, Davies,* 38; *Fosdick* v. *Perrysburg,* 14 Ohio St., 473; y otras autoridades. Puesto que los Códigos han sido copiados del Código Penal de California, que en su original es una sola ley, y puesto que tienen el mismo objeto á saber: el de establecer en la Isla de Puerto Rico, un sistema de leyes criminales americanas, derogando el anterior sistema español, y siendo por tanto *in pari materia,* deben ser interpretados juntamente, y si es posible, debe hacerse que funcionen en harmonía, debiéndoselos interpretar de tal manera que no estén en contradicción con los principios generales de la ley, que no son de presumirse que la Legislatura los haya querido cambiar. Puesto que los dos Códigos constituyen un sólo sistema, y siendo imposible separarlos el uno del otro,

cution (*United States* v. *Healy,* 160 U. S. 136; *People* v. *Dayton,* 55 N. Y. 377; *Wetmore* v. State, 55 Ala. 198; *United States* v. *A. G. S. R. R. Co.,* 142 U. S. 615; *United States* v. *Johnston,* 124 U. S. 236), and a reluctance to change a long current of decisions involving serious consequences to the administration of justice. (Sutherland on Statutory Construction, sec. 314, 323; *In re Warfield,* 22 Cal. 51; *Broker* v. *Lorrilard,* 4 N. Y. 261; *Rogers* v. *Goodwin,* 2 Mass. 477). Reference is made in the opinion cited to *Soon Hing* v. *Crowley,* 113 U. S. 703; *Ming* v. *Gallun,* 109 U. S. 99; *Wisconsin Central R. R. Co.* v. *Forsythe,* 159 U. S. 46; *United States* v. *Clarke,* 8 Pet. 436; *Territory* v. *Commissioners,* 8 Mont. 409, 411; *Foster* v. *Blount,* 18 Ala. 687; *Phillips* v. *Detroit,* 111 U. S. 604; *United States* v. *Perot,* 98 U. S. 428; *Conger* v. *Weaver,* 6 Cal. 548; *Sparrow* v. *Strong,* 3 Wall. 97; *Tavner* v. *Patton,* 49 Ala. 406; *Stockton School District* v. *Wright,* 134 Cal. 68; *People* v. *Craycroft,* 111 Cal. 544; *Carpy* v. *Dowdell,* 129 Cal. 245; *Merced Bank* v. *Casaccia,* 103 Cal. 645; *People* v. *Curry,* 130 Cal. 94; Black on Interpretation of Laws, 112; Bishop's Criminal Law, 19; *United States* v. *Webster, Davies,* 38; *Fosdick* v. *Perrysburg,* 14 Ohio St. 473; and other authorities. The two codes being copied from the Penal Code of California, which is in the original a single act, and having the same object, to establish a system of American criminal laws in the Island of Porto Rico repealing the former Spanish system, and being thus *in pari materia,* should be construed together and if possible be made to harmonize, and so construed as not to conflict with the general principle of law, which the legislature could not be presumed to desire to change. The two codes constituting a single system, and it being impossible to separate one from the other, they must be presumed to take effect at the same time in regard to any given case or class of cases, provided for therein; and as the Penal Code especially enacts that it shall not affect offenses committed prior to

debe presumirse que empiezan á regir á un mismo tiempo, con respecto á cualquiera causa, ó clase de causas, que se presente y esté comprendida en los mismos; y puesto que el Código Penal dispone especialmente que no afectará á los delitos cometidos con anterioridad al primero de Julio de 1902, debe interpretarse el Código de Enjuiciamiento Criminal en el sentido de que contenga la misma disposición. (*Manuel* v. *Manuel*, 13 Ohio St., 458, 465; *Smith* v. *People*, 47 N. Y., 330; *Whitcomb* v. *Rood*, 20 Vt., 49; *McDougal* v. *Dougherty*, 14 Ga., 674; *Hays* v. *Richardson*, 1 Gill and J., 366; *Noble* v. *State*, 1 Green, 325; *Lane* v. *Missoula County*, 6 Mont., 482; *Caruthers* v. *Madison County*, 6 Mont., 483; *Thorpe* v. *Schoeling*, 7 Nev., 17). En lo que respecta á este fundamento de la solicitud, este caso es exactamente igual al de Mauleón, y las discusiones contenidas en los dictámenes emitidos en aquél caso, son aplicables al presente, y no es necesario repetirlas aquí.

7.   El séptimo motivo que alega el peticionario, para que se le ponga en libertad, es una repetición de su alegación con respecto al derecho que pretende tener á un juicio por jurado, excepto que él reclama dicho derecho ''bajo'' las disposiciones del Capítulo 10 del Código Penal de Puerto Rico'', que se dice haber empezado á regir el primer día de Julio de 1902. Dicha Ley dispone expresamente que no tiene referencia alguna á delitos cometidos con anterioridad á esa fecha, y tanto por esta razón, cuanto por otras expresadas anteriormente en la presente, especialmente bajo el tercer motivo de la solicitud del acusado, éste no tenia derecho á un juicio por jurado, y no se ha cometido ningún error al denegar su solicitud, en que lo pidió. Sin embargo, examinaremos la cuestión bajo el punto de vista del peticionario, para darle el pleno beneficio de todas sus reclamaciones.

Los abogados defensores del acusado, se refieren en su alegato al Capítulo 10 del Código Penal de Puerto Rico, sin expresar el título, ni la sección del Código. En dicho Código

the 1st of July, 1902, the Code of Procedure must be construed to do the same. (*Manuel* v. *Manuel*, 13 Ohio St. 458, 465; *Smith* v. *People*, 47 N. Y. 330; *Witcomb* v. *Rood*, 20 Vt. 49; *McDougal* v. *Dougherty*, 14 Ga. 674; *Hays* v. *Richardson*, 1 Gill and J., 366; *Noble* v. *State*, 1 Greene, 325; *Lane* v. *Missoula County*, 6 Mont. 482; *Carruthers* v. *Madison County*, 6 Mont. 483; *Thorne* v. *Schooling*, 7 Nev. 17.) In so far as this ground of the application is concerned this case is exactly parallel with that of Mauleón, and the discussions in the opinion delivered in that case apply to the present and need not be repeated here.

7. The seventh reason assigned by the applicant for his discharge is a reiteration of his claim to a trial by petit jury, except that he claims it "under the provisions of chapter 10 of the Penal Code of Porto Rico," which is said to have taken effect on the first day of July, 1902. This act expressly provides that it has no reference whatever to offenses which were committed prior to that date, and for this reason, as well as others hereinbefore stated, and especially under the third ground of the defendant's application, he was not entitled to a jury trial, and there was no error committed in refusing his request for the same. Nevertheless we will examine the question from the view point of the applicant in order to give him the full benefit of all his claims.

Counsel in argument makes reference to chapter 10 of the Penal Code of Porto Rico without saying what title they refer to or what section of the Code. There are three chapters

hay tres capítulos marcados con el número diez, uno en el Título 12, con respecto á libelo; otro en el Título 13, referente á dueños de casas de préstamos; y otro en el Título 17, con respecto á pesos y medidas falsas. El primero de los tres capítulos mencionados, es probablemente al que dichos abogados tenían la intención de referirse, y hay que presumir que la Sección 246, es la que tenían presente, y que dice lo siguiente:

"En todos los procesos promovidos por libelo, se podrá testificar la verdad ante el tribunal ó jurado, y si éste estimare ser cierto lo denunciado como infamatorio, y haberse publicado con sana intención, y para fines justificables, deberá absolverse libremente al acusado; incumbiendo al jurado determinar las cuestiones de hecho y de derecho".

Por cuanto la ley del jurado, que ha sido incorporada en el Código de Enjuiciamiento Criminal, dispone que ninguna persona tiene derecho á un juicio por jurado cuando esté acusada solamente de *misdemeanor* (y libelo es solamente un *misdemeanor* con arreglo al Código), la sección anteriormente citada, no puede, por implicación, dar al acusado el derecho de pedir un jurado en una causa promovida por libelo. El simple hecho de que se haga esa cita, no contradice á la Ley del Jurado, puesto que hay que interpretarla en el sentido de que, siempre que en adelante se disponga que las causas promovidas por libelo, sean juzgadas por un jurado, dicho jurado tendrá el derecho de determinar la ley y los hechos. En el caso de que el derecho á un juicio por jurado, fuere hecho extensivo á los acusados en causas por *misdemeanor,* ó si el delito de libelo fuese declarado *felony,* entonces podría aplicarse esta sección, pero mientras no se hagan estos cambios en las leyes, dicha cita no puede tener la fuerza ó efecto que se trata de darle por el peticionario en este caso. Ciertamente, bajo ningún punto de vista de la causa pudiera haberse concedido un jurado al acusado en el juicio en que fué declarado culpable. Esto, sin embargo, no

numbered ten in said Code, one in title 12, in regard to libel; one in title 13 in regard to pawnbrokers, and one in title 17 in regard to false weights and measures. The first of the three mentioned is probably the one to which counsel intended to refer, and section 246 is presumed to be the section which they had in mind, and which reads as follows:

"In all criminal prosecutions for libel, the truth may be given in evidence to the court or jury, and if it appears to the court or jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. The jury have the right to determine the law and the fact."

Inasmuch as the jury law which has been incorporated into the Code of Criminal Procedure provides that no man has a right to be tried by a jury when charged with a mere misdemeanor, and libel is only a misdemeanor under the Code, the section above quoted cannot by implication give the right to defendant to demand a jury in a libel case. The mere fact that such a recitation is made does not contradict the jury law, since it must be construed to mean that whenever a jury may hereafter be provided for in a libel case they shall have the right to determine the law and the fact. Should the right of trial by jury be extended to defendants in misdemeanor cases, or should the offense of libel be raised to a felony, then this section could be applied; but until such changes in the laws are made, this recital cannot have the force or effect sought to be given it by the applicant in this case. Certainly, under no view of the case whatever could a jury have been awarded to defendant on the trial at which he was convicted. This, however, is not very material to the discussion, as it must be remembered that defendant was not charged with, or

es muy importante para la discusión, puesto que hay que recordar que el acusado no lo fué por libelo, y que no fué juzgado ni declarado culpable por dicho delito, sino por otro completamente distinto.

8. El octavo motivo que alega el acusado en apoyo de su solicitud, no tiene ningún fundamento de hecho, y es positivamente falso. Un examen del dictamen del Tribunal demostrará, y es un hecho, que de acuerdo con la Ley de 12 de Marzo de 1903, este Tribunal examinó cuidadosamente todos los autos para determinar si habia algún punto legal, ó de hecho, á favor del acusado, sobre el cual podría basarse una revocación de la sentencia. Los autos no demostraron ningún incidente en que se hubieran violado los derechos del acusado, no existiendo procedimiento alguno del que pudiera quejarse con razón. No obstante el hecho de que los abogados del acusado en la vista de esta causa en apelación, solamente presentaron dos proposiciones al Tribunal, en el informe oral, el Tribunal examinó minuciosamente los autos de un extremo á otro, y discutió todos los puntos que surgían de los mismos, en un dictamen extenso ó amplio que forma parte del expediente en esta causa, y que ampliamente refuta el ataque hecho en esta parte de la solicitud. Celo en el interes de su cliente, por parte de un abogado defensor, debe siempre recomendarse, pero cualquier desvío de los hechos contenidos en los autos, es imperdonable.

9. El noveno motivo de que el fallo y sentencia del Tribunal Supremo sea irregular y nulo, por las diferentes razones enumeradas anteriormente, es simplemente un resumen de lo que se ha dicho ya, y no necesita ulterior consideración, á excepción de decir que nunca ha sido decidido por el Tribunal Supremo de los Estados Unidos, que ''la Constitución sigue á la bandera''. En toda extensión de territorio, que hasta ahora ha sido adquirida por los Estados Unidos, antes de que la Constitución, con todos sus poderes y restricciones pudiera considerarse aplicable al Gobierno, Tribunales, y

tried for, nor convicted of libel, but of an entirely different offense.

8. The eighth ground alleged by the defendant in support of his application has no foundation whatever in fact and is positively untrue. A reference to the opinion of the court will show, and it is a fact, that in accordance with the act of March 12, 1903, this court carefully examined the whole record in order to ascertain if there might be any point of law or of fact beneficial to the accused, on which a reversal of the judgment could be predicated. The record showed no incident in which the rights of the accused had been violated, there being no proceeding whatever of which he could reasonably complain. Notwithstanding the fact that counsel for defendant on the trial of this case on appeal made only two propositions and presented them to the court in his oral argument, the court examined the record minutely from one end to the other, and discussed all the points arising thereon in an elaborate opinion, which forms a part of the record in this case, and amply refutes the charge made in this portion of the application. Zeal in the interest of their clients on the part of counsel is always to be commended; but any departure from the facts contained in the record is unpardonable.

9. The ninth ground, that the judgment and sentence of the Supreme Court are irregular and void, for the various reasons previously enumerated, is merely a summing up of what has been said before, and needs no further consideration, except to say that it has never been decided by the Supreme Court of the United States that "the Constitution follows the flag." In every tract of territory which has heretofore been acquired by the United States before the Constitution with all its powers and restrictions could be considered

pueblo de tal territorio, se ha considerado necesario que el Congreso adopte alguna medida en el asunto, ya sea estableciendo una ley directa, por la cual los beneficios de la Constitución se hacían extensivos á dicho territorio, ó ya asintiendo tácitamente á medidas tomadas en este sentido, por otros ramos del Gobierno. El Congreso no ha adoptado semejante ley con respecto á Puerto Rico; y no existe tal asentimiento. Se podrá decir, y nosotros creemos que es el caso, que ciertos derechos personales del ciudadano individual, por el mero hecho de la posesión americana, se hacen extensivos á cada persona que resida dentro de la jurisdicción de los Estados Unidos. Esos derechos son tales como el de dar culto según los dictados de su propia conciencia, el derecho de estar seguro en cuanto á su casa, persona, documentos y efectos, contra registros y secuestros irrazonables, y la uniforme protección de las leyes; pero otras disposiciones de la Constitución, que se refieren á la condición política, derechos civiles, ciudadanía ó sufragio, y otras cosas por el estilo, no tienen ninguna referencia á un pueblo que habita una isla ó una extensión de territorio, que ha sido adquirido por conquista, por descubrimiento, por un tratado, ó de otra manera. Y si fuese necesario invocar aquél documento, se podrá fácilmente ver y comprender por el Tratado de Paris mismo, que la condición del pueblo de Puerto Rico, en cuanto á sus derechos civiles y condición política, depende enteramente de la voluntad del Congreso, según se expresa en la Ley. (Véase el Tratado de Paris, Artículo 9); y hasta que el Congreso tenga por conveniente, hacer las disposiciones de la Constitución de los Estados Unidos, y las leyes adoptadas á consecuencia de las mismas, extensivas á los habitantes de esta Isla, éstos deben limitarse á gozar de la libertad que les ha sido concedida por la Ley Orgánica, por la cual se les han dado los privilegios de una autonomía limitada, y de un gobierno civil.

El mero hecho de que los Estados Unidos son una república en vez de monarquía, no priva á su gobierno del poder

as applicable to the government, to the courts and to the people of that territory, it has been deemed necessary that Congress should act in the matter either by a direct statute extending the benefits of the Constitution to such territory, or tacitly acquiescing in such action by other branches of the Government. No such act of Congress has been passed in regard to Porto Rico, and no such acquiescence has been made. It may be stated, and it is believed to be the case, that certain personal rights of the individual citizen are, by the mere fact of American possession, extended to every one residing within the jurisdiction of the United States. They are such as the right to worship according to the dictates of his own conscience, the right to be secure in his house, person, papers and effects from unreasonable searches and seizures, and the equal protection of the laws; but other provisions of the Constitution which have reference to their political status, to civil rights, or to citizenship, or to suffrage, and the like, have no reference whatever to a people inhabiting an island or a tract of country which has been acquired by discovery, conquest, treaty or otherwise. And if it were necessary to invoke that document it can easily be seen and understood from the Treaty of Paris itself, that the condition of the people of Porto Rico as to their civil rights and political status depends entirely upon the will of Congress, as expressed in legislative enactment (See Treaty of Paris, Art. IX); and until Congress sees fit to extend the provisions of the Constitution of the United States, and the laws passed in pursuance thereof, to the inhabitants of this Island, they must be limited to the enjoyment of such liberty as is granted them in the Organic Act, by which they were given the privileges of a limited autonomy and of civil government.

The mere fact that the United States is a republic instead of a monarchy does not deprive its government of the power

de declarar y hacer guerra, de extender sus confines, de hacer conquistas, de hacer tratados y de adquirir territorio en tal forma como les parezca más prudente y conveniente, á los poderes ejecutivo y legislativo. Es, por supuesto, de presumirse que un gobierno libre, como lo es el de los Estados Unidos, al adquirir territorio, concederá á la población del mismo, mayor suma de libertades de las que anteriormente gozaba bajo dominio real; pero el sostener que los habitantes de tal territorio tengan en seguida, inmediatamente después de la ocupación por los ejercitos del Gobierno americano, todos los derechos de ciudadanía que los ciudadanos primitivos de la República adquirieron por herencia de sus antepasados, no está autorizado por nada, en la Constitución, ni en las leyes de los Estados Unidos, ni en las instituciones, que en el progreso de trece décadas, han nacido bajo la protección de aquella Constitución y de aquellas leyes.

Hasta que el Congreso establezca una ley, haciendo la Constitución de los Estados Unidos, extensiva á Puerto Rico, ó hasta que el Tribunal Supremo de los Estados Unidos declare que dicho instrumento está en plena fuerza y vigor aquí, este Tribunal debe conformarse con administrar las leyes de esta Isla, tales como se encuentran en los Códigos y estatutos, y no tratar de usurpar funciones legislativas ó ejecutivas, al ir en pos del fantasma de derechos imaginarios.

Nosotros deducimos de los dictámenes sobre casos insulares, contenidos en 182 U. S. Reports, las proposiciones siguientes:

(A) Considerando los diferentes y numerosos tratados, por los cuales el Gobierno americano ha adquirido territorio extranjero, á la luz de las circunstancias que prevalecían en la época en que fueron celebrados, vemos que el poder que celebraba el tratado, carecía siempre de autoridad para incorporar el territorio en los Estados Unidos, sin el consentimiento expreso ó implícito del Congreso Nacional.

(B.) Cuando un tratado no contiene estipulaciones res-

to levy and carry on war, to expand its boundaries, to make conquests, to make treaties, and to acquire territory, in such a manner as may seem wisest and best to the executive and to the legislative power. It is of course to be presumed that a free government like that of the United States, when it does acquire territory, will concede to the population inhabiting the same a greater measure of liberty than they previously enjoyed under royal rule; but to contend that the inhabitants of such territory have, at once immediately on the occupation by the armies of the American Government, all the rights of citizenship which the original citizens of the republic acquired by inheritance from their forefathers, is not warranted by anything in the Constitution or in the laws of the United States, or in the institutions which have grown up, in the progress of thirteen decades, under the protection of that Constitution and those laws.

Until Congress shall enact a law extending the Constitution of the United States to Porto Rico, or until the Supreme Court of the United States shall decide that instrument to be in full force and vigor here, this court must content itself with administering the laws of this Island as they are found upon the statute books and it should never attempt to usurp legislative or executive functions, in grasping after the phantom of imaginary rights.

We deduce from the opinions in the Insular Cases in 182 U. S. Reports, the following propositions:

(a) Considering the various and numerous treaties by which the American Government has acquired foreign territory in the light of circumstances surrounding them when made, the treaty-making power was always devoid of authority to incorporate territory into the United States without the assent, express or implied, of the National Congress.

(b) When a treaty contains no conditions for incorpora-

pecto á la incorporación, y sobre todo, cuando no solamente no tiene tales estipulaciones, sino expresamente dispone lo contrario, entonces la incorporación no procede sino hasta que, en la opinión del Congreso, el territorio adquirido haya llegado á tal estado, que sea conveniente que entre en la familia americana, formando parte de ella.

(C.) Las disposiciones de la Ley Foraker, consideradas en su totalidad, claramente manifiestan la intención del Congreso de que, por lo menos en la actualidad, Puerto Rico no ha de ser incorporado en los Estados Unidos.

En el reciente caso de la González, en que se interpuso recurso de apelación para ante el Tribunal Supremo de los Estados Unidos, contra el fallo dictado por el Tribunal de Circuito de los Estados Unidos, en Nueva York, el Tribunal primeramente citado, declaró que la persona que quería inmigrar en los Estados Unidos, ó sea la González, no era una extranjera en el sentido dado á esta palabra en las leyes de inmigración, pero, al mismo tiempo, no declaró que ella era ciudadana de los Estados Unidos, dejando así la condición de los puertorriqueños, en cuanto á la ciudadanía, en el mismo ser y estado en que había sido colocada por la Ley Foraker, y las decisiones en los Casos Insulares. Cualesquiera que sean las aspiraciones que nuestro pueblo tenga con respecto á ciudadanía, gobierno de la Isla por sí misma, gobierno territorial, y á que se declare la Isla Estado de la Unión, esas aspiraciones deben dirigirse al Congreso Nacional, ó al menos, á alguna otra autoridad que no sean los Tribunales insulares, los cuales están obligados á juzgar las cuestiones sometidas á ellos, de acuerdo con las leyes vigentes.

Aunque se sostuvo por el abogado defensor del acusado, en su informe oral, que esta petición había de concederse ó negarse con arreglo á las disposiciones de la Constitución de los Estados Unidos, y la sección trigésimaquinta de la Ley Orgánica, que confiere á este Tribunal la facultad de expedir

tion, and, above all, where it not only has no such conditions but expressly provides to the contrary, incorporation does not arise until, in the wisdom of Congress, it is deemed that the acquired territory has reached that state where it is proper that it should enter into and form a part of the American family.

(c) The provisions of the Foraker Law, taken as a whole, plainly manifest the intention of Congress that, for the present, at least, Porto Rico is not to be incorporated into the United States.

In the recent case of González appealed to the Supreme Court of the United States from the Circuit Court of the United States in New York the former court held that the intended immigrant was not an alien within the purview of the immigration laws, but at the same time did not decide that she was a citizen of the United States, thus leaving the status of Porto Rico as to citizenship where it had been placed by the Foraker Act and the decisions of the Insular Cases. Whatever aspirations our people may have in the direction of citizenship, self-government, territorial government and statehood, must be directed to the National Congress, or at least to some other authority than the insular courts, which are bound to adjudicate questions submitted to them in accordance with the existing laws.

Although it was contended by counsel in his argument that this application should stand or fall on the provisions of the Constitution of the United States, and on the thirty-fifth section of the Organic Act giving to this court power to issue writs of *habeas corpus,* and he maintained that the Leg-

autos de *habeas corpus*; y que la Legislatura de Puerto Rico no podía ni aumentar ni restringir los poderes conferidos por dicha Constitución y Ley Orgánica, sin embargo, no creemos que esa afirmación esté bien fundada. Por cuanto la Legislatura de Puerto Rico tiene la facultad de legislar en cuanto á la jurisdicción y procedimiento de los Tribunales, y ha adoptado una Ley referente á *habeas corpus* que establece todos los principios tan conocidos de la ley americana, aplicables á este gran auto; con respecto á la solicitud de ese auto y la concesión del mismo, nosotros creemos que es el deber de este Tribunal, cumplir con esa Ley, y nosotros la examinarémos para ver si hay algo contenido en la misma, que autorice al peticionario para pedir que se le ponga en libertad.

Las leyes con respecto á *habeas corpus,* aplicables á este caso, son especialmente las Secciones 482 y 483 del Código de Enjuiciamiento Criminal, que dicen lo siguiente:

"Art. 482.—Si no ha expirado el tiempo durante el cual puede estar detenida legalmente una persona, el juez ó tribunal ordenará que continúe detenida dicha persona, si resulta que está detenida ó en custodia:

1. En virtud de mandamiento expedido por el juez del tribunal de distrito de los Estados Unidos, en los casos que dicho tribunal ó juez tenga competencia exclusiva, ó

2. En virtud de orden de arresto ó sentencia firme ó decreto de cualquier tribunal competente en la jurisdicción criminal, ó de cualquier mandamiento expedido en virtud de dicha orden de arresto, sentencia ó decreto.

Art. 483.—Si resulta del auto diligenciado que el preso está en custodia en virtud de mandamiento de cualquier tribunal ó juez de Puerto Rico, ó funcionario del mismo, el preso puede ser excarcelado en cualquiera de los casos siguientes, con sujeción á las prescripciones del artículo anterior:

1. Cuando se ha traslimitado la jurisdicción de tal tribunal ó funcionario.

2. Cuando siendo legal en su orígen el arresto, ha tenido lugar

islature of Porto Rico could neither enlarge nor restrict the powers therein conferred, yet we do not believe such a position to be well taken. Inasmuch as the Legislature of Porto Rico has power to legislate in regard to the jurisdiction and procedure of courts, and has passed an act concerning *habeas corpus,* which lays down all the well-known principles of American law applicable to this great writ, and in regard to the application for and the granting of the same, we believe it is the duty of this court to follow that law; and we shall examine it to see if there is anything contained therein under which this applicant can claim his discharge.

The statutes in regard to *habeas corpus* applicable to this case are particularly sections 482 and 483 of the Code of Criminal Procedure, which read as follows:

"Section 482.—The court or judge, if the time during which such party may be legally detained in custody has not expired, must remand such party, if it appears that he is detained in custody;

"1. By virtue of process issued by the court or judge of the United States District Court, in a case where such a court or judge has exclusive jurisdiction; or,

"2. By virtue of a warrant or final judgment or decree of any competent court of criminal jurisdiction, or of any process issued upon such warrant, judgment or decree.

"Section 483.—If it appears on the return of the writ that the prisoner is in custody by virtue of process from any court of Porto Rico, or judge or officer thereof, such prisoner may be discharged in any of the following cases, subject to the restrictions of the preceding section:

"1. When the jurisdiction of such court or officer has been exceeded.

"2. When the imprisonment was at first lawful yet by some act,

después alguna acción, omisión ó suceso por el cual la persona arrestada se haya hecho acreedora á su excarcelación.

3. Cuando el mandamiento es defectuoso en algún requisito fundamental de los que la ley exige, produciendo por este hecho la nulidad.

4. Cuando el mandamiento, no obstante ser correcto en su forma, se ha expedido fuera de los casos permitidos por la ley.

5. Cuando la persona que tenga en custodia al preso, no es la persona autorizada por la ley para detenerlo.

6. Cuando el mandamiento no está autorizado por ninguna prescripción de la ley, sentencia ó decreto de algún tribunal.

7. Cuando se ha encarcelado una persona bajo una acusación criminal sin causa razonable ó probable para ello''.

Del examen de estas secciones resulta claramente que la única sección aplicable á este caso, es el primer párrafo de la Sección 483, por la que se declara que ''cuando se haya excedido la jurisdicción de tal tribunal ó funcionario'' se podrá poner en libertad al acusado. No puede haber duda después de una revista minuciosa de todos los autos, y de las razones alegadas por el peticionario, para que se le ponga en libertad, que en este caso el Tribunal de Distrito tenía jurisdicción sobre el delito denunciado, sobre la persona del acusado, y sobre el asunto de que se trataba en esta causa, que no se había excedido la jurisdicción en lo más mínimo, y que el Tribunal Supremo tenía jurisdicción de apelación para decidir dicho asunto al interponerse el recurso de apelación.

No se ha demostrado nada en la solicitud, ni en el alegato, que pueda atacar, con éxito, esta jurisdicción ó la forma en que se ha ejercido, y tanto por esta razón, cuanto por otras expresadas en la presente, la solicitud no puede prevalecer.

La mayoría de los puntos alegados en esta solicitud, atacan más bien el método de procedimiento, que no la jurisdicción de los Tribunales que dictaron la sentencia, por la cual el acusado fué declarado culpable, y de esta manera tratan de apartar el objeto del auto de *habeas corpus* de su primitivo propósito de libertar al peticionario de una sujeción ó encar-

omission, or event which has taken place afterwards, the party has become entitled to a discharge.

"3. When the process is defective in some matter of substance required by law rendering such process void.

"4. When the process, though proper in form, has been issued in a case not allowed by law.

"5. When the person having custody of the prisoner is not the person allowed by law to detain him.

"6. Where the process is not authorized by any order, judgment, or decree of any court, nor by any provision of law.

"7. Where a party has been committed on a criminal charge without reasonable or probable cause."

It is plain from an examination of these sections that the only one applicable hereto is paragraph 1 of section 483 declaring that "when the jurisdiction of such court or officer has been exceeded" the prisoner may be discharged. There can be no doubt, after a careful review of the whole record and the reasons assigned by the applicant for his discharge, that in this case the district court had jurisdiction of the offense charged, and of the person of the defendant, and of the subject-matter of the case, and that the jurisdiction was not in the least exceeded, and that the Supreme Court had appellate jurisdiction to decide the same on appeal.

Nothing has been shown in the application or argument which can successfully attack this jurisdiction or the manner of its exercise, and for this reason, as well as the others herein set forth, the application cannot prevail.

Most of the points made in this application attack the method of procedure rather than the jurisdiction of the courts deciding the case and rendering the judgment under which the defendant was convicted, and thereby seek to pervert the purpose of the writ of *habeas corpus* from its original design of freeing the applicant from illegal restraint or imprisonment,

celación ilegal, de modo que haga las veces de un recurso de error ó de apelación. Es un principio elemental, que esto no es posible, y en apoyo de esto, no creo que sea necesario citar autoridades; sin embargo, podrá hacerse referencia á algunas: (*Storti* v. *Massachusetts,* 183 U. S., 141; *Minnesota* v. *Brundage,* 180 U. S., 499; *Markuson* v. *Boucher,* 175 U. S., 184; *Tinsley* v. *Anderson,* 171 U. S., 101; *Baker* v. *Grice,* 169 U. S., 284.

El Juez Taft, en la causa de McKnight, en Federal Reporter, página 801, dijo muy bien, que ''Antes de que un Tribunal pueda intervenir mediante *habeas corpus,* en la sentencia dictada por otro Tribunal, deberá poder decir que dicha sentencia es nula y sin ningún valor''. También se ha dicho por el Tribunal Supremo de los Estados Unidos, que ''cuando la objeción que se haga contra una sentencia, solamente se refiere á la regularidad de los procedimientos que dieron por resultado el juicio, y no á la jurisdicción del Tribunal de hacer ejecutar la sentencia, tal irregularidad no hace nula la sentencia. *Harding, ex-parte,* 120 U. S., 782. No hay nada en estos autos, que invalide la sentencia y apoye la solicitud.

Habiendo examinado minuciosamente todas las reclamaciones hechas por el peticionario, para que se le ponga en libertad, é investigado las cuestiones presentadas en su causa, aún más detenida y extensamente de lo que ha indicado el abogado defensor en su alegato, y habiendo buscado en vano algún motivo por el cual se pudiera poner en libertad al acusado, sin encontrar alguno, la petición de *habeas corpus* debe ser denegada.

*Denegada.*

Jueces concurrentes, Sres. Presidente Quiñones y Asociados Hernández y Figueras.

Juez disidente: Sr. Sulzbacher.

Opinión Disidente del Juez Asociado Sr. Sulzbacher.

Es esta una solicitud de *habeas corpus,* formulada por

so as to make it take the place of a writ of error or an appeal. It is an elementary principle that this cannot be done and in support of it no authorities are deemed necessary; but reference may be made to a few. (*Storti* v. *Massachusetts,* 183 U. S. 141; *Minnesota* v. *Brundage,* 180 U. S. 499; *Markuson* v. *Boucher,* 175 U. S. 184; *Tinsley* v. *Anderson,* 171 U. S. 101; *Baker* v. *Grice,* 169 U. S. 284.)

It was well said by Judge Taft in the case of McKnight, in Federal Reporter, page 801, that "before a court can interfere with the judgment of another court by *habeas corpus,* it must be able to say that the judgment is void and null." Again it is said by the Supreme Court of the United States that, "when the objection to the sentence goes only to the regularity of the proceedings which resulted in the adjudication and not to the jurisdiction of the court to enforce the sentence, such an irregularity does not render the judgment void." (*Harding, Ex parte,* 120 U. S. 782.) There is nothing in this record to invalidate the judgment and support the application.

Having carefully examined all the claims made by the applicant for his enlargement, and having gone into the questions presented in his case even more fully and extensively than his counsel has indicated in his argument, and having searched in vain for some ground on which he could be liberated, none has been found, and for that reason the application for *habeas corpus* must be denied.

*Denied.*

Chief Justice Quiñones and Justices Hernández and Figueras concurred.

Mr. Justice Sulzbacher dissented.

DISSENTING OPINION OF MR. JUSTICE SULZBACHER.

This is an application for a writ of *habeas corpus* by Ho-

Hobart S. Bird, quien, el día 21 de Octubre de 1903, á con-
secuencia de un segundo juicio celebrado en esta causa, fué
declarado culpable en la Corte de Distrito de San Juan del
delito de injurias á la autoridad, de acuerdo con el Artículo
265 del antiguo Código Penal. Interpuso apelación para ante
este Tribunal, confirmándose la sentencia dictada por la
Corte de Distrito, en 27 de Febrero de 1904. No formé parte
del Tribunal cuando la causa vino ante el mismo en apelación,
ni tomé parte alguna en su resolución. La causa fué devuelta
á la Corte de Distrito y el acusado Bird fué arrestado y con-
ducido á la cárcel para cumplir la sentencia que le fuera
impuesta.

Obtuvo un auto de *habeas corpus* de esta Corte, y después
de argumentarse el caso, la mayoría del Tribunal denegó la
solicitud. Soy de opinión que ha debido declararse con lugar
la solicitud, y ponerse al prisionero en libertad. Á los fines
de mi opinión disidente, considero necesario hacer una rela-
ción de los hechos esenciales del caso, desde su origen.

La acusación fué presentada ante la Corte de Distrito
de San Juan en el mes de Marzo de 1902, y el acusado fué
declarado culpable, por dicha corte, en 19 de. Septiembre
Contra esta sentencia interpuso apelación para ante este Tri-
bunal, el que, por resolución de 15 de Junio de 1903, revocó la
sentencia dictada por la Corte de Distrito, y ordenó la cele-
bración de un nuevo juicio. Estuve conforme en la revoca-
ción de la sentencia y en una opinión, que separadamente
emití, expresé las razones que tuve para ello. Según la ley, la
Corte de Distrito está compuesta de tres Jueces, pero en el
juicio uno de los Jueces sirvió en calidad de Juez especial ó
suplementario. El Juez Presidente Sr. Quiñones y los Sres.
José C. Hernández y José Ma. Figueras, resolvieron que, de
acuerdo con cierto Real Decreto de España, y que aún está
vigente en Puerto Rico, el acusado tenía que ser notificado,
por lo menos 24 horas antes de la celebración del juicio, de
que un Juez substituto habría, también, de formar tribunal

bart S. Bird, who, on the twenty-first day of October, 1903, on a second trial of this case, was convicted in the District Court of San Juan for the offense of libel against the authorities, under article 285 of the old Penal Code. He appealed to this court, and on the 27th of February, 1904, the judgment of the district court was affirmed. I did not sit in the case when it came before the court on appeal, nor did I take any part in its decision. The case was remanded to the district court and the defendant, Bird, was arrested and taken to jail to serve his sentence.

He sued out a writ of *habeas corpus* before this court and after argument the writ was denied by a majority of the court. I am of the opinion that the writ should have been granted and the prisoner discharged. For the purpose of my dissenting views I deem it necessary to make a statement of the material facts of the case from its beginning.

The accusation was filed in the District Court of San Juan in the month of March, 1902, and the defendant was convicted by said court on the 19th of September. From that judgment he appealed to this court, and by its decision of the 15th of June, 1903, the judgment of the district court was reversed and a new trial ordered. I concurred in reversing the judgment, stating my reasons in a separate opinion. The district court, under the law, is composed of three judges, but one of the judges at the trial was a special or supplementary judge. Mr. Chief Justice Quiñones, Mr. José C. Hernández and Mr. José Ma. Figueras held that, under a certain royal decree of Spain, and still in force in Porto Rico, the defendant would have to be notified, at least twenty-four hours in advance of the trial that a supplementary judge would also sit in his case, and this notice not having been given a new trial would have to be granted. I held that no special or

en el juicio de su causa, y que no habiéndose hecho esta notificación, tenía que ordenarse la celebración de un nuevo juicio. Yo sostuve que no podía formar parte del tribunal, en ningún caso, ningún Juez substituto ó especial, y que la sentencia tenía que ser revocada.

Durante el tiempo transcurrido entre la época en que se cometió el supuesto delito y el día del juicio, la Legislatura Insular aprobó un nuevo Código Penal, y otro de Procedimientos, los que, según sus disposiciones, empezaron á regir el día primero de Julio de 1902, conteniendo, en substancia, la disposición de *que todos los delitos cometidos con anterioridad á aquella fecha deberían perseguirse de la misma manera que si la nueva ley no hubiera sido aprobada.* Este Tribunal, en el caso de *In re Mauleón,* resolvió, con fecha 29 de Octubre de 1903, que con respecto á los delitos cometidos con anterioridad al primero de Julio de 1902 el antiguo Código de Enjuiciamiento Criminal era el *único* aplicable, expresando que:

No existe, pues, duda alguna, de que el nuevo Código Penal y la nueva Ley de Enjuiciamiento Criminal constituyen partes integrantes de un mismo sistema, y están íntimamente relacionados. Está generalmente admitido que el primero define el crimen y establece el castigo, mientras que la segunda prescribe la forma, el método y los procedimientos que deben seguirse para el cumplimiento de la misma. Á este tribunal no le cabe duda de que fué la intención de la legislatura el que el Artículo 558 se considerase como una cláusula de reserva, toda vez que en ella se expresa, en términos positivos é inequívocos, que todo acto ú omisión, cometido con anterioridad á la aprobación del Código, podrá "investigarse, perseguirse y castigarse, como si no se hubiera aprobado este Código". Por consiguiente, los preceptos del nuevo Código Penal y de Enjuiciamiento Criminal, no podían aplicarse á todos los delitos ó faltas cometidos antes del día primero de Julio de 1902, y dichas leyes habían de considerarse como si no hubieran existido absolutamente.

El nuevo sistema criminal fué copiado de los estatutos de Montana y California, pero la ley insular prescribe que *en*

supplementary judge could sit in any case and that the judgment had to be reversed.

During the time the supposed offense was committed and the day of trial the Insular Legislature passed a new Penal Code, and one of Procedure, which, by their terms, went into effect on the 1st of July, with the proviso, in substance, *that all criminal offenses committed prior to that date should be prosecuted the same as if the new law had not been passed.* This court, on the twenty-ninth day of October, 1903, *In re Mauleón,* 4 Porto Rico Reports, 227, held that, as to the offenses committed prior to July 1, 1902, the old Penal Code of Procedure *only* was applicable, stating:

"There is no doubt that the new Penal Code and the new Code of Criminal Procedure are parts of the same system and closely related to each other. As universally recognized the former defines the crime and fixes the punishment, whilst the other outlines the manner, the course and the proceedings to prosecute and enforce the latter. It is evident to this court that it was the intention of the legislature that section 558 should be considered as a saving clause, for it states in most positive and unequivocal terms that any act or omission committed prior to the establishment of the Code 'shall be enquired of, prosecuted and punished in the same manner as if this Code had never been passed.' Hence, as to all crimes or offenses committed prior to the first day of July, 1902, the new Penal Code and the Code of Criminal Procedure could not be applied, but had to be considered as if they were not in existence at all."

The new criminal system was copied from the statutes of Montana and California, but it is provided, by the insular law,

*casos de misdemeanors no procederá apelación de la Corte de Distrito para ante el Tribunal Supremo.* Por esta razón, únicamente son apelables los delitos *felony* y cuando en ellos se interponga apelación, este Tribunal, siguiendo la práctica generalmente seguida en los Estados Unidos, bajo Códigos modernos semejantes, puede considerar solamente aquellos errores que se hubieran señalado ó reservado por medio de un pliego de excepciones, á no ser que de otro modo aparezcan manifiestos en autos, después de haberse presentado mociones en solicitud de un nuevo juicio ó para casar la sentencia, respectivamente. Pero toda vez que un delito *misdemeanor* no es apelable para ante el Tribunal Supremo, sería inútil que un acusado hiciera objeciones á las decisiones del Tribunal sentenciador, y él tendría que aceptar sin remedio alguno, todos sus errores.

El antiguo procedimiento criminal, ó sea la ley española, según se modificara por las órdenes militares, y que estuvo vigente hasta el día 1 de Julio de 1902, y era aplicable á todos los crímenes y delitos cometidos con anterioridad á esa fecha ,es enteramente distinto de aquel contenido en la nueva ley. Toda causa criminal que tuviera su origen ante la Corte de Distrito era apelable para ante el Tribunal Supremo, y, declarado culpable un acusado, tenía 10 días durante los cuales podía presentar su moción interponiendo apelación, y la sentencia no adquiría el carácter de firme hasta después de haber transcurrido estos días. La distinción que hace la jurisprudencia moderna entre *felonies* y *misdemeanors* no era conocida al derecho español, ni existía tal distinction durante la vigencia del mismo. Los dos sistemas criminales eran tan completamente distintos y diferentes que sería incorrecto, y sin fundamento legal alguno, que una persona familiarizada con ambos procedimientos aplicara el término *misdemeanor* á cualquier delito comprendido en el antiguo Código Penal, y cualquiera alusión ó comparación, que quisiera hacerse, originaría confusión.

De acuerdo con el antiguo procedimiento, el tribunal sen-

that *no appeals shall lie from the district court to the Supreme Court in cases of misdemeanor.* For this reason felonies only are appealable and when appealed, this court, as is generally the practice in the United States, under similar modern codes, can only consider such errors which are pointed out or saved by bill of exceptions, except when they are otherwise apparent upon the face of the record, after motions for a new trial or arrest of judgment, respectively. But since a misdemeanor is not appealable to the Supreme Court, it would be unavailing for a defendant to save any objections to the rulings of the trial court, and he would have to submit without remedy to all its errors.

The old criminal procedure, the Spanish law, and as modified by military orders, and in force up to July 1, 1902, and applicable to all crimes and offenses committed prior to that date, is entirely different from that of the new law. Every criminal case originating in the district court was appealable to the Supreme Court, and, upon conviction, the defendant had ten days during which to file his motion for appeal, and the judgment did not become final until after these ten days. The distinction of the modern jurisprudence, of felonies and misdemeanors, was not known and did not exist under the Spanish law. The two criminal systems were so entirely different and dissimilar that it would be unsound and without legal foundation for one acquainted with both methods to apply the term "misdemeanor" to any offense under the old criminal law, and any allusions or comparisons would be misleading.

Under the old system the trial court would have to write

tenciador tenía que redactar una sentencia en estricta conformidad con la Ley de Enjuiciamiento Criminal. En esa sentencia tenía que hacerse una relación *correcta* de todos los hechos probados, según surgieran de la prueba practicada durante el juicio. El tribunal tenía que expresar también sus conclusiones legales y terminar expresando el castigo que impusiera. *Estos tres elementos componentes se exigían de modo imperioso.* Esta relación de hechos, según aparecía en las sentencias, como *hechos probados,* era todo lo que el tribunal de apelación podía tomar en consideración al revisar la causa, de acuerdo con el procedimiento criminal vigente con anterioridad al primero de Julio de 1902. Por consiguiente, es muy marcada y notable la diferencia que existe entre la antigua y la nueva ley. Con arreglo al nuevo procedimiento, en casos de *felony* aparece toda la prueba, ó aquella parte de la misma que el apelante considere necesario expresar por medio de un pliego de excepciones. Con arreglo al otro procedimiento, ó sea la ley española, aparece una relación de los hechos tomada de la prueba practicada durante el juicio, y expresada en la sentencia de la Corte de Distrito, y aunque este Tribunal había resuelto que todos los delitos cometidos con infracción del antiguo Código Penal Español y con anterioridad al primero de Julio de 1902, tenían que ser juzgados y castigados con arreglo al antiguo procedimiento, no obstante la *Corte de Distrito* según aparece claramente de sus propios autos, resolvió, en el *segundo juicio* de esta causa, que el nuevo Código de Enjuiciamiento Criminal era de aplicarse, considerando el delito hasta como un *misdemeanor,* cuando esta nomenclatura legal era absolutamente desconocida en el procedimiento español, adoptando así un procedimiento que no estaba justificado por autoridad ó fundamento alguno. Este hecho parece concluyente, según se deduce de la providencia que obra en autos, dictada por la Corte de Distrito en primero de Octubre de 1903:

'Resultando: que el Tribunal Supremo anuló la sentencia decre-

a judgment (*sentencia*) in *strict conformity* with the laws of criminal procedure. A *correct* statement of all the facts (*hechos probados*) (facts proven) as they appear from the evidence during the trial, would have to be stated in that *sentencia*. The court had also to give its legal findings and conclude with the punishment inflicted. *These three component parts were imperatively required.* This statement of the facts as it appeared in the *sentencias*, as "facts proven," (*hechos probados*) was all the appellate court could consider in reviewing the case, under the criminal procedure in force prior to July 1, 1902. The difference therefore between the old and the new law is most marked and notable. Under the new procedure, in cases of felony, there appeared the whole evidence or so much thereof as the appellant deemed proper to save by bill of exceptions; under the other, the Spanish law, a statement of the facts gathered from the evidence during the trial, and as contained in the judgment (*sentencia*) of the district court, and although this court had decided that all offenses in violation of the former Spanish Penal Code and committed prior to the first day of July, 1902, had to be tried and punished under the old system, the *district court,* nevertheless, and as it plainly appears by its record, ruled at the *second trial* of this case, that the new Code of Criminal Procedure was applicable, treating the offense even as a misdemeanor, when this nomenclature was absolutely unknown to the Spanish system, thereby taking a position without any authority or foundation. This fact seems conclusive by the record entry of the district court of October 1, 1903:

"Finding: that the Supreme Court reversed the judgment render-

tada en·esta causa y todo lo actuado desde la acusación fiscal y ordenó que se celebrara nuevo juicio con arreglo á ley.

Resultando: que hoy está vigente, desde el primero de Julio de 1902, y después de la instrucción de esta causa, una nueva ley procesal.

Cítese al acusado Hobart S. Bird para que comparezca ante el Tribunal el día doce del corriente á las 9 de la mañana y oiga la acusación fiscal (antes conclusiones provisionales) y conteste dicha acusación con arreglo al Código de Enjuiciamiento Criminal vigente y para señalar día para el juicio''.

De acuerdo con esta resolución de la Corte de Distrito, el acusado, después de dictada la sentencia condenatoria, fué prontamente conducido á la cárcel, no siéndole concedidos los diez días de gracia y privilegio para interponer la apelación, de acuerdo con el antiguo procedimiento.

Tarde en la noche de su prisión, se presentó al Juez Sr. Hernández, uno de los Magistrados de esta Corte, una solicitud de *habeas corpus*, y dicho Magistrado dictó una providencia transfiriendo la solicitud al conocimiento del Tribunal en pleno, en la mañana siguiente. Al resolver la solicitud de *habeas corpus*, este ·Tribunal, entre otros, expresó el siguiente:

'Considerando: que debiendo haberse continuado sustanciándose esta causa con arreglo al procedimiento antiguo, por tratarse· de la averiguación y castigo de un delito cometido con anterioridad á la fecha en que comenzó á regir en esta Isla el nuevo Código Penal, según está ya declarado por esta Corte Suprema en otros casos análogos, no ha podido ser reducido á prisión el peticionario para cumplir una sentencia que no era firme, puesto que aún no habían transcurrido los diez días que le concedía el Artículo 81 de lo Orden General, número 118, para alzarse contra la sentencia, requisito indispensable para que ésta hubiera adquirido la calidad de firme, y hubiera podido procederse á su ejecución con arreglo al Artículo 988, en relación con el 141 de la antigua Ley de Enjuiciamiento Criminal''.

Lo que no puede significar otra cosa que, toda vez que el proceso fué comenzado bajo el antiguo Código Penal, y siendo

ed in this case, and declared null all the proceedings had since the accusation of the *Fiscal,* and ordered that a new trial be had in accordance with law.

"Finding: that from the first of July, 1902, and after filing the information in this case, a new law of procedure has been in force.

"Notify the accused, Hobart S. Bird, in order that he may appear before the court on the twelfth day of the present month at nine o'clock a. m. and hear the accusation of the *Fiscal* (formerly provisional conclusions) and answer said accusation in accordance with the Code of Criminal Procedure in force, and to set a day for the trial.

In accordance with this action by the district court the defendant, after the rendition of the judgment of conviction, was speedily taken to jail, and the ten days of grace and privilege for appeal under the old system were not conceded to him.

Late at night on the evening of his imprisonment an application for *habeas corpus* was presented to Mr. Justice Hernández, one of the justices of this court, who made an order referring the application to the full bench for the following morning. This court, in its decision on the writ of *habeas corpus,* stated amongst other things, the following:

"Considering that in this case the court should have continued under the old procedure, inasmuch as it treats of the investigation and punishment of a crime, committed prior to the date on which the new Penal Code went into effect on this Island, as has already been declared by this Supreme Court in other and analogous cases, the petitioner could not be compelled to serve a sentence which was not final, inasmuch as the ten days allowed by article 81 of General Order No. 118 to perfect an appeal had not yet expired, which was an indispensable requisite in order that the same be final, and the execution of the same be proceeded with in accordance with article 988, in connection with 141 of the old Code of Criminal Procedure."

—which can have no other meaning than that, since the prosecution was commenced under the old Criminal Code, and being

por un delito cometido con anterioridad al primero de Julio de 1902, tenía que ser continuado y terminado de la misma manera. Esto no lo hizo el tribunal sentenciador, negándole por ello hasta el derecho de apelación, considerando el delito como si fuera un *misdemeanor*. Convencido el Tribunal Supremo del error cometido por la Corte de Distrito, al resolver el caso en esa forma, concedió el auto y puso en libertad al prisionero.

Posteriormente el acusado siguió su apelación contra la sentencia de la Corte de Distrito para ante este Tribunal, y el veinte y siete de Febrero de 1904, fué confirmada la sentencia dictada por la Corte de Distrito.

La causa fué devuelta á la Corte de Distrito y el acusado Bird fué arrestado nuevamente y conducido á la cárcel, obteniendo entonces el presente auto de *habeas corpus*. No puedo estar conforme con mis compañeros al denegar la petición, porque opino que todos los procedimientos seguidos con motivo de esta acusación criminal, desde el principio, son absolutamente nulos, y que muchos otros errores se cometieron que afectaron el derecho civil á la libertad personal, y los cuales pueden revisarse propiamente en un procedimiento de *habeas corpus*.

En el segundo juicio celebrado en este caso, volvió á formar parte del Tribunal un juez especial, juntamente con los jueces nombrados regularmente. En la apelación interpuesta con motivo del primer juicio, expresé mi opinión sobre este punto, en la siguiente forma:

'La Corte de Distrito trae su origen del Artículo 10 de la Orden General, número 118, que dice así:

Cada tribunal de distrito se compondrá de tres jueces, entre los cuales uno será Presidente, y los cuales reunidos todos, constituirán su sala de justicia, para lo Civil y Criminal........".

La facultad de nombrar jueces suplentes se deriva del Artículo 94 de la misma orden, que dice así:

'Los tribunales nombrarán uno ó más jueces suplentes para que

for an offense committed prior to July 1, 1902, it had to be continued and concluded in the same manner. This the trial court had not done, thereby denying him even the right of an appeal, treating it as a misdemeanor. The Supreme Court being satisfied of the error committed by the district court in so holding, granted the writ and discharged the prisoner.

The defendant thereafter prosecuted his appeal on the judgment of the district court to this court and on the twenty-seventh day of February, 1904, the judgment of the district court was affirmed.

The case was remanded to the district court and the defendant, Bird, was again arrested and taken to jail, when he sued out this present writ of *habeas corpus,* I am unable to concur with my brethren in denying the writ, for I am of the opinion that all the proceedings in this criminal accusation, from the beginning were absolutely void, and that many other errors were committed which affected a civil right of personal liberty and properly reviewable by writ of *habeas corpus.*

In the second trial of this case, again a special judge was sitting together with the regularly appointed judges. In the appeal from the first trial I expressed my views upon this subject in the following manner:

"The district court derives its existence from section 10 of General Order No. 118, which reads as follows:

" 'Each district court shall be composed of three judges, one of whom shall be presiding judge, and who jointly shall constitute a bench for civil and criminal business. . . . . .'."

"The authority to appoint supplementary judges is derived from section 94 of the same order, which reads as follows:

" 'The court shall nominate one or more supplementary judges

sustituyan á los propietarios en los casos de vacantes ó ausencias ó enfermedades. Cada Fiscal nombrará también su suplente para iguales casos.

El nombramiento habrá de recaer en letrados inscritos en el Colegio de esta Isla, con residencia fija y estudio abierto en la capitalidad donde el tribunal ejerciere sus funciones. Los jueces suplentes devengarán en concepto de dietas, seis pesos, oro Americano, por cada día en el que ejercieren funciones de justicia en Cortes de Distrito y diez pesos, oro Americano, si las ejerciesen en el Tribunal Supremo''.

Por virtud de la Sección 33 de la Ley del Congreso titulada, ''Ley para proveer temporalmente, de rentas y un gobierno civil á la Isla de Puerto Rico, y para otros fines'', aprobada en Abril 12, 1900, se dejaron subsistentes las Cortes de Distritos. Dicha sección está expresada en los siguientes términos:

''Que el poder judicial residirá en las Cortes y Tribunales de Puerto Rico establecidos ya y en ejercicio................. Por la presente se declaran subsistentes dichas Cortes y Tribunales........ .................... Disponiéndose, sin embargo............. los Jueces de las Cortes de Distrito serán nombrados por el Gobernador, con el concurso y consentimiento del Consejo Ejecutivo..........''.

Aparece pues que dicha Ley del Congreso especialmente dispuso que para ser nombrado Juez de una Corte de Distrito de Puerto Rico, dos condiciones absolutas y positivas deben existir, á saber, que tales Jueces deben ser nombrados por el Gobernador y con el concurso y consentimiento del Consejo Ejecutivo, lo que tácitamente implica, pero expresa de modo efectivo, que solamente aquellos que posean estas condiciones, y no otros, han de ser los Jueces de las Cortes de Distrito de Puerto Rico investidos con la jurisdicción que corresponda á dichos Tribunales.

Mas si fuere de otro modo, y si dicha Ley del Congreso no impidiera el nombramiento de Jueces suplentes, aún en ese caso sostengo que dicho Artículo 94 de la Orden General es nulo, porque dice: ''Los tribunales nombrarán uno ó más jueces suplentes,'' etc. Esto indicaría que un tribunal podría nombrar tantos como tres, constituyendo de ese modo un Tribunal completamente nuevo.

Pero aún admitiendo que los jueces suplentes pudieran ser nombrados, se observará que dicho artículo dice: ''El *tribunal* nombrará Jueces suplentes''. De donde se deduce que si existe alguna facultad de nombrar Jueces suplentes, tales nombramientos deben hacerse por el Tribunal, constituido por tres Jueces''.

to substitute the incumbent in case of vacancy, absence or sickness. Each attorney shall also nominate his substitute for the same reason.

" 'These nominations must be made from among lawyers registered at the bar of this island who are practicing in the town where the court sits. Substitute judges shall receive six dollars for each day's services in the district courts and ten dollars if serving in the Supreme Court of Justice.'

"By section 33 of the act of Congress, entitled 'An act temporarily to provide revenues and a civil government for Porto Rico, and for other purposes,' approved April 12, 1900, the district courts were continued. The following is the language of said section:

" 'That the judicial power shall be vested in the courts and tribunals of Porto Rico as already established and now in operation . . . . which courts and tribunals are hereby continued, . . . . provided, however, the judges of the district courts shall be appointed by the governor, by and with the advice and consent of the executive council. . . . . .'

"Thus it appears that it was specially provided by said act of Congress that to be constituted a judge of the district court of Porto Rico, two absolute and positive conditions must exist, namely, that such judges must be appointed by the Governor and with the consent and advice of the Executive Council, tacitly implying, but effectually indicating that only those possessing these qualifications, and none other, are to be judges of the district court of Porto Rico, and vested with the jurisdiction of said tribunal.

"But were it otherwise, and said act of Congress should not preclude the appointment of supplementary judges, still I contend that said article of General Order No. 94 is void, because it says: 'The court shall nominate one or more supplementary judges,' etc. This would mean that a court could appoint as many as three supplementary judges, thereby forming an entirely new tribunal.

"But even admitting that the supplementary judges could be appointed it will be observed that said section says, the *court* shall nominate supplementary judges. Hence if any authority exists to appoint supplementary judges, such appointments must be made by the court, constituted of three judges.

La Sección 33 de la Ley Orgánica dice así:

"Sección 33.—Que el poder judicial residirá en las Cortes y Tribunales de Puerto Rico establecidos ya y en ejercicio, incluyendo los Juzgados Municipales creados en virtud de Ordenes Generales, número ciento diez y ocho, promulgadas por el Brigadier General Davis, Voluntarios de los Estados Unidos, en Agosto diez y seis de mil ochocientos noventa y nueve incluyendo también los tribunales de policia establecidos por Ordenes Generales, número ciento noventa y cinco, promulgadas en Noviembre veinte y nueve de mil ochocientos noventa y nueve por el Brigadier General Davis, Voluntarios de los Estados Unidos, y las leyes y ordenanzas de Puerto Rico y sus Municipios que se hallan vigentes, en todo lo que no se oponga á esta Ley, y por la presente se declaran subsistentes dichas Cortes y Tribunales. La jurisdicción de estas Cortes y trámites seguidos en ellas, así como los distintos funcionarios y empleados de las mismas, respectivamente, serán los que se definen y prescriben en dichas leyes y ordenanzas y dichas Ordenes Generales, número ciento diez y ocho y ciento noventa y cinco, mientras no se legisle otra cosa. *Disponiéndose, sin embargo,* que el Presidente y Jueces Asociados del Tribunal Supremo y el Marshal (Alguacil Mayor) del mismo, serán nombrados por el Presidente, con el concurso y consentimiento del Senado; y los Jueces de las Cortes de Distrito serán nombrados por el Gobernador con el concurso y consentimiento del Consejo Ejecutivo, y todos los demás empleados y agregados de las demás Cortes serán escogidos ó elegidos según disponga la Asamblea Legislativa, la que tendrá autoridad para legislar de tiempo en tiempo, conforme tenga por conveniente, con referencia á dichas Cortes, y cualesquiera otras que estime oportuno establecer; su organización, el número de Jueces y empleados y agregados para cada una, su jurisdicción, sus procedimientos y demás asuntos que las afecten".

Aunque la Ley del Congreso expresa "que el poder judicial residirá en las Cortes y tribunales establecidos ya y en ejercicio..............por la presente se declaran subsistentes dichas Cortes y Tribunales", no obstante tales Cortes y Tribunales han sido creados por el Congreso de la misma manera que si la Ley estuviera redactada así: "Habrá un Tribunal Supremo, una Corte de Distrito", etc. La intención del Congreso debe haber sido la de *crear* tribunales para

"Section 33 of the Organic Act reads as follows:

" 'Section 33.—That the judicial power shall be vested in the courts and tribunals of Porto Rico as already established and now in operation, including municipal courts, under and by virtue of General Orders, numbered One Hundred and Eighteen, as promulgated by Brigadier-General Davis, United States Volunteers, August sixteenth, eighteen hundred and ninety-nine, and including also the police courts established by General Orders Numbered One hundred and ninety-five, promulgated November twenty-ninth, eighteen hundred and ninety-nine, by Brigadier-General Davis, United States Volunteers, and the laws and ordinances of Porto Rico and the municipalities thereof in force, so far as the same are not in conflict herewith, all which courts and tribunals are hereby continued. The jurisdiction of said courts and the form of procedure in them, and the various officials and attachés thereof, respectively, shall be the same as defined and prescribed in and by said laws and ordinances, and said General Orders, Numbered One hundred and eighteen and One hundred and ninety-five, until otherwise provided by law; *Provided, however,* That the chief justice and associate justices of the supreme court and the marshal thereof shall be appointed by the President, by and with the advice and consent of the Senate, and the judges of the district courts shall be appointed by the governor, by and with the advice and consent of the executive council, and all other officials and attachés of all the other courts shall be chosen as may be directed by the legislative assembly, which shall have authority to legislate from time to time as it may see fit with respect to said courts, and any others they may deem it advisable to establish, their organization, the number of judges and the officials and attachés for each, their jurisdiction, their procedure, and all other matters affecting them." '

Although the act of Congress states "that the judicial power shall be vested in the courts and tribunals as already established, and now in operation, . . . . . all of which courts and tribunals are hereby continued," they became nevertheless creatures of Congress to the same extent as if the law would read: "There shall be a supreme court, a district court," etc. It must have been the intention of the Congress to *create* courts for Porto Rico, which can be

Puerto Rico, lo que puede deducirse fácilmente del mismo título de la Ley "Ley para proveer temporalmente, de rentas y un Gobierno civil". El requisito más importante de un Gobierno civil son los Tribunales de Justicia. Si el Congreso estimó que los Tribunales establecidos ya por el Gobierno Militar eran Tribunales adecuados, no podía emplear ninguna expresión más propia que el mismo término "subsistente". Parece, por consiguiente, que estas Cortes, el Tribunal Supremo y las Cortes de Distrito, no pueden ser afectadas en su constitución por ninguna Ley de la Asamblea Legislativa de Puerto Rico. Son Tribunales constitucionales en tanto en cuanto la Ley de Abril 12 de 1900 (Ley Foraker) sea la Constitución de Puerto Rico; y si han de hacerse algunos cambios, bien por el nombramiento de Jueces suplentes ó especiales, el Congreso, el creador de estas organizaciones, es el único que puede legislar sobre esta materia y disponer la manera de su nombramiento. El Gobernador, con el concurso y consentimiento del Consejo Ejecutivo, puede nombrar un nuevo Juez para cubrir una vacante pero no puede nombrar á un Juez suplente ó especial.

Se observará también que dicha Sección 33 prescribe que la Legislatura "tendrá facultad para legislar de tiempo en tiempo con referencia á dichas Cortes, y *cualesquiera otras que estime oportuno establecer, su organización, el número de dichos jueces, su jurisdicción*", etc.

Las primeras palabras "tendrá autoridad para legislar con referencia á dichas Cortes" solamente pueden referirse á las Cortes establecidas, ó que se dejaran subsistentes, por dicha Ley del Congreso. Esto lo ha cumplido la Legislatura de tiempo en tiempo al aprobar, por ejemplo, una Ley de Mandamus, y otras, cambiando el procedimiento, y otras semejantes, pero la *última parte de la ley* que se refiere al número de Jueces y su jurisdicción, solamente puede tener aplicación á los nuevos Tribunales que hayan de establecerse por la Legislatura, por virtud de esta facultad que le ha sido

readily inferred from the very title of the law, "An act temporarily to provide revenues and a civil government." The most important requirements for a civil government are courts of justice. If Congress considered that the courts theretofore established by the Military Government were proper tribunals, no phraseology more appropriate could have been employed than the very term "continued." It therefore seems that these courts, the Supreme Court and district courts, cannot be affected in their constitution by any laws of the Legislative Assembly of Porto Rico. They are constitutional courts in so far as the act of April 12, 1900 (Foraker Act), is the constitution for Porto Rico; and if any changes are to be made, be they supplementary or special judges, the Congress alone, the creator of these organizations, can legislate upon this subject, and provide the manner of their appointment. The Governor, by and with the advice and consent of the Executive Council, can appoint a new judge to fill a vacancy but not a special or substitute judge.

It will also be observed that said section 33 provides that the legislature "shall have authority to legislate from time to time as to those courts, and *any others they may deem it advisable to establish, their organization, their number of judges, their jurisdiction,*" etc.

The first words "shall have authority to legislate with respect to those courts" can only have reference to the courts established or continued by said act of Congress. This the legislature has from time to time carried out by enacting, for instance, a law of mandamus, and others, changing the procedure and the like, but the *latter portion* of the act, referring to the number of judges and their jurisdiction, can only have application to the new courts to be established by the legislature, by virtue of this congressional authorization. The jurisdiction of the Supreme Court and district courts has

conferida por el Congreso. La jurisdicción del Tribunal Supremo y Cortes de Distrito ha sido definida al principio de dicha sección, cuando dice'' que serán los que se definen y prescriben en dichas leyes y ordenanzas y órdenes militares''. La Legislatura puede aumentar y extender la jurisdicción de dichos Tribunales constitucionales, con tal que tales innovaciones y extensiones estén dentro de la esfera de la organización que se ha intentado darles.

El Juez suplente ó especial que formó tribunal en esta causa no fué nombrado por el Tribunal, sino por orden del Attorney General, indudablemente de acuerdo con las líneas siguientes que se encuentran en el presupuesto anual, ó Ley de Presupuesto de la Legislatura Insular, aprobada en 12 de Marzo de 1903:

''Para un Juez Asociado suplente, con residencia fija en San Juan, quien en el desempeño de su cargo se sujetará á las órdenes del Attorney General, para cubrir temporalmente las vacantes que ocurran en las Cortes de Distrito de la Isla, mil quinientos dollars''.

Esta parte solamente no podría tener el efecto de derogar la Orden General referente á Jueces suplentes, en caso de que la misma estuviera aún en vigor. La Corte de Distrito, dudosa, quizás, con respecto á si era correcto que un Juez suplente pudiera ó no ser nombrado para formar tribunal en esta causa, pidió al Attorney General su opinión sobre el asunto, lo que puede deducirse de la siguiente carta que se encuentra en autos:

''Oficina del Attorney General de Puerto Rico, San Juan, Julio 27, 1903. Hon Frank H. Richmond, Juez Presidente accidental, Corte de Distrito de San Juan. Señor: En contestación á su atenta del tres del corriente, me permito manifestar que he sido informado de que el Hon Angel García Veve tiene un nombramiento de Juez suplente, expedido por el Gobernador, siendo el deber de aquél servir en casos de esta naturaleza y que por tal servicio se le paga un sueldo anual. Si he sido correctamente informado, me parece pues que es

been defined at the beginning of said section when it reads: "They shall be the same as defined and prescribed by said laws, ordinances, and military orders." The Legislature may enlarge and amplify the jurisdiction of said constitutional courts, provided such innovations and extensions are within the scope of their intended organization.

The special or substitute judge who sat in the case was not appointed by the court but by order of the Attorney General, undoubtedly under the following lines found in the annual budget, or appropriation act of the Insular Legislature, approved March 12, 1903.

"For one associate substitute judge, with fixed residence in San Juan, whose duties shall be subject to the orders of the Attorney General, to temporarily fill such vacancies as may occur in the District Courts of the Island, fifteen hundred dollars."

This portion alone could not have the effect of repealing the general order of supplemental judges, should the same still be in force. The district court, perhaps, doubtful as to the propriety of whether or not a special judge could sit in this case, asked the advice of the Attorney General on the question, which can be inferred from the following letter found in the record:

"Office of the Attorney General of Porto Rico, San Juan, July 7, 1903. Hon. Frank H. Richmond, Temporary Presiding Judge, District Court of San Juan.—Sir: Replying to your favor of the 3rd instant, I beg to say that I am informed that Hon. Angel García Veve holds an appointment from the Governor as a substitute judge, whose duty it is to serve in cases of this character, and that he is paid an annual salary therefor. If I am correctly advised, then it seems to me he should be the person to act in the premises. If this is an error,

él la persona que debe actuar en el asunto. Si esto es un error, sírvase informarme en qué consiste tal error. Muy sinceramente suyo, Willis Sweet, Attorney General''.

Se observará, pues, que el Hon. Angel García Veve había sido nombrado solamente por el Gobernador y no fué confirmado por el Consejo Ejecutivo. Si hubiera sido de otro modo, el Hon. Attorney General, que es miembro del Consejo Ejecutivo, lo hubiera dejado ver en su comunicación al Tribunal, y que él debe haber tenido alguna duda con respecto á la legalidad de un Juez que no ha sido debidamente nombrado con arreglo á ley, puede deducirse de su misma comunicación.

La comunicación de la Corte de Distrito al Attorney General, no se encuentra en autos, y por esta razón no aparece de modo afirmativo que existiera alguna vacante en dicha Corte, pero hay una correspondencia entre el Attorney General y la Corte de Distrito, en relación con el primer juicio, de la que aparece que dos Jueces de la Corte de Distrito se consideraron incompetentes para actuar en la causa. Puede, por lo tanto, deducirse racionalmente que las mismas condiciones existían en el segundo juicio con respecto á uno de los Jueces, que no había vacante alguna, y en ese caso las líneas de carácter legislativo, contenidas en la Ley de Presupuesto, no tenían aplicación alguna.

La doctrina americana que hace referencia á jueces *de facto* no puede aplicarse propiamente á un Tribunal español, que entienda en materia criminal, cual lo fué el que juzgó y condenó al acusado, y debe tenerse presente que estas leyes continuaron subsistentes por virtud de la Sección 8 de la Ley Foraker. Dice así:

"Sección 8.—Que las leyes y ordenanzas de Puerto Rico actualmente en vigor, continuarán vigentes, excepto en los casos en que sean alteradas, enmendadas ó modificadas por la presente; ó hayan sido alteradas ó modificadas por ordenes militares y decretos vigentes cuando esta ley entre á regir, y en todo aquello en que las mismas

kindly advise me wherein the mistake occurs. Very truly yours, Willis Sweet, Attorney General.''

It will therefore be observed that the Hon. Angel García Veve had been appointed by the Governor, only, and was not confirmed by the Executive Council. Had it been otherwise the Honorable Attorney General, who is a member of the Executive Council, would have disclosed it in his letter to the court, and that a doubt as to the legality of a judge not duly qualified under the law must have been entertained by him can be inferred from his letter.

The letter from the district court to the Attorney General is not found in the record, and for this reason it does not affirmatively appear that any vacancy existed on that bench, but there is a correspondence between the Attorney General and the district court in connection with the first trial, from which it does appear that two judges of the district court considered themselves disqualified to sit in the case. It can therefore reasonably be inferred that the same conditions existed at the second trial as to one of the judges, that there was no vacancy, and in that event the legislative lines, contained in the appropriation act, were inapplicable.

The American doctrine of a judge *de facto* could not be well applied to Spanish criminal courts under which the defendant was tried and convicted, and it must be borne in mind that by section 8 of the Foraker Act these laws remained in force. It reads:

''Section 8.—That the laws and ordinances of Porto Rico now in force shall continue in full force and effect except as altered, amended or modified by military orders and decrees in force when this act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inappli-

no resulten incompatibles ó en conflicto con las leyes estatutarias de
los Estados Unidos, no inaplicables localmente, ó con las presentes
disposiciones, hasta que sean alteradas, enmendadas ó revocadas por
la autoridad legislativa creada por la presente para Puerto Rico,
ó por una Ley del Congreso de los Estados Unidos.''

Bajo el Gobierno español los Jueces suplentes eran nom-
brados por el Capitán General de la Isla, mas esta práctica
fué cambiada por la Orden General, y ellos tenían que ser
nombrados por el tribunal (supra).

La Corte de Distrito en tales casos criminales constituye
Tribunal como si fuera un jurado, y por esta razón debe exis-
tir una ley válida y expresa que autorice el nombramiento
de Jueces suplentes ó especiales, porque si no fuera así casi
aparecería que tales funcionarios se convertirían en jurados
*de facto*.

El Tribunal Supremo de los Estados Unidos, en el caso de
*ex-parte* Henry Ward, vol. 173, página 452, dice:

'No necesitamos, sin embargo, tomar en consideración la brillante
y completa argumentación del abogado con respecto á este punto, toda
vez que estimamos que es aplicable á este caso la regla bien estable-
cida de que cuando un Tribunal tiene jurisdicción sobre el delito y
sobre el acusado, y los procedimientos son correctos en otros sentidos,
una declaración de culpabilidad es legal, aun cuando el Juez que
constituya tribunal sea solamente un funcionario *de facto;* y que la
validez del título de tal Juez para desempeñar el cargo, ó su derecho
para ejercer funciones judiciales no pueden resolverse en un proce-
dimiento de *habeas corpus''*.

El Tribunal establece sus conclusiones fijando como re-
quisito que los procedimientos *sean correctos en otro sentido,*
pero se observará que los procedimientos seguidos en el caso
sometido á nuestra consideración fueron de lo más irregular
que puede darse y aun desde su mismo principio la Ley de
Abril 12 de 1900, conocida como Ley Foraker, en su Sección
16, exige que todas las diligencias judiciales se harán á nom-

cable, or the provisions hereof, until altered, amended or repealed by the legislative authority hereinafter provided for Porto Rico or by act of Congress of the United States.''

Under the Spanish Government supplemental judges were appointed by the Captain General of the Island, but this was changed by the general order and they had to be appointed by the court (*supra*).

The district court in such criminal cases sits as a jury, and for this reason an express and valid law should exist authorizing the appointment of supplemental or special judges, because otherwise it would almost appear that such functionary should become a juror *"de facto."*

The Supreme Court of the United States, in *Ex parte. Henry Ward,* vol. 173, p. 452, says:

''We need not, however, consider the elaborate argument of counsel in this behalf, since we regard the well-settled rule applicable here that where a court has jurisdiction of an offense, and of the accused, and the proceedings are otherwise regular, a conviction is lawful though the judge holding the court may be only an officer *de facto;* and that the validity of the title of such judge to the office, or his right to exercise the judicial functions, cannot be determined on a writ of *habeas corpus.''*

The court qualifies its conclusions by the requirement that the proceedings must be *otherwise regular,* but it will be found that the proceedings in the case under consideration were most irregular, and even from the very beginning. The act of April 12, 1900, known as the Foraker Act, in its section 16, required that all judicial powers shall run in the name of the ''United States of America, ss: the President of the United

bre de los Estados Unidos de America, ss: El Presidente de los Estados Unidos de America''. La orden, el mandamiento, es de lo más esencial en un procedimiento criminal. En este caso no se ha expedido tal mandamiento.

La doctrina referente á Jueces *de facto* ha sido frecuentemente resuelta en los Estados Unidos en favor de tales funcionarios, pero debe tenerse presente que en este caso se trata de aplicar una jurisprudencia completamente Americana á un procedimiento y sistema de leyes enteramente extraño para la primera, y en que la designación de un Juez *de facto* es absolutamente desconocida. La aplicación resulta por consiguiente forzada y violenta. Debemos administrar la ley en la forma en que la encontremos.

El Decreto Real que exige que un acusado sea notificado por lo menos veinte y cuatro horas del hecho de que un Juez suplente habrá de constituir tribunal en el juicio de su causa, no había tampoco sido derogado, y el antiguo procedimiento, con respecto á delitos cometidos con anterioridad al primero de Julio de 1902, estaba también vigente en la época en que se celebró el segundo juicio, como lo estaba asimismo al celebrarse el primero, según resolvió este Tribunal en los procedimientos sobre *habeas corpus*. De los autos no aparece que tal notificación se hiciera alguna vez. Esta omisión debe haberse escapado á los Jueces del Tribunal Supremo en la vista de la apelación á que dió lugar el segundo juicio.

Es por lo tanto evidente que la Corte de Distrito incurrió en error y que el caso debió haberse revocado por las mismas razones que motivaron la revocación del primer juicio.

Podría argumentarse que no se hizo objeción alguna por parte del acusado, pero dichos tres jueces, en esta decisión de 15 de Junio de 1903, al revocar la primera sentencia y ordenar la celebración de un nuevo juicio, resolvieron que, toda vez que la Asamblea Legislativa de Puerto Rico, en 12 de Marzo de 1903, cambió la naturaleza del Tribunal Supremo, de Casación, á un Tribunal de Apelación, ''este Tribunal,

States of America." The process, the warrant, goes to the very foundation of a criminal proceeding. In this case there was no such process issued.

The doctrine of a judge de facto has been frequently decided in the United States and in favor of such official, but in this instance it should be borne in mind that a jurisprudence, totally American, is attempted to be applied to a procedure and system of laws entirely foreign to the former, and where the designation of judge de facto is absolutely unknown. The application is therefore forced and strained. We must administer the law as we find it.

The royal decree, that a defendant has to be notified at least twenty-four hours of the fact that a special judge will sit in his judgment, had likewise not been repealed, and the old procedure, as to offenses committed prior to the 1st of July, 1902, was as much in force at the time of the second trial as it was at the first, as this court has held in the habeas corpus proceeding. The record does not show that any such notification was ever given. This omission must have escaped the justices of the Supreme Court at the hearing of the appeal of the second trial.

It is therefore evident that the district court committed an error and the case should have been reversed for the same reasons as those of the first trial.

It might be contended that no objections were raised on the part of the defendant, but the said three justices in this decision, the 15th of June, 1903, reversing the first judgment and ordering a new trial, held that since the Legislative Assembly of Porto Rico, on the twelfth day of March, 1903, changed the character of the Supreme Court of Cassation to a court of appeals, "this court, to accomplish the highest ends

para realizar los más altos fines de la justicia, está en el deber de fijar su atención en el procedimiento y decidir sobre los errores substanciales que en él se hayan cometido, aunque sobre ellos nada se haya alegado por las partes''. Estos mismos fines de la justicia debieron también haberse aplicado en la segunda apelación. En la primera apelación, el tribunal, de oficio, suplió la omisión en que incurriera el acusado.

Es evidente que el acusado fué juzgado de acuerdo con el nuevo Código de Enjuiciamiento Criminal, y surge la cuestión de si el Tribunal, al juzgar y declarar culpable al acusado Bird, bajo ese procedimiento, en lugar de haberse ajustado al antiguo Código Español, incurrió en errores que resultaron en perjuicio de aquél.

Las leyes que regulan los juicios y las sentencias de las Cortes de Distrito, bajo el antiguo sistema, son de carácter mandatorio é imperativo, y se exigía su más estricto cumplimiento. El Artículo 142 de la Ley de Enjuiciamiento Criminal, dice así:

''Las sentencias se redactarán con sujeción á las reglas siguientes:

1. Se principiará expresando: El lugar y la fecha en que se dictaren, los hechos que hubieren dado lugar á la formación de la causa, los nombres y apellidos de los actores particulares si los hubiere, y de los procesados, los sobrenombres y apodos con que sean conocidos, su edad, estado, naturaleza, domicilio, oficio ó profesión, y en su defecto, todas las demás circunstancias con que hubieren figurado en la causa, y, además, el nombre y apellido del magistrado ponente.

2. Se consignarán en *Resultandos* numerados los hechos que estuvieren enlazados con las cuestiones que hayan de resolverse en el fallo, haciendo declaración expresa y terminante de los que se estimen probados.

3. Se consignarán las conclusiones definitivas de la acusación y de la defensa y la que en su caso hubiese propuesto el Tribunal, en virtud de lo dispuesto en el Artículo 733.

4. Se consignarán también en párrafos numerados, que empezarán con la palabra *Considerando*:

of justice, it is its duty to pay attention to the proceedings, and to decide such critical errors which may have been committed, although the parties did not point them out." These same ends of justice should have been also applied to the second appeal. In the first appeal the court, of its own motion, supplied the defendant's omission.

It is evident that the defendant was tried under the new Code of Criminal Procedure, and the question arises whether the court, in trying and convicting the defendant Bird under that system, instead of the old Spanish Code, committed errors to his prejudice and injury.

The laws governing trials and judgments (*sentencias*) of the district court under the old system are *mandatory* and *imperative,* and the strictest compliance was required. Section 142 of the Law of Criminal Procedure reads as follows:

"Decisions (*sentencias*) shall be prepared subject to the following rules:

"1. They shall begin by stating the place at and date on which rendered; the facts which gave rise to the formation of the cause; the names and surnames of the private complainants, should there be any, and of the accused; the titles and nicknames by which they are known; their age, conjugal condition, nativity, domicile, trade or profession, and in the absence thereof all the other matters by which they may have figured in the cause, and also the name and surname of the justice *ponente.*" (The judge who writes the judgment.)

"2. In numbered *resultandos* (findings of facts) shall be stated the facts which may be related to the questions which are to be decided, making a clear and positive statement of those considered proved.

"3. The definite findings both of the accusation and of the defense shall be stated, as also, in a proper case, any proposal made by the court, in pursuance of the provisions of article 733.

"4. Also in numbered paragraphs, which shall begin with the word *considerando* (conclusions of law) shall be stated:

*Primero* los fundamentos doctrinales y legales de la calificación de los hechos que se hubiesen estimado probados.

*Segundo* los fundamentos doctrinales y legales determinantes de la participación que en los referidos hechos hubiese tenido cada uno de los procesados.

*Tercero* los fundamentos doctrinales y legales de la calificación de las circunstancias atenuantes, agravantes ó eximentes de responsabilidad criminal, en caso de haber concurrido.

*Cuarto* los fundamentos doctrinales y legales de la calificación de los hechos que se hubiesen estimado probados, con relación á la responsabilidad civil en que hubiesen incurrido los precesados, ó las personas sujetas á ella á quienes se hubiere oido en la causa, y los correspondientes á las resoluciones que hubieren de dictarse sobre costas, y en su caso, á la declaración de querella calumniosa''.

Los *Resultandos* (conclusiones de hecho) deben contener ''los hechos que se relacionen con la cuestión''. No acepto como correcta la traducción del segundo párrafo. Estas traducciones se hicieron en el Departamento de la Guerra de Washington, y nunca se han considerado en Puerto Rico como traducciones oficiales, sino simplemente como una cuestión de conveniencia. La palabra ''related'' se encuentra en el original español como ''enlazado'', que en este caso significa, entrelazados ó conectados. La prueba principal y esencial de este caso fué el artículo publicado. Éste, de acuerdo con el antiguo procedimiento, no podía consignarse *aliunde* en otras partes del record; tenía que expresarse en toda su extensión en los *resultandos* (conclusiones de hecho), como hechos probados, como este Tribunal ha resuelto ya invariablemente, y esto lo hizo la Corte de Distrito en el primer juicio. Sin embargo, este Tribunal ha resuelto también que de acuerdo con la jurisprudencia del Tribunal Supremo de España, cuando las conclusiones de hecho no eran completas y no expresaban suficientemente el delito, y podía éste deducirse de las conclusiones legales, cuando en ella se expresaban los hechos deficientes, el Tribunal podía considerar las últimas en relación con las primeras, pero que todos los hechos tenían que aparecer de la sentencia.

"*First.* The points of law and legal principles relating to the classification of the acts which are considered proven.

"*Second.* The points of law and legal principles relating to the participation in said acts of each of the accused.

"*Third.* The points of law and legal principles for the classification of extenuating or aggravating circumstances or exemption from criminal liability, if such be attendant.

"*Fourth.* The points of law and legal principles for the classification of the acts which may have been considered as proven with regard to the civil liability incurred by the person accused or the persons subject thereto heard in the cause, and those pertaining to decisions upon costs, and, in a proper case, to a declaration of a calumnious complaint."

The *resultandos* (findings of fact) must contain "the facts which may be related with the question.". I do not accept the translation of the second paragraph to be correct. These translations were made in the War Department at Washington, and have never been considered in Porto Rico as official translations, but merely as a matter of convenience. The Spanish for the word "related" is in the original "*enlazadas,*" which in this instances means, interwoven or connected. The principal and essential evidence in this case was the article published. This, under the old practice, could not be gathered *aliunde* from the other portions of the record; it had to be set out at length in the *resultandos* (findings of fact), as facts proven, as this court has invariably *held before,* and this the district court had done at the first trial. This court, however, has also decided, that, and in accordance with decisions of the Supreme Court of Spain, when a finding of facts was not complete and did not sufficiently set out an offense, and it could be gathered from the legal conclusions when they contain the remaining portions, the court could consider the latter in connection with the former, but all the facts must appear in the judgment (*sentencia*).

En este caso la Corte de Distrito no redactó sentencia alguna, según lo exige de modo imperativo el procedimiento español, de acuerdo con el cuál fué Bird, acusado, juzgado y condenado. No ha habido ni *Resultandos* (conclusiones de hechos) ni *Considerandos* (conclusiones legales), sino que, en lugar de esto, se dictó la sentencia de 21 de Octubre de 1903, que es todo lo que este Tribunal podía considerar al resolver la apelación.

En un caso, ante este Tribunal, seguido contra Mariano Abril Ostaló, Director de un periódico titulado "La Democracia", la relación de hechos contenida en la sentencia de la Corte de Distrito decía solamente lo siguiente:

"*Resultando*: que el periódico "La Democracia" del día siete del mes, en su segunda hoja contiene un artículo titulado "Tribunal de Policía" en el que se insertan frases y expresiones injuriosas al Alcalde Municipal de esta ciudad en sus funciones de Juez de Policía".

El Tribunal Supremo no estimó suficiente esta relación de los hechos y en una sentencia ó resolución, revocando el caso, dice:

*Considerando*: que el Artículo 142 de la Ley de Enjuiciamiento Criminal prescribe que los hechos que se consideren probados y que estén enlazados con la cuestión y hayan de tomarse en relación con la culpabilidad deben expresarse en Resultandos numerados.

*Considerando*: que en los Resultandos de la sentencia apelada, y que se han insertado anteriormente, no se ha insertado ninguna palabra, frase, ó porción del artículo publicado en el periódico "La Democracia", con el título de "Tribunal de Policía", que constituya el delito de injuria contra la autoridad, que así se ha calificado y castigado; y que tal sentencia no contiene suficientes hechos que sirvan de base para afirmar que el procesado reuna los requisitos integrantes de aquel delito, procediendo así, en su consecuencia, por tal concepto, la casación que se ha solicitado". .

La Corte de Distrito de Ponce, en donde se celebró el

In this case the district court did not write any *sentencia* (judgment) as imperatively required by the Spanish procedure, under which Bird was accused, tried and convicted. There were neither *resultandos* (findings of fact) nor *considerandos* (legal conclusions),. but in lieu thereof the judgment of October 21, 1903, and which is all this court could consider in passing on the appeal.

In a case before this court against Mariano Abril Ostaló, the editor of a newspaper called "La Democracia," the statement of facts in the judgment (*sentencia*) of the district court only reads as follows:

*Resultando* (findings of fact): Whereas, the newspaper 'La Democracia,' on the 7th day of the month in its second sheet contains an article styled 'Tribunal de Policía,' which contains phrases and expressions injurious to the municipal *alcalde* (mayor) of this city in his functions as police judge."

This statement of the facts the Supreme Court did not consider sufficient, and in a judgment or decision reversing the case states:

"Concluding that section 142 of the Law of Criminal Procedure provides that the facts which are held to be proven, and which are connected (*enlazados*) (interwoven) with the question and which have to be taken in connection with the conviction must be set out in the numbered findings of facts.

"Concluding that in the findings of fact (*resultandos*) of the judgment from which the appeal is taken, and which statement has been copied above, there has not been set forth any word, phrase or period of the article inserted in the newspaper 'La Democracia' under the title of 'Police Court,' which constitutes the crime of an offense against the authorities, which as such is classified and punished; and that the said judgment does not contain merits of fact upon which to affirm that the acts committed by the accused constitute the essential requisites of the said offense (*que el procesado reuna los requisitos integrantes de aquel delito*), so that in consequence of this the cassation (reversal) requested for that reason is proper."

The District Court of Ponce, in which the case was tried,

juicio, no se ajustó á los preceptos estrictos de la ley, como se consigna en el Artículo 142. Las conclusiones de hecho (resultandos), no contenían el artículo publicado. Por lo tanto el Tribunal Supremo revocó la sentencia de la Corte de Distrito y absolvió al acusado, facultad que tenía el Tribunal de acuerdo con el antiguo procedimiento criminal.

Se ha indicado que la Ley de 12 de Abril de 1903, convirtiendo esta Corte, de Tribunal de Casación, en Tribunal de Apelación, relevándole por ello de las estrictas reglas y limitaciones, y concediéndole el privilegio de una interpretación más liberal, autorizaría á este Tribunal para suplir cualquier defecto del Tribunal inferior en una causa criminal, al efecto de declarar culpable un acusado. No estoy de acuerdo con esa afirmación. Una ley subsiguiente puede mejorar las condiciones de un acusado en una causa criminal, pero que el privilegio de una interpretación liberal, concedido á un tribunal de apelación, pueda ser utilizado á los efectos de dar una declaración de culpabilidad, es una afirmación tan extravagante que los términos *ex-post facto* ó "retraoctivo" serían inadecuados para describirla. De acuerdo con el procedimiento español y con las reglas generales de Derecho Penal, en tales casos debe someterse á la consideración del Tribunal el artículo publicado en su totalidad, para darle al acusado el beneficio de cualquiera expresión consignada en el mismo, que pueda tender á mitigar ó explicar su sentido.

Los *Resultandos* (conclusiones de hecho) de la sentencia, que contienen los hechos probados, toman el lugar de la prueba consignada en un pliego de excepciones, de acuerdo con el procedimiento penal americano. ¿Podría un Tribunal de apelación, en los Estados Unidos, revocar una sentencia en los casos en que el apelante dejara de incluir en su pliego de excepciones el artículo injurioso que trajo consigo la declaración de su culpabilidad, impidiendo por ello que el Tribunal tuviera oportunidad de apreciarlo? Haciendo aplicación de este principio, en sentido inverso, pero natural, ¿cómo

did not follow the strict precepts of the law, as laid down in article 142. The findings of fact (*resultados*) did not contain the article published. The Supreme Court therefore reversed the judgment of the district court and acquitted the defendant, which power the court possessed under the old criminal system.

It has been intimated that the law of April 12, 1903, changing this court from a court of cassation to a court of appeals, thereby relieving it from its narrow rules and limitations, and granting the privilege of a more liberal construction, would authorize this court to supply any defects of the trial court in a criminal case for the purpose of convicting a defendant. I cannot reconcile such assertion. A subsequent statute may ameliorate the conditions of a defendant in a criminal case, but that the privileges of liberal construction by a court of appeals could be utilized for the purpose of a conviction is a position so extravagant that the terms "*ex post facto*" or "*retroactivo*" would be inadequate to portray it. Under the Spanish system and under the universal rules of criminal law in such cases, the whole of the publication should be before the court for its consideration, so as to entitle the defendant to the benefit of any expressions which may tend in mitigation or explanation.

The *resultandos* (findings of fact) in the judgment containing the facts proven take the place of the evidence saved by a bill of exceptions, under the American criminal procedure. Would an appellate court in the United States reverse a judgment when the appellant had failed to comprise in his bill of exceptions the libelous article upon which he was convicted, whereby the court would have no opportunity to pass on it? Applying this statement in a converse, but just, manner, how can an appellate court, under the Spanish practice, affirm a judgment when the trial court, whose sacred duty it

puede un Tribunal de Apelación, bajo el procedimiento
español, confirmar una sentencia en los casos en que el Tri-
bunal sentenciador, cuyo sagrado deber era incluir el artículo
injurioso en los Resultandos de su sentencia, ha dejado de
hacerlo así, con infracción de las estrictas reglas de derecho,
y cuando está fuera de las facultades del apelante regular
la acción del Tribunal, privándole por ello de los beneficios
de hacer que su causa se revisara por el más alto Tribunal?

Toda vez que la Corte de Distrito hizo aplicación del nuevo
Código de Enjuiciamiento Criminal, juzgando el caso
como un *misdemeanor*, del cual no había apelación, hubiera
sido supérfluo é inútil que el acusado preparara un pliego de
excepciones é incluyera en él, íntegro, el artículo publicado, á
fin de someterlo á la consideración de este Tribunal para su
revisión. Esta resolución y acción por parte de la Corte de
Distrito resultó, por consiguiente, en detrimento del acusado,
y ha debido revocarse la sentencia dictada por la Corte de
Distrito. La opinión emitida por esta Corte en Febrero 27
de 1904, en donde se confirma la sentencia de la Corte de Dis-
trito, contiene íntegramente el artículo ó publicación, tomán-
dolo, indudablemente, de los documentos en autos, pero esta
amplificación que ha hecho este Tribunal no puede ni suplir
las omisiones en que incurriera la Corte de Distrito, ni corre-
gir los errores por ella cometidos.

El Artículo 265 del antiguo Código Penal Español, ley
bajo la cual el acusado Bird fué acusado y declarado culpable,
dice así:

"Los que, hallándose un Ministro de la Corona ó una autoridad
en el ejercicio de sus funciones ó con ocasión de éstas, los calumniaren,
injuriaren, insultaren de hecho ó de palabra, fuera de su presencia
ó en escrito que no estuviere á ellos dirijido, serán castigados con la
pena de *arresto mayor*".

Parece evidente que esta ley solamente puede tener refe-
rencia á Ministros de la Corona, bajo el Gobierno español, ó

was to embody the libelous article in the findings of fact of its judgment (*sentencia*), in violation of the strict rules of the law, failed to do so, and when it is beyond the power of the appellant to control the action of the court, thereby depriving him of the benefit of having his case reviewed by the higher court?

Since the district court applied the new Code of Criminal Procedure, trying the case as a misdemeanor, from which there was no appeal, it would have been superfluous and fruitless for the defendant to prepare a bill of exceptions and to embody therein the whole of the publication, so as to present it to this court for review. This ruling and position of the district court was therefore detrimental to the defendant, and the judgment of the district court should have been reversed. The opinion of this court of February 27, 1904, affirming the judgment of the district court, contains the whole article or publication, copying it, undoubtedly, from the exhibit in the files, but this amplification by this court can neither supply the omissions of the district court nor cure its errors.

The law under which the defendant Bird was accused and convicted is article 265 of the old Spanish Penal Code, and reads as follows:

"Those who, while a minister of the Crown or an authority is in the exercise of his functions or on the occasion thereof, shall calumniate, outrage or insult him by deed or word, outside his presence or in a writing not addressed to him, shall be punished with the penalty of *arresto mayor.*"

·It seems evident that this law could only have reference to ministers of the Crown, under the Spanish Government, or to

á funcionarios de la monarquía, y que no puede tener aplicación alguna á un Juez ó institución que traiga su existencia de una Ley del Congreso de los Estados Unidos, ó de cualquiera otra autoridad americana. Las leyes que al adquirir un territorio extranjero, se encuentren vigentes en él y que estén en conflicto ó sean incompatibles con nuestras instituciones, constitución y jurisprudencia americana, deben caer sin ningún acto Legislativo especial, á ese efecto, y puedo, por lo tanto, sostener con seguridad, que cuando después del Tratado de Paz entre el Gobierno de los Estados Unidos y el Reino de España, los ''Ministros de la Corona y las autoridades en el ejercicio de sus funciones'' se marcharon de la Isla de Puerto Rico, y regresaron á su madre patria, se llevaron consigo el alma y el espíritu de este mismo Artículo 265 del Código Penal, arrojándolo á los piés de su hacedor en España, y quedando sólo en Puerto Rico, su cuerpo, sin vida alguna, á manera de letra muerta en los libros estatutarios, y las Cortes y Tribunales de la Isla de Puerto Rico no están investidos de la facultad judicial sobrenatural de resucitar este cadáver, para darle animación y vitalidad, y para ajustarlo y amoldarlo, como un entrepaño, en la estructura del Derecho Penal, bajo una forma de Gobierno republicano. Y el prisionero Bird fué acusado, juzgado y condenado de acuerdo con esta ley que no tiene vida alguna.

Pero esta ley debe ser considerada también bajo otro aspecto. No es ni una ley de desacato á tribunales, ni tiene el carácter de una ley general sobre libelo. Prohibe é impide publicaciones contra determinadas personas solamente. Este Tribunal ha resuelto que la primera enmienda á la Constitución de los Estados Unidos, que se refiere á la libertad de la prensa y la palabra, está vigente en Puerto Rico, y esa resolución se fundó en lo resuelto por el Tribunal Supremo de los Estados Unidos en el caso de *Chicago Rock Island*, etc., *R. R. Co.* v. *McGlinn*, 114 U. S., 546; en donde, por conducto del Juez Asociado Sr. Field, el Tribunal se expresa así:

officials under that monarchy, and could have no application to a judge or institution which received its existence by an act of Congress of the United States or any other American authority. Laws which are found upon the acquisition of a foreign territory, and which are in conflict, or incompatible with our American institutions, constitution and jurisprudence, must fall without any special legislative act to that effect, and I can therefore safely assert that when, after the Treaty of Peace between the Government of the United States and the Kingdom of Spain, the "ministers of the Crown and authorities in the exercise of their functions" left the Island of Porto Rico and returned to their mother country, they carried with them the soul and the spirit of this very section 265 of the Penal Code, and surrendered it to its maker, in Spain, and there remained in Porto Rico only its lifeless corpse in the nature of a dead letter upon the statute book, and the courts and tribunals of the Island of Porto Rico are not endowed with the supernatural judicial power to resurrect this cadaver, to inspire it with animation and vitality and to fit and adjust it as a panel in the structure of criminal law, under a republican form of government. And the prisoner Bird was accused, tried and convicted under this inanimate ordinance.

But this statute should also be viewed from another aspect. It is neither a law for contempt of court, nor in the nature of a general libel law. It prohibits and forbids publications against certain persons only. This court has held that the first amendment to the Constitution of the United States as to the freedom of the press and speech exists in Porto Rico, and that decision was based upon the expressions of the Supreme Court of the United States in the case of *Chicago, Rock Island, etc., R. R. Co., v. McGlinn,* 114 U. S. 546, where, speaking through Mr. Justice Field, the court said:

"Es una regla general de derecho público, reconocida y aceptada
por los Estados Unidos, que siempre que la jurisdicción política y
el poder legislativo que existan sobre cualquier territorio se trans-
fieran de una nación ó soberanía á otra, las leyes municipales del
país—esto es, las leyes que tienen por objeto la protección de los
derechos privados—continúan vigentes hasta que sean derogadas ó
modificadas por el nuevo Gobierno ó Soberanía.  Por virtud de la
cesión, los bienes públicos pasan de un gobierno á otro, pero la pro-
piedad privada permanece como antes, y con ella ,aquellas leyes
municipales que tienen por objeto asegurar el uso y goce pacífico de
la misma.  Como una consecuencia necesaria todas las leyes, orde-
nanzas y disposiciones que estén en conflicto con la naturaleza polí-
tica, instituciones y constitución del nuevo gobierno quedan inme-
diatamente anuladas.  Así, por virtud de la cesión de una jurisdic-
ción política y del poder legislativo—y el último está envuelto en
la primera—á los Estados Unidos, las leyes que existan en el país y
que tiendan á sostener una religión ya establecida, ó que tiendan á
limitar la libertad de la prensa, ó que autoricen castigos inusitados
y crueles, y otras semejantes, inmediatamente cesarían de ser obli-
gatorias sin necesidad de que se haga declaración alguna á ese efecto;
y las leyes del país sobre otras materias serían necesariamente su-
plantadas por las leyes existentes en el nuevo gobierno, que se refieran
á las mismas materias.  Mas con respecto á otras leyes que afecten
la posesión, uso y traspaso de bienes, y que tengan por objeto ase-
gurar el buen orden y la paz en la comunidad, y obtener la salud
y prosperidad de la misma, que son estrictamente de carácter munici-
pal, es regla general de que un cambio de soberanía las deja en vigor
hasta que, por acción expresa del nuevo gobierno, sean alteradas ó
derogadas".

Parece, por consiguiente, que la ley antes mencionada in-
fringe los preceptos de esta enmienda porque, aparente-
mente, supone ilegal la publicación misma, coartando por ello
la libertad de la prensa.  Encontramos en la obra de Story
sobre la Constitución, tomo 2, página 643, lo siguiente:

"Una persona es responsable por el *abuso del derecho de la liber-
tad de la prensa,* pero cualquier ley que prohiba la publicación misma
infringe ciertamente la constitución".

"It is a general rule of public law, recognized and acted upon by the United States, that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country, that is, laws which are intended for the protection of private rights, continue in force until abrogated or changed by the new government or sovereign. By the cession public property passes from one government to the other, but private property remains as before, and with it those municipal laws which are designed to secure its peaceful use and enjoyment. As a matter of course, all laws, ordinances and regulations in conflict with the political character, institutions and constitution of the new government are at once displaced. Thus upon a cession of political jurisdiction and legislative power—and the latter is involved in the former—to the United States, the laws of the country in support of an established religion, or abridging the freedom of the press, or authorizing cruel and unusual punishments, and the like, would at once cease to be of obligatory force without any declaration to that effect; and the laws of the country on other subjects would necessarily be superseded by existing laws of the new government upon the same matters. But with respect to other laws affecting the possession, use and transfer of property, and designed to secure good order and peace in the community, and promote its health and prosperity, which are strictly of a municipal character, the rule is general, that a change of government leaves them in force until, by direct action of the new government, they are altered or repealed."

It would therefore seem that the law above mentioned is in violation of this amendment, for, apparently, it makes the publication itself illegal, and thereby infringes upon the liberty of the press. We find in Story on the Constitution, vol. II, p. 643, the following:

"A person is responsible for the *abuse of the right of freedom of the press,* but any law which forbids the publication itself is certainly in violation of the Constitution."

En la solicitud interesando el auto de *habeas corpus* se alega también que debió concederse al prisionero un juicio por jurado. La cuestión de si la Constitución está ó no vigente en Puerto Rico, no surge necesariamente en relación con la alegación del solicitante; pero encontramos ciertas expresiones del Tribunal Supremo de los Estados Unidos, en el caso de *Downes* v. *Bidwell,* que pudieran tomarse en consideración, en este asunto. En una opinión disidente que emití en este Tribunal, en el caso de *Stahl* v *Soldini,* tuve ocasión de hacer referencia á esa misma resolución. Sin entrar en detalle alguno con respecto á este litigio, expresaré brevemente que Stahl estableció un pleito bajo el antiguo Código Penal, de la naturaleza de libelo, contra Soldini. El acusado fué absuelto por la Corte de Distrito, y el demandante, acusador privado, apeló para ante este Tribunal. La mayoría del Tribunal, compuesta de los Honorables Juez Presidente Sr. Quiñones y Jueces Asociados Sres. José C. Hernández y José Ma. Figueras, revocaron la sentencia de la Corte inferior y simplemente, por los resultandos contenidos en la sentencia de la Corte de Distrito, declararon convicto al acusado y le impusieron determinado castigo. Disentí de esa opinión en los siguientes términos:

'Se afirma que la Sección 8 de la ya mencionada Ley del Congreso reestableció las leyes y decretos de España, en vigor en aquella fecha, declarándolas vigentes en Puerto Rico, sujetas, sin embargo, á ciertas modificaciones que en dicha ley se expresan. Pero cualquiera que sea la extensión de esta ley, nunca podría tener el efecto de dejar en vigor en Puerto Rico leyes que están en absoluta oposición con nuestras instituciones, que infringen principios generales y universales del sistema americano, que afectan derechos personales, así como el derecho á la vida, á la libertad y á la propiedad, despojando de ese modo á una persona de privilegios sagrados, garantizados por la Constitución, y á los que tienen derecho todas las personas que vivan bajo la protección de este Gobierno, que consideren á los Estados Unidos de America como á su propio país, ó que residan dentro de los límites de esta república. En esta opinión parece que

In the application for a writ of *habeas corpus* it is also claimed that there should have been afforded to the prisoner a trial by jury. The question whether or not the Constitution is in force in Porto Rico does not necessarily arise in connection with the contention of the applicant; but we find some expressions by the Supreme Court of the United States in *Downes* v. *Bidwell,* which might be considered at this moment. In a dissenting opinion, in this court, in the case of *Stahl* v. *Soldini,* I had occasion to refer to this same decision. Without going into any details of this litigation, I shall briefly state that Stahl brought a suit under the old Penal Code in the nature of libel against Soldini. The defendant was acquitted by the district court, and the plaintiff, a private accuser, appealed to this court. A majority of the court, the Hon. Mr. Chief Justice Quiñones, José C. Hernández and José Ma. Figueras, reversed the judgment of the trial court and merely upon the findings of fact, contained in the judgment (*sentencia*) of the district court, convicted the defendant and imposed a certain punishment. I dissented from that opinion in the following terms:

"It is contended that by section 8 of the above-mentioned act of Congress the laws and ordinances of Spain in force at that date, became the laws of Porto Rico by re-enactment, subject to certain modifications, as therein stated. But whatever the extent of this law may be, it could never be to the effect that there should remain in Porto Rico laws which are in absolute contravention of our institutions, violating general and universal principles of the American system, affecting personal rights, impairing the security of life, liberty and property, thereby depriving a person of sacred privileges guaranteed by the Constitution and which are granted to all persons living under the protection of this government who claim the United States of America as their country, or who reside within the domain of this Republic. In this position we are, seemingly, sustained by the

nos sostiene la Corte Suprema de los Estados Unidos, según sus propias expresiones en el caso de *Downes* v. *Bidwell*, 182 U. S., página 282.

'Sugerimos, aunque sin intención de resolver nada, que puede haber alguna diferencia entre ciertos derechos naturales, establecidos en la Constitución mediante prohibiciones contra toda intervención con ellos, y lo que podríamos llamar derechos artificiales ó reparadores (*remedial*) que son propios de nuestro sistema de jurisprudencia. Á la primera clase pertenecen los derechos que tiene uno de sustentar opiniones religiosas particulares, y de expresarlas públicamente, ó, como se dice algunas veces, adorar á Dios según los dictados de nuestra propia conciencia; el derecho á la libertad personal y á la propiedad individual; el derecho á la libertad de la palabra y de la prensa; á la libre admisión en las cortes de justica; el derecho á que los procedimientos legales sigan su curso natural y á que las leyes se apliquen igualmente á todos; el derecho á privilegios ó inmunidades contra registros ó investigaciones y embargos ó capturas, que no sean razonables, así como también contra castigos crueles y no comunes; y á todos los otros privilegios que son indispensables á un Gobierno libre''.

Aun cuando las expresiones de la Corte Suprema, contenidas en la cita anterior, no sean completamente definidas, sin embargo, la Corte declara más adelante, en los términos más precisos, el grado de protección que ha de darse al Pueblo de Puerto Rico con arreglo á la Constitución.

''Cualquiera que sea la resolución final del Pueblo americano con respecto al *status* de estas islas y de sus habitantes—ya se les permita ingresar en la hermandad de Estados, ó formar gobiernos independientes—no se sigue desde luego, que, en el entretanto es decir, que mientras estén esperando esa resolución, el Pueblo ha de quedar con respecto á derechos personales sin la protección concedida por las prescripciones de nuestra Constitución, y sujeto simplemente al dominio arbitrario del Congreso. Aún si se les considerase como extranjeros, tienen derecho, con arreglo á los principios de la Constitución, á que se les proteja en su vida, libertad y propiedad. Esta opinión ha sido sustentada por esta Corte frecuentemente con respecto á los chinos, aún los que son extranjeros, los cuales no gozan de los derechos políticos de que gozan los ciudadanos de los Estados Unidos''.

De la anterior resolución parece que la Corte Suprema de los

expressions of the Supreme Court of the United States in *Downes* v. *Bidwell,* 182 U. S., p. 282.

" 'We suggest, without intending to decide, that there may be a distinction between certain natural rights, enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights, which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinion and to public expressions of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; to the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice; to due process of law and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government.'

"Although the expressions of the Supreme Court in the foregoing citation may not be quite definite, nevertheless, the court continuing declares in most positive terms the degree of protection the People of Porto Rico shall have under the Constitution.

" 'Whatever may be finally decided by the American people as to the status of these islands and their inhabitants—whether they shall be introduced into the sisterhood of States, or be permitted to form independent governments—it does not follow that, in the meantime, awaiting that decision, the people are in the matter of personal rights unprotected by the provisions of our Constitution, and subject to the merely arbitrary control of Congress. Even if regarded as aliens, they are entitled under the principles of the Constitution to be protected in life, liberty and property. This has been frequently held by this court in respect to the Chinese, even when aliens, not possessed of the political rights of citizens of the United States.'

"It seems the Supreme Court of the United States, by the above

Estados Unidos sostiene que las prescripciones de la sexta enmienda á la Constitución, en cuanto protege los derechos personales, están vigentes en Puerto Rico''.

El *espíritu* de la Constitución de los Estados Unidos, este artículo de fé del Pueblo americano, de carácter civil ó político, y la protección á la vida y libertad que aseguran sus disposiciones, deben seguir la bandera de la Nación, y permanecer siempre que el Gobierno llegue á convertirse en dueño del suelo de un país. Cuando los funcionarios enviados á las nuevas posesiones y colocados al frente de la Administración local, se obligan, en el desempeño de sus funciones, por solemne juramento, á guardar aquella Constitución, ¿Consiste entonces su deber simplemente en instruir é ilustrar á los residentes con respecto á los principios y á los beneficios que la misma asegura? ¿En trazar imágenes de libertad moral y deleitar sus imaginaciones por medio de visiones que representen una protección igual con arreglo á derecho? ¿Serán suficientes estas enseñanzas y exhibiciones ilustrativas de probabilidades, sin que se llegue á una realización de las mismas? Algo más que todo eso ha debido ser la intención del Congreso de los Estados Unidos cuando por su Ley de Abril 12 de 1900, la Ley Foraker, estableciendo un Gobierno civil para Puerto Rico, concede apelaciones al Tribunal Supremo de los Estados Unidos'' en todos aquellos casos en que la Constitución de los Estados Unidos sea traida á discusión''.

Observamos que el Tribunal Supremo de los Estados Unidos, con la sabiduría que le caracteriza, se expresa así:

'Cualquiera que sea la resolución final del Pueblo americano con respecto al *status* de estas islas y de sus habitantes................ no se sigue desde luego, que, en el entretanto, es decir, que mientras estén esperando esa resolución, el Pueblo ha de quedar con respecto á derechos personales sin la protección concedida por la Constitución ...............................Aún cuando se les considerase

decision, indicates that the provisions of the sixth amendment to the Constitution, in protecting personal rights, are in force in Porto Rico."

The *spirit* of the Constitution of the United States, this civil or political article of faith of the American people and the protection of life and liberty under its provisions, must accompany the banner of the Nation, and remain, whenever the government becomes the owner of the soil and of a country. When the officers sent to the new possessions and placed in charge of the local administration are bound to their functions by a solemn oath to support that Constitution, does it then become simply their duty to instruct and enlighten the residents of its principles and of its blessings? To draw images of moral freedom and to muse their imaginations by visionary fancies of equal protection under the law? Will these teachings and illustrative exhibitions of probabilities suffice without realization? More than all that must have been the intention of the Congress of the United States when by its act of April 12, 1900, the Foraker Act, creating a civil government for Porto Rico, it allows appeals to the Supreme Court of the United States "in all cases where the Constitution of the United States is brought in question."

We observe that the Supreme Court of the United States in its wisdom says:

"Whatever may be finally decided by the American people as to the status of this Island and its inhabitants    .    .    .    . it does not follow that, in the meanwhile, awaiting that decision, the people are in the matter of personal rights, unprotected by the Constitution.    .    .    .    . Even if regarded as aliens, they

como extranjeros, tienen derecho, con' arreglo á los principios de la Constitución, á que se les proteja en su vida, libertad y propiedad''.

Los principios y disposiciones de la Constitución consisten en la protección á la vida, libertad y propiedad, y no puede haber una protección mayor que la de un juicio por jurado.

Sin duda alguna el objeto del Congreso al establecer un Gobierno Civil para la isla fué el de establecer la uniformidad de las leyes y conceder iguales derechos á todos los habitantes de Puerto Rico.

La Sección 34 de la Ley del Congreso aprobada en Abril 12 de 1900, y generalmente conocida con el nombre de Ley Foraker, dice así:

''Que Puerto Rico constituirá un distrito judicial que se denominará ''el Distrito de Puerto Rico''. El Presidente con el concurso y consentimiento del Senado, nombrará un Juez de Distrito, un Fiscal de Distrito y un Marshal para dicho Distrito, cada uno por el término de cuatro años, á menos que antes no sean destituidos por el Presidente. La Corte de Distrito para dicho Distrito, se denominará ''Corte de Distrito de los Estados Unidos para Puerto Rico'', y tendrá la facultad de nombrar todos los empleados y ayudantes necesarios, incluyendo un Clerk (Secretario), un Intérprete, y los Comisionados que sean necesarios, quienes tendrán las mismas atribuciones que los comisionados de las Cortes de Circuito de los Estados Unidos; y tendrá, además de la jurisdicción ordinaria de Cortes de Distrito de los Estados Unidos, jurisdicción en todos los casos que sean de la competencia de las Cortes de Circuito de los Estados Unidos, y seguirán la misma tramitación que las Cortes de Circuito.................''.

¿Podrá concebirse que una Corte de Distrito ó de Circuito de los Estados Unidos funcionara sin juicios por jurados, y cuán injusto aparecería que en un edificio de la ciudad de San Juan, en la Isla de Puerto Rico, un ciudadano gozara de todos los derechos y protección concedidos por nuestras instituciones americanas, y en otro local de la misma capital, estos privilegios é inmunidades le sean denegados, cuando

are entitled under the principles of the Constitution to be protected in life, liberty and property.''

The principles and provisions of the Constitution are the protection of life, liberty and property, and there can be no higher protection than that of a trial by jury.

To establish uniformity of laws and to grant equal rights to all the inhabitants of Porto Rico was beyond a doubt the aim of Congress when a civil government was established for the Island.

Section 34 of the act of Congress, approved April 12, 1900, and generally known as the Foraker Act, reads as follows:

''That Porto Rico shall constitute a judicial district to be called 'the district of Porto Rico.' The President, by and with the advice and consent of the Senate, shall appoint a district judge, a district attorney, and a marshal for said district, each for a term of four years, unless sooner removed by the President. The district court for said district shall be called the district court of the United States for Porto Rico and shall have power to appoint all necessary officials and assistants, including a clerk, an interpreter, and such commissioners as may be necessary, who shall have like powers and duties as are exercised and performed by commissioners of the circuit courts of the United States, and shall have, in addition to the ordinary jurisdiction of the district courts of the United States, jurisdiction of all cases cognizant in the circuit courts of the United States, and shall proceed therein in the same manner as a circuit court.''

Would it be conceivable that a United States district or circuit court could be conducted without trials by jury, and how unreasonable it would appear that in one building in the city of San Juan, on the Island of Porto Rico, a citizen should enjoy all the rights and protection of and under our American institutions, and in another locality, in the same capital, these privileges and immunities should be denied to him, when all

todos estos Tribunales han recibido su existencia de la misma fuente, ó sea el Congreso de los Estados Unidos, y cuando la ley guarda silencio con respecto á los atributos Constitucionales que corresponde á cualquiera de ellos?

Debió haberse declarado con lugar la solicitud de *habeas corpus* y decretarse la excarcelación del prisionero.

### Opinión Concurrente del Juez Presidente Señor Quiñones y Asociados Señores Hernández y Figueras.

Los Jueces que suscriben se ven obligados á formular este voto concurrente porque las razones expuestas en el del Hon. Juez disidente no se expresaron por él en el momento oportuno, ó sea antes de dictarse la resolución denegatoria del mandamiento de *habeas corpus* solicitado por Hobart S. Bird. Si así se hubiera hecho, se hubieran entonces discutido y apreciado en dicha resolución y así se hubiera evitado ésto que tal vez parezca una incorrección.

Trata dicho Juez de algunos hechos y de ciertas actuaciones que no constan de este *record* y al cual solamente podemos referirnos.

Parte el Sr. Juez disidente de una presunción para impugnar la validez del nombramiento de Don Angel García Veve, como Juez asociado de todas las Cortes de Distrito y que actuó como tal en el presente caso, y aunque reconoce que fué nombrado por el Hon. Gobernador, afirma que tal nombramiento no se hizo con el consentimiento del Consejo Ejecutivo; pero debemos aceptar que la primera autoridad de la Isla cumplió con ese deber, si á ello se creía obligado por las leyes, y en tanto en cuanto no se demuestre la carencia de ese requisito, hay que aceptar la legalidad del nombramiento y tener como válidos todos los procedimientos en que el Juez sustituto intervino.

Se dice que al formar parte del Tribunal dicho García Veve debió notificarse su nombramiento á Bird, y si esto no

these tribunals received their existence from the same source, the Congress of the United States, and when the law is silent as to the constitutional attributes of either?

The writ of *habeas corpus* should have been granted and the prisoner discharged.

CONCURRING OPINION OF MR. CHIEF JUSTICE QUIÑONES AND JUSTICES HERNÁNDEZ AND FIGUERAS.

The undersigned justices find themselves obliged to prepare this concurring opinion, inasmuch as the reasons set forth by the dissenting justice were not expressed at the proper time, that is, when the decision was rendered denying the writ of *habeas corpus* applied for by Hobart S. Bird. If said reasons had been expressed, they would have been discussed and considered in said decision, and thus what may perhaps appear as an impropriety would have been avoided.

The said justice discusses some facts and certain proceedings which do not appear upon this record, and to which we can only refer.

The dissenting justice starts with a presumption for the purpose of impeaching the validity of the appointment of Angel García Veve, as associate judge of all the district courts, and who acted as such in the present case; and although he acknowledges that he was appointed by the Governor, he contends that such appointment was not made with the consent of the Executive Council. However, we must assume that the first authority of the Island complied with that duty if he considered himself bound to do so by the law; and until the absence of that requirement is shown, it is necessary to accept the legality of the appointment and to hold valid all the proceedings in which the substitute judge intervened.

It is alleged that when said García Veve formed part of the court notice of his appointment should have been given

se hizo, debió declararse nula la sentencia, como se declaró
por igual motivo la dictada en 19 de Septiembre de 1902. Pero
debe tenerse en cuenta que son casos distintos los que se dis-
cuten por el Juez disidente.

La primera designación que se hizo de un Juez sustituto,
fué para un caso concreto y no teniendo el acusado noticia de
su designación era necesario que se le notificara su nombra-
miento para que ejercitase, si lo deseaba, el derecho de re-
cusación por las causas que taxativamente marca la ley que
entonces se aplicaba. Pero en este caso el nombramiento del
Juez García Veve era de carácter general, pues fué para sus-
tituir á todos los Jueces propietarios de las Cortes de Dis-
trito de la Isla en los casos de vacante. Tenía, por tanto, su
nombramiento, un carácter público. Pero además de esto
no consta en el expediente de *habeas corpus* si el nombra-
miento se notificó ó no á Bird, y no es posible referirse de
memoria á actuaciones que no se tuvieran en cuenta en la
resolución que es hoy objeto de la apelación.

Se impugna también el procedimiento seguido por la
Corte de Distrito de San Juan; pero ese procedimiento no
discrepa del establecido por la Orden Judicial No. 28, de 23
de Diciembre de 1899, y hay que acatar lo que dispone esa
órden para los casos en que, como en el presente, pida el
Fiscal pena correccional, órden que tuvo el laudable fin de
activar en cuanto fuere posible los procedimientos criminales
y reducir el término de las prisiones provisionales.

Se discute también la forma de la sentencia dictada por
la Corte de Distrito de San Juan porque no se acomoda á lo
dispuesto en el Artículo 142 de la Ley de Enjuiciamiento Cri-
minal anterior á la que se votó por esta Asamblea Legisla-
tiva, y fué aprobada en 1º. de Marzo de 1902, y de aquí se
deduce que debió revocarse la sentencia condenatoria de Bird,

to Bird, and that if this was not done the judgment should be declared void, as the judgment rendered on September 19, 1902, was held void for a like reason. But the fact should be taken into consideration that the cases discussed by the dissenting justice are quite different.

The first designation made of a substitute judge was for a specific case, and the accused having no knowledge of his designation, it was necessary that notice of such appointment should be served upon him so that he could, if he desired, exercise the right of challenge for the causes which are specifically prescribed by the law then applicable. But in this case the appointment of Judge García Veve was of a general character, since it was made for the purpose of providing a substitute for all the regular judges of the district court of the Island in cases of vacancies. His appointment, therefore, possessed a public character. But in addition to this, it does not appear from the *habeas corpus* proceedings whether notice of the appointment was given to Bird or not, and it is not possible to refer from memory to proceedings which were not taken into consideration in the decision which is now the subject of the appeal.

The procedure adopted by the District Court of San Juan is also attacked; but that procedure does not depart from that established by Judicial Order No. 228 of December, 1899, and it is necessary to respect the provisions of said order in cases in which, as in the present one, the *Fiscal* is asking for a correctional penalty. That order had the laudable object of expediting criminal proceedings, in so far as possible, and of reducing the term of provisional imprisonments.

The form of the judgment rendered by the District Court of San Juan is also drawn into question, on the ground that it fails to comply with the provisions of article 142 of the Law of Criminal Procedure, which was antecedent to the law enacted by the Legislative Assembly of Porto Rico, approved March 1, 1902; and hence it is concluded that the judgment of

como se hizo en el caso de la Corte de Ponce, de Mariano Abril, precisamente por un defecto de forma.

Mas se olvida el Sr. Juez disidente de los diferentes tiempos en que han ocurrido los hechos. Cuando llegó á esta Corte el caso de Abril, regía en toda su plenitud la antígua ley de procedimiento que dejó aquí implantada España y era éste un Tribunal que conocía de los recursos de casación, que eran remedios extraordinarios que procedían en todos los juicios criminales contra las resoluciones de los Tribunales que causaban ejecutoria, con el fin de reparar el agravio que se hubiese cometido en la sentencia, por infracción de ley, relativa al fondo del asunto, ó por no haberse observado las formas *sustanciales* del procedimiento. Entonces no podía tenerse para nada en cuenta el sumario. Aquella Corte de Casación tenía que formar juicio con la misma sentencia de la Corte inferior, y Mariano Abril, por consiguiente, fué absuelto, porque no se insertó en dicha sentencia el Artículo que se suponía penable y faltaban, por tanto, términos hábiles para que el Tribunal de casación pudiese juzgar con acierto sobre el alcance y trascendencia de las palabras publicadas en el periódico "La Democracia". Y por eso, en este caso, y en otros semejantes y cumpliendo siempre con la ley vigente, la sentencia fué casada y absuelto el acusado del delito que se le imputaba.

Mas el caso actual de Hobart S. Bird es distinto en todos conceptos. Vino á esta Corte en grado de apelación, no de casación, como el de Abril. La sentencia de Bird contiene insertas las palabras y frases que el Tribunal originario conceptuó injuriosas, y ya esta Corte de que formamos parte como Jueces, no tiene que someterse á los estrechos moldes de la antigua ley. Hoy pudo examinar el artículo denunciado, aunque no se comprendiese lo necesario en la sentencia, como se ha comprendido, porque á ello nos autoriza la Ley

conviction against Bird should be reversed, as was done in the case of Mariano Abril from the District Court of Ponce by reason of a defect of form.

But the dissenting justice forgets the different periods of time in which the facts occurred. When the case of Abril came to this court the old law of procedure established here by Spain was in full force and effect, and this was a tribunal having cognizance of appeals in cassation, which were extraordinary remedies which would lie in all criminal causes from the final decisions of courts, the object of which was to correct any wrong committed in the judgment through errors of law affecting the substance of the subject-matter, or for failure to observe the *essential* forms of the proceedings. The record of the preliminary proceedings could not then be taken into consideration for any purpose. That court of cassation had to form its opinions in view of the judgment of the lower court; and Mariano Abril was therefore discharged because the alleged punishable article was not set forth in the judgment, and there was therefore no way by which the court of cassation could correctly judge as to the scope and importance of the words published in the newspaper, "La Democracia." And hence in that case and in other similar ones, and always complying with the law in force, the judgment was annulled and the accused acquitted of the crime with which he was charged.

But the present case of Hobart S. Bird is different in every respect. It came to this court on appeal, and not in cassation like that of Abril. The judgment against Bird contains the words and phrases which the court *a quo* considered defamatory, and this court of which we form part as judges is no longer required to subject itself to the strict limits of the old law. It can now examine the article complained of, even though the necessary matter is not included in the judgment, as has been done, because we are authorized

de esta Asamblea Legislativa, aprobada en 12 de Marzo de 1903, que literalmente dice así:

## "LEY PARA TRANSFORMAR LA CORTE SUPREMA DE PUERTO RICO EN CORTE DE APELACION.

*Decrétese por la Asamblea Legislativa de Puerto Rico:*

Sección 1.—Que el Tribunal Supremo de Puerto Rico constituirá de aquí en adelante un Tribunal de apelación y no un Tribunal de Casación. En sus deliberaciones y fallos en todos los asuntos, tanto en lo civil como en lo criminal, dicho Tribunal no se limitará solamente á infracciones de ley ó quebrantamiento de forma, según fueren señalados, alegados ó salvados por los litigantes, ó según se hiciera constar en sus exposiciones y excepciones, sino que con el más alto fin de justicia, el Tribunal puede también entender en todos los hechos y tramitaciones en la causa, tal como aparecieren en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras.

Sección 2.—Todos los artículos de la Ley de Enjuiciamiento Civil que establecen los trámites para los recursos de casación, quedan abolidos.

Sección 3.—Las apelaciones se tramitarán en la forma que establece la Ley de Enjuiciamiento para las apelaciones en los antiguos juicios de mayor cuantía, suprimiendo el trámite llamado de apuntamiento.

Sección 4.—En todos los casos en que la Ley de Enjuiciamiento Civil habla de recursos de casación, se entenderá de apelación.

Sección 5.—Toda ley ó parte de ley en conflicto con las disposiciones de esta Ley queda por la presente derogada.

Sección 6.—Esta Ley empezará á regir inmediatamente después de su aprobación.

Aprobada, 12 de Marzo de 1903''.

Y creemos que la mejor administración de justicia y del derecho y el deseo de evitar injusticias que son fines que se propone esta ley, se han de conseguir lo mismo absolviendo al inocente que condenando al que resulte culpable de un delito.

to do so by the act of the Legislative Assembly, approved March 12, 1903, which reads as follows:

"AN ACT ESTABLISHING THE SUPREME COURT OF PORTO RICO AS A COURT OF APPEALS..

"*Be it enacted by the Legislative Assembly of Porto Rico*:

"Section 1.—That the Supreme Court of Porto Rico shall hereafter be a Court of Appeals and not a Court of Cassation. In its deliberations and decisions, in all cases, civil or criminal, said court shall not be confined to the errors in. proceeding (procedure) or of law only, as they are pointed out, alleged or saved by the respective parties to the suit, or as set forth in their briefs and exceptions, but in furtherance of justice, the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof, so as to promote justice and right and to prevent injustice and delay.

"Section 2.—All the sections of the Law of Civil Procedure establishing proceedings for appeals on cassation.are hereby repealed.

"Section 3.—The procedure on appeals shall conform to the provisions of the Code of Civil Procedure for suits of greater import, suppressing the proceedings known by the name of '*Apuntamiento.*'

"Section 4.—In all cases where reference is made in the Law of Civil Procedure to actions on cassation, the same shall be construed as meaning actions on appeals.

"Section 5.—All laws or parts of laws in conflict with this act are hereby repealed.

"Section 6.—This act shall take effect from and after its passage. "*Approved, March* 12, 1903."

We believe that the promotion of justice and right and the desire to prevent injustice, which are the objects proposed by this law, are attained as well by absolving the innocent as by condemning the person found guilty of a crime.

Nunca consideramos tampoco, de modo tan absoluto, la necesidad de la declaratoria expresa de los hechos probados en los resultandos de la sentencia recurrida, y alguna vez se indicó que era suficiente que de los resultandos, sin la declaratoria terminante de "probados", y de los considerandos del fallo recurrido, se dedujese de modo claro la naturaleza del delito y la participación del acusado, y esto ocurrió en el recurso de Pablo Font y Crespo, procedente de la Corte de Ponce, en que no había declaratoria de hechos probados en los resultandos, y esta Corte, entonces de casación, en su sentencia de 22 de Noviembre de 1902, y, siendo precisamente Ponente el Hon. Juez disidente, consignó en un considerando que los términos absolutos y categóricos en que estaba redactado el primer Resultando de la sentencia recurrida, y la relación íntima que guardaban con una consideración de la misma, eran suficientes para estimar que el Tribunal *á quo* había considerado en su conciencia como probados los hechos consignados en dicho primer resultando. Esta misma teoría se sienta en la sentencia de este Tribunal de 25 de Marzo de 1902, que también suscribió el Juez disidente.

Queda, pues, contestada la impugnación de la forma en que se redactó la sentencia de la Corte de Distrito de San Juan que condenó á Hobart S. Bird, aparte de que esa materia no es propia de un *habeas corpus,* como no es propio tampoco el procedimiento que ha seguido nuestro ilustrado cómpañero el Sr. Juez disidente, al revisar la decisión de esta Corte dictada en la causa pendiente de apelación, para presentar su voto particular en el asunto de *habeas corpus,* pues es jurisprudencia bien conocida que sean cuales fueren los errores de un Tribunal, no pueden afectar la decisión del *habeas corpus* á no ser que llegaran á desposeer á la Corte sentenciadora de su jurisdicción.

Entramos ahora en el último punto que trata el Sr. Juez disidente y es la teoría que sostiene de que el alma y el

Neither have we ever considered in such an absolute manner the necessity of an express declaration in the judgment appealed from of the facts proved in the findings of fact, and it was once pointed out that it was sufficient to deduce the nature of the crime and the participation of the accused therein from the findings of fact, without the positive declaration of "facts proven," and from the conclusions of law contained in the judgment appealed from. This occurred in the appeal of Pablo Font y Crespo, from the District Court of Ponce, in which there was no declaration of facts proved in the findings of fact; and this court, which was then one of cassation, in its judgment of November 22, 1902, and the opinion having been prepared by the dissenting justice himself, held in one of its conclusions of law that the absolute and categorical terms in which the first finding of fact was embodied in the judgment appealed from, and the intimate connection which it bore to a consideration of said judgment, were sufficient grounds for holding that the court a quo had considered in its conscience as proven, the facts set forth in said first finding of fact. This same doctrine was laid down in the judgment of this court of March 25, 1902, which was also subscribed by the dissenting justice.

The attack upon the form in which the judgment of the District Court of San Juan was drafted has therefore been answered, apart from the fact that it is not a proper subject of habeas corpus, as is likewise improper the procedure adopted by our illustrious colleague, the dissenting justice, in reviewing the decision rendered by this court in the case pending on appeal and filing a dissenting opinion in the matter of habeas corpus, for it is well-known law that regardless of the errors of a court, they cannot affect the decision on habeas corpus unless they operate to divest the trial court of its jurisdiction.

Let us now enter upon a consideration of the last point discussed by the dissenting justice, and that is the theory

espíritu, así dice, del Artículo 265 del Código Penal que se
aplicó á Bird, se fué con España al cesar aquí en su soberanía.
Pero ha venido á ver esto muy tarde el Hon. Juez disidente,
porque se olvida que condenó con su voto á Práxedes Rosario
de Jesús y firmó la sentencia condenatoria de 17 de Junio de
1902, aplicando el Artículo 258. En otra sentencia que tam-
bién votó y firmó en 26 de Junio de 1902 se aplicó el Artículo
262, que por su carácter, por referirse á atentado á los
agentes de la Autoridad, y desacato á la misma, y estar en el
mismo título en que está el Artículo 265, debieran haberse ido
con la soberanía de España, según hoy sostiene el Sr. Juez
disidente.

Pero donde se vé claramente el olvido involuntario de
dicho Juez, es en la sentencia de tres de Junio de 1902, que
copiada literalmente dice así:

"En la Ciudad de San Juan de Puerto Rico á tres de Junio de
mil novecientos dos, en el recurso de casación por infracción de ley
que ante *nos* pende, interpuesto por Antonio Pomales Gómez, contra
sentencia del Tribunal de Distrito de Arecibo, en causa seguida al
mismo por injuria y calumnia á la Autoridad.

*Resultando* : que la expresada sentencia dictada en veinte y
cuatro de Agosto último, contiene el siguiente Resultando :

*Resultando* : probado que el acusado Antonio Pomales, vecino de
Manatí, dijo públicamente á varias personas, y entre ellas á Don
Virgilio Pozo y Don José Rivera, que el Alcalde de la población, Don
Virgilio Ramos, había sido gratificado en la cantidad de cien dollars
por Don Abelardo de la Haba, para que no se opusiera á la reedifica-
ción de una casa sita en el pueblo de Manatí y propiedad de la
Sucesión Brunet.

*Resultando* : que el Tribunal sentenciador calificó los hechos pro-
bados de delito comprendido en el Artículo 265 del Código Penal, y
de autor del mismo á Antonio Pomales Gómez, sin circunstancias
modificativas de su responsabilidad, por lo que le condenó á la pena
de dos meses y un día de arresto mayor, accesorias y costas.

*Resultando* : que contra esta sentencia ha interpuesto la represen-
tación del procesado recurso de casación por infracción de ley, auto-

maintained by him that the soul and spirit (so he says) of article 265 of the Penal Code, applied to Bird, went away to Spain upon the cessation here of her sovereignty. But the dissenting justice has come to see this very late, since he forgets that by his vote he condemned Práxedes Rosario de Jesús, and signed the judgment of conviction of June 17, 1902, applying article 258, and in another judgment for which he also voted, and signed on June 26, 1902, application was made of article 262, which, owing to its character and to the fact that it relates to criminal attempts against agents of authority and disrespect toward the same, and is included in the same title as article 265, should also have gone with the sovereignty of Spain, as now contended by the dissenting justice.

But where the involuntary forgetfulness of the dissenting justice is clearly seen is in the judgment of June 3, 1902, which reads as follows:

"In the city of San Juan, Porto Rico, June 3, 1902. This is an appeal in cassation for error of law, which is pending before us, prosecuted by Antonio Pomales Gómez from a judgment of the District Court of Arecibo, in a case instituted against him for insults and calumny against authorities.

"Said judgment, which was rendered on the 24th of August last, contains the following finding of fact:

"The fact has been proved that the accused, Antonio Pomales, a resident of Manatí, stated publicly to various persons, and among them to Virgilio Pozo and José Rivera, that the mayor of the town, Virgilio Ramos, had been paid the sum of one hundred dollars by Abelardo de la Haba not to oppose the re-building of a house, situated in the town of Manatí, and the property of the estate of Brunet.

"The trial court declared that the facts proved constituted the crime included in article 265 of the Penal Code, and that Antonio Pomales Gómez was guilty of the same, without any circumstances modifying his liability, by reason whereof it condemned him to the penalty of two months and one day's imprisonment, accessory penalties and costs.

"From this judgment the counsel for the defendant has taken an appeal in cassation for error of law, as authorized by subdivision 1

rizado por el No. 1 del Artículo 849 de la Ley de Enjuiciamiento Criminal, citando como infringido el Artículo 265 del Código Penal, por aplicación indebida, pues en el Resultando transcrito no se expresa que Don Virgilio Ramos recibiera como Alcalde en el ejercicio de sus funciones la dádiva que se indica, requisito indispensable para que como tal Alcalde fuera calumniado y tampoco en el propio concepto de Alcalde ha sido injuriado, tanto por la razón antedicha, cuanto porque el hecho de ser gratificada una persona para que no ejecute actos lícitos que puede ejecutar no cede en su deshonra, descrédito ó menosprecio, máxime cuando se trata de quien, como el Sr. Ramos, tiene bien cimentada su reputación.

*Resultando*: que el Ministerio Fiscal impugnó el recurso en el acto de la vista.

*Visto*, siendo Ponente el Juez Asociado Don José C. Hernández.

*Considerando*: que cometen el delito que define y castiga el Artículo 265 del Código Penal, los que hallándose una Autoridad en el ejercicio de sus funciones, ó con ocasión de éstas, la calumniaren, injuriaren ó insultaren de hecho ó de palabra, fuera de su presencia ó en escrito que no estuviere á ella dirigido, siendo calumnia la falsa imputación de un delito de los que dan lugar á procedimiento de oficio, é injuria toda expresión proferida ó acción ejecutada en deshonra, descrédito ó menosprecio de otra persona, según los Artículos 471 y 475 del mismo Código.

*Considerando*: que la imputación hecha públicamente por el recurrente al Alcalde de Manatí, Don Virgilio Ramos, fuera de su presencia, de haber sido gratificado con la cantidad de cien dollars á los fines que se expresan, constituye indudablemente un delito de cohecho bajo alguna de las formas que se definen en el Capítulo 9 del Título 7 del Libro 2 del Código Penal, y si no lo constituyera sería injuriosa á la Autoridad del Alcalde de Manatí, Don Virgilio Ramos, como ofensiva á la rectitud é imparcialidad que deben revelarse en el ejercicio de las funciones de su cargo; siendo evidente, por tanto, que la Sala sentenciadora no ha incurrido en el error de derecho en que se funda el recurso, ni cometido la infracción legal que se le atribuye.

Fallamos que debemos declarar y declaramos no haber lugar al recurso de casación interpuesto por Antonio Pomales Gómez al que condenamos en las costas; y con devolución de la causa, comuníquese esta resolución al Tribunal de Distrito de Arecibo, á los efectos consiguientes.

of article 849 of the Law of Criminal Procedure, citing as having been violated article 265 of the Penal Code by reason of the improper application thereof, since in the finding of fact above set forth it is not stated that Virgilio Ramos received the gift in question as mayor in the exercise of his functions, which is an indispensable requisite to make it possible for him to have been calumniated as such mayor. Nor has he been insulted in his capacity as mayor, not only for the reason above set forth, but also because the fact that a person has been rewarded for not performing lawful acts which he may perform does not redound in his dishonor, discredit or contempt, especially in the case of a person who, like Mr. Ramos, has his reputation well established.

"The *Fiscal* opposed the appeal upon the hearing.

"The case having been heard, the opinion of the court was prepared and delivered by Associate Justice José C. Hernández, as follows:

"The crime defined and punished by article 265 of the Penal Code is committed by those who, while an authority is in the exercise of his functions, or on the occasion thereof, shall calumniate, outrage, or insult him by deed or word, outside his presence, or in a writing not addressed to him; calumny consisting of the false imputation of any crime which gives rise to a prosecution at the instance of the government, and insult of any expression made or act committed in dishonor, discredit or contempt of another person, according to articles 471 and 475 of the same Code.

"The imputation publicly made by the appellant against the mayor of Manatí, Virgilio Ramos, outside his presence, to the effect that he had been paid the sum of one hundred dollars for the purposes mentioned, undoubtedly constitutes the crime of bribery under some or any of the forms defined in chapter 9 of title 7 of book 2 of the Penal Code, and if it did not constitute said crime, it would be insulting to the authority of said official as offensive to the uprightness and impartiality which he should evince in the exercise of the duties of his office. It is evident, therefore, that the trial court has not committed the error of law on which the appeal is based, nor has it committed the violation of law with which it is charged.

"We therefore adjudge that we ought to declare and do declare that the appeal in cassation prosecuted by Antonio Pomales Gómez was not properly taken, and we condemn him to the payment of the costs. Let the record of the case be returned and this decision be communicated to the District Court of Arecibo for proper action.

Así por esta nuestra sentencia, que se publicará en la Gaceta Oficial, lo pronunciamos, mandamos y firmamos: José S. Quiñones, José C. Hernández, José Ma. Figueras, Louis Sulzbacher, J. H. MacLeary.

*Publicación.*—Leida y publicada fué la anterior sentencia por el Señor Juez Asociado del Tribunal Supremo Don José C. Hernández, celebrando audiencia pública dicho Tribunal en el día de hoy, de que certifico como Secretario, en Puerto Rico á tres de Junio de mil novecientos dos: Antonio F. Castro''.

Esta sentencia fué votada y firmada, como se vé, por el Sr. Juez disidente. En esa sentencia se aplicó el mismo Artículo 265 del Código Penal ó sea el que se fué en alma y espíritu, según él, con la soberanía de España.

¿Y es posible que ese cadáver estuviese vivo en la ley y en la mente y conciencia del Hon. Sr. Juez disidente, en ese caso á que se refiere la sentencia copiada, y en cuya fecha ya había cesado la soberanía española y que hoy esté ese artículo verdaderamente muerto para no aplicarlo á Hobart S. Bird bajo el argumento del cambio de soberanía? Salta á la vista la inconsecuencia que puede tener justificación en el olvido involuntario de esos casos en que intervino ántes, con su voto y su firma, el Sr. Juez disidente.

Todos los demás puntos del voto están tratados en el dictámen del Sr. Ponente que los suscribientes aceptamos, é hicimos propio, al dictar la resolución negando el mandamiento de *habeas corpus* solicitado por Hobart S. Bird.

Concluimos manifestando de nuevo que solo la necesidad de justificar nuestra consecuencia y conducta al emitir nuestro voto y dictar la resolución, nos obliga á salir por este medio al encuentro del voto del Hon. Juez disidente, pues las razones en él expuestas, no las expresó en su oportunidad, es decir, al discutir el caso y entonces todas se hubieran rebatido, como lo hacemos ahora, al conocer las razones en que funda su disentimiento con la sentencia.

"Thus by this our judgment, which will be published in the Official Gazette, we pronounce, order and sign. José S. Quiñones, José C. Hernández, José Ma. Figueras, Louis Sulzbacher, J. H. Mac-Leary.

"Publication.—The foregoing judgment was read and published by José C. Hernández, associate justice of the Supreme Court, a public session of said court having been held on this day, to which I certify as clerk, in Porto Rico, July 3, 1902: Antonio F. Castro."

As will be observed, the dissenting justice voted for and signed this judgment. In said judgment the same article 265 of the Penal Code was applied, namely, the one which went in soul and spirit, according to him, with the Spanish sovereignty.

And is it possible that that cadaver lived in the law and in the mind and conscience of the dissenting justice in the case referred to in the judgment set forth, and on a date on which Spanish sovereignty had ceased, and that to-day that article is really dead so that it cannot be applied to Hobart S. Bird under the argument of the change of sovereignty? There comes before us the inconsistency of such a position, which may find its justification in the involuntary forgetfulness of those cases in which the dissenting justice previously intervened with his vote and signature.

All the other points made in the dissenting opinion are discussed in the decision of the judge who prepared the opinion of the court, which we accept and adopt as our own, in denying the writ of *habeas corpus* applied for by Hobart S. Bird.

We conclude by stating that only the necessity of justifying our consistency and conduct in expressing our opinion and rendering our decision constrains us to come out in this way against the opinion of the dissenting justice, since he failed to express the reasons therein set forth in due season, that is to say, at the time the case was discussed, and then they would have been refuted, as we now do, after having ascertained the reasons upon which he bases his dissent to the judgment.